UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------- X

IN RE: HOLOCAUST VICTIM ASSETS
LITIGATION

Case No. CV 96-4849 (ERK)(MDG)
(Consolidated with CV 96-5161
and CV 97-461)

-------------------------------------------------------------

This Document Relates to: All Cases

**MEMORANDUM & ORDER** DEC 5 2008

------------------------------------------------------------- X

## MEMORANDUM & ORDER APPROVING THE DECISION ON APPEAL: IN RE ACCOUNTS OF LAZAR BUJAKER

KORMAN, C.J.:

As provided under the Settlement Agreement, and in accordance with the procedures established in the December 8, 2000 Memorandum & Order and in the Distribution Plan, Special Master Michael Bradfield is hereby requesting the Court's approval of the Decision on Appeal: In re Accounts of Lazar Bujaker (the "Decision"), which is attached hereto as Annex A and authorization of the transfer of $2,344,791.67 to be deposited in deposited in the Swiss Banks Settlement-Dormant Accounts-Payment Account from the Settlement Fund, which is needed to pay the revised award amount to the Appellant Alexander Bujaker.

Therefore, it is hereby

ORDERED that the Decision attached as Annex A is approved by the Court; and

ORDERED that the Signatories of the Settlement Fund are hereby directed to immediately transfer $2,344,791.67 from the Settlement Fund to the Swiss Banks Settlement-Dormant Accounts-Payment Account for payment of the Decision.

Dated: December 2, 2008
Brooklyn, New York

SO ORDERED:

s/Edward R. Korman
_____
Edward R. Korman
United States District Judge

WAI-2880632v1

# IN RE HOLOCAUST VICTIM ASSETS LITIGATION
## CASE NO. CV96-4849

In re Holocaust Victim Assets Litigation
Case No. CV96-4849

**Decision on Appeal**

to Appellant ▓▓▓▓▓▓▓▓▓

**in re Accounts of Lazar Bujaker**

Claim Number: 203608

On July 25, 2006, ▓▓▓▓▓▓▓▓▓ (the "Appellant") submitted a letter (the "Appeal Letter") appealing the finding of the Claims Resolution Tribunal ("CRT") -- <u>In re Claimed Account Owners Lazar Bujaker, Alexander Bujaker, 34-564 & 224</u> (the "Finding"), which was approved by this Court on May 10, 2006.[1] The Finding was with respect to the Appellant's claim for unpublished accounts of Lazar (Eliser) Bujaker (the "Account Owner").

The Appellant satisfies the requirements of Article 30(3) of the Rules Governing the Claims Resolution Process (the "Rules"), which states that appeals submitted without a plausible suggestion of error shall be summarily denied. The Appellant submitted additional documentation on appeal supporting his claim that the Account Owner held accounts at the Zurich branches of the *Schweizerische Bankgesellschaft* ("Bank 1") and the *Schweizerische Kreditanstalt* ("Bank 2") (together the "Banks").

## Conclusion of the Finding

The auditors who carried out the investigation of the Bank to identify accounts of Victims of Nazi Persecution pursuant to instructions of the Independent Committee of Eminent Persons ("ICEP" or the "ICEP Investigation") did not report an account belonging to Lazar Bujaker. The Finding concluded that as the CRT was not able to locate an account held by Lazar Bujaker in the Accounts History Database ("AHD"), it was not possible to issue an award. The Finding also indicated that the CRT conducted a search of the AHD for the account numbers and additional names provided by the Appellant in his Claim Form and Initial Questionnaire.

---

[1] All decisions on appeal are published, but where an appellant has requested confidentiality, as in this case, the names of the appellant, any relatives of the appellant other than the account owner, and the bank have been redacted.

## Information Provided by the Appellant in his Claim Form and Initial Questionnaire

### Background Information on the Account Owner and Accounts

In his Claim Form and Initial Questionnaire, submitted in 2001 and 1999, respectively, the Appellant stated that his great-uncle, Lazar Bujaker, who was born in 1897 and resided in Romania, held two Swiss bank accounts, one each at the Zurich branches of Bank 1 and Bank 2. The Appellant explained that his great-uncle held an account at Bank 1 containing SFr. 169,000.00, and a safe deposit box account at Bank 2 containing 10,000.00 United States Dollars in cash and approximately SFr. 11,950.00 worth of Swiss-made watches.[2] The Appellant stated that his great-uncle, who was Jewish, was a clock and jewelry dealer in Bucharest, Romania, and that he was not married and did not have children. The Appellant explained that his great-uncle regularly traveled to Zurich to purchase inventory for his business, and that his last two trips occurred in October and November of 1940, at which time he contacted a real estate agent and architect named Mr. Hennauer, whose address was Borsenstrasse 26. The Appellant further explained that his great-uncle planned to purchase a house in Zurich, and that these trips were made for this purpose. According to the Appellant, his father, Igor Alexander Bujaker, accompanied Lazar Bujaker on his November 1940 trip to Zurich, at which point the Appellant stated that his father witnessed Lazar Bujaker contact Bank 1 and Bank 2, and withdrawal from one of his accounts the sum of SFr. 10,000.00 to pay for a deposit on the property. The Appellant further stated that the purchase of the property was not finalized because his great-uncle was murdered in the early hours of January 23, 1941 by the Romanian Iron Guard, a fascist and overwhelmingly anti-Semitic revolutionary movement responsible for initiating a deadly pogrom against the Jews of Bucharest in January 1941.

### The 1947 Letter

The Appellant indicated that after the conclusion of the Second World War, Igor Alexander Bujaker, as Lazar Bujaker's sole heir, attempted to retrieve Lazar Bujaker's assets deposited in Switzerland, but was unsuccessful. The Appellant submitted with his Claim Form a letter, dated August 16, 1947 (the "1947 Letter"), to Igor Alexander Bujaker from his representative, who informed Igor Alexander Bujaker that the representative had inquired with the Banks as to Lazar Bujaker's accounts, and was told by Bank 1 that an account numbered 34-564 "had existed until the end of 1945," at which time it was closed "when all foreign and German accounts were seized."[3] This representative stated that Bank 1 did not reveal the amount in the account.

With respect to his efforts to access Lazar Bujaker's safe deposit box account at Bank 2, the representative stated in the 1947 Letter that Bank 2 acknowledged that such an account existed, but refused to open the account or to hand over to him the contents of the account due to confidentiality reasons. The representative further stated that he encountered resistance from the Banks with respect to his efforts to gain information about Lazar Bujaker's accounts, and

---
[2] Additional documentation provided by the Appellant indicates that both the SFr. 169,000.00 and 10,000.00 United States Dollars were held in the same account at Bank 1.
[3] Letter to Alexander Bujaker, August 16, 1947.

recommended that Igor Alexander Bujaker personally inquire at the Banks, as he assumed they may be more willing to talk directly to Lazar Bujaker's heir. In closing, the representative encouraged Igor Alexander Bujaker to contact a Swiss attorney named Dr. M. Moll, and indicated that a journey to Zurich would be worth the effort since "an amount of 220,000.00 Swiss Francs" was at issue.

The 1962 Letter

The Appellant also submitted a letter written by Igor Alexander Bujaker to a lawyer, Mr. Jaccober, on September 1, 1962 (the "1962 Letter"), in which Igor Alexander Bujaker explained that before the Second World War, including in 1940,[4] Lazar Bujaker regularly traveled to Zurich to purchase items for his business, including watches and instruments. Igor Alexander Bujaker indicated that Lazar Bujaker was his uncle, and that Lazar Bujaker had informed him that he held a demand deposit account at Bank 1, numbered 34-564, which was valued at SFr. 169,000.00 as of November 1940. Igor Alexander Bujaker stated that he accompanied Lazar Bujaker to Zurich in October and November 1940, at which time Lazar Bujaker opened a safe deposit box account at Bank 2, which ended in the numbers 224. Igor Alexander Bujaker indicated to Mr. Jaccober that he had first-hand knowledge of the opening of the account into which Lazar Bujaker deposited 10,000.00 United States Dollars[5] and a collection of 60 watches valued at SFr. 11,950.00. Igor Alexander Bujaker also described Bank 1 as being close to the main railway station in Zurich, and indicated that the safe deposit box was located in the basement of Bank 2. He also explained that during his uncle's last trip to Zurich in November 1940, he purchased property in the amount of SFr. 120,000.00, at which time he paid to the architect the sum of SFr. 10,000.00.

Igor Alexander Bujaker also explained in the 1962 Letter that he attempted to contact the Banks after the end of the War, but never received a response. He indicated that he contacted a man in Zurich named Paul Sibold Albrecht, who resided at Seefeldstrasse 263, requesting his assistance.[6] Igor Alexander Bujaker further explained that he attempted to contact the Banks in 1941, 1945, 1946 and 1947 with respect to his rights to Lazar Bujaker's accounts, as Lazar Bujaker's sole heir, and that he also contacted the Ministry of Trade in Bern, Switzerland, which he claims informed him in 1947 that the case would be investigated. Igor Alexander Bujaker also informed Mr. Jaccober that the Romanian authorities indicted him in 1959 for holding accounts in Switzerland.

Jenny Bujaker's Statement

According to a notarized statement given by the Appellant's mother, Jenny Bujaker, on September 4, 1997, she knew of Lazar Bujaker's deposits in Zurich in the amount of SFr. 223,950.00, as both he and Jenny Bujaker's husband, Igor Alexander Bujaker, had provided her the details. Jenny Bujaker explained that Lazar Bujaker began depositing money in Switzerland prior to 1940, as he needed funds to purchase watches and jewels bought in that country. Jenny

---

[4] Romania formally joined the Axis Alliance on November 20, 1940.
[5] In 1940, 1 United States Dollar was the equivalent of SFr. 4.41.
[6] According to the 1962 letter to Mr. Jaccober, Mr. Albrecht wrote to Alexander Bujaker twice in 1947. These letters are noted in the 1962 letter as being attached to that letter, but are not now available.

Bujaker further indicated that as a result of her husband's efforts to recover Lazar Bujaker's deposited assets at the Banks, the Romanian government intercepted and censored his mail, which culminated in her husband's arrest in September 1959 on the grounds that he held foreign currency in Switzerland.[7] Jenny Bujaker explained that in 1962 or 1963, after her husband's release from a Romanian prison in January 1960, she and her husband delivered documents with respect to their efforts to recover Lazar Bujaker's accounts to an official named George Balica at the British Embassy in Bucharest, who in turn handed the file over to a lawyer in London named "Jaccober," who was a specialist in East European Jewish issues.[8] Jenny Bujaker indicated that Mr. Jaccober died at some point after 1963, and that her husband was therefore never able to recover the documentation submitted to his office.

Jenny Bujaker also stated that in 1980, she and her husband were issued passports to travel to Western Europe, at which point they headed directly to Zurich in an attempt to access Lazar Bujaker's accounts. She claims that they were rebuffed in a hostile manner by the Banks and associated agencies they attempted to contact.

Additional Information

In addition to the information noted above, the Appellant submitted other documents in support of his claim, including a copy of a postcard dated February 23, 1940 sent by Lazar Bujaker in Zurich to a friend in Luzern, Switzerland; a copy of an article published in the Mozaic Cult Magazine in 1981, which lists Lazar Bujaker as a victim of the pogrom against Romanian Jews in January 1941; a copy of Jenny Bujaker's last will and testament, dated April 1, 1984, in which she leaves to her son, the Appellant, two accounts held at Bank 1 and Bank 2 valued at SFr. 223,950.00 as of 1940 that her husband, Igor Alexander Bujaker, inherited from his uncle, Lazar Bujaker; and a copy of a statement given by the Appellant on March 30, 1970 to the Romanian Ministry of Internal Affairs, indicating that Lazar Bujacker held two Swiss accounts in Zurich valued at approximately SFr. 225,000.00, the proceeds of which his father, as sole heir, never received.

**Information Provided by the Appellant on Appeal**

On appeal, the Appellant submitted additional documentation to support his claim, which he explains he attempted to obtain from the Romanian Archives while his claim was pending with the CRT, but which was not made available to him until July 2006. Specifically, the Appellant submitted a copy of an official indictment issued against his father by the Romanian government in 1959, which indicates that Igor Alexander Bujaker "illegally" held at the Banks in Switzerland two accounts, one at Bank 1 numbered 43-5648[9] containing 10,000.00 United

---

[7] Appellant says that his father had submitted documentation about the account to the Swiss embassy for transmission to the Swiss bank and that the Romanian government may have learned about the account through a leak at the Swiss embassy

[8] The letter written by the Appellant's father to Mr. Jaccober in 1962 indicates he was enclosing documentation with respect to his case, and that costs arising from Mr. Jaccober's efforts would be handled by Mr. Balica of London.

[9] The numerals in the account number as recorded in the indictment are not in the same order as they appear in other documentation provided by the Appellant, but the digits are the same.

States Dollars and SFr. 169,000.00[10], and a safe deposit box account, numbered 2249, held at Bank 2 containing watches and jewelry that were valued at SFr. 12,000.00.[11] The indictment indicates that the Romanian government obtained the information pertaining to the accounts from "banking documents in German" and "other mail" as well as from an heir certificate issued in December 1947, numbered 2457, with respect to the Appellant's father, which indicated that Igor Alexander Bujaker was the holder and heir of the deposits at issue as a result of the death of the original owner. The indictment further states that by holding assets abroad, the Appellant's father was "undermining" the national economy.

The Appellant also obtained a document issued by the State Security Council dated 4 March 1969, which confirms that Igor Bujaker was "deprived of freedom through an administrative act" from 26 September 1959 until 16 January 1960.

### Evidence of Swiss Bank Accounts Held by the Account Owner

In his Claim Form, Initial Questionnaire and Appeal Letter, the Appellant indicated that his uncle held an account at Bank 1 containing SFr. 169,000.00, and a safe deposit box account at Bank 2 containing 10,000.00 United States Dollars in cash and approximately SFr. 11,950.00 worth of Swiss-made wrist watches. The Appellant explained that after his uncle's murder in 1941 by the Romanian Iron Guard, the Appellant's father inherited the accounts, but never received the proceeds despite efforts to do so after the Second World War. The Appellant further explained that in 1959, the communist regime in Romania arrested and imprisoned his father as a result of his father's efforts to access the accounts, and, on appeal, provided copies of the indictment issued by the Romanian government against his father, and confirmation of his father's imprisonment, corroborating the information, described above, that the Appellant had provided in his Claim Form and Initial Questionnaire with respect to the accounts at issue. The indictment indicates that the Appellant's father held an account of unknown type at Bank 1 containing SFr. 169,000.00 and USD $10,000.00, and one safe deposit box at Bank 2 containing SFr. 12,000.00 worth of gold wrist watches. The value of these accounts at the time of Lazar Bujaker's death was SFr. 225,100.00.

### Issue of Who Received the Proceeds

With regard to the issue of whether the Account Owner or his heirs closed the account and received the proceeds themselves, although the Banks' records pertaining to the accounts no longer exist, it is nevertheless possible to conclude that the Account Owner or his heirs did not receive the proceeds of the accounts for the reasons described below.

---

[10] The 10,000.00 United States Dollars is indicated in the 1947 and 1962 letters written by Alexander Bujaker, as well as in the affidavits of Jenny Bujaker and the Appellant, as having been deposited in Lazar Bujaker's safe at Bank 2 rather than in his account of unknown type at Bank 1.

[11] The indictment appears to have rounded the value of the account as indicated in other documentation submitted by the Appellant from 11,950.00 Swiss Francs to 12,000.00 Swiss Francs.

### Efforts Made by Appellant's Father to Access the Accounts

The Account Owner died in 1941, and the Appellant's father, who was the Account Owner's heir, attempted to contact the Banks several times with respect to his entitlement to the accounts at issue, beginning after the death of the Account Owner. In 1947, the Appellant's father engaged a representative to assist him in his efforts to gain control over the Account Owner's accounts. In the 1947 Letter, the representative informed the Appellant's father that while the Banks had confirmed the existence of the accounts, the representative had encountered "resistance" from the Banks with respect to his efforts to gain information on behalf of the Appellant's father. The 1947 Letter also indicates that Bank 1 informed the representative that the account of unknown type had been "closed" in 1945, when "all foreign and German accounts were seized." The reference to a seizure of accounts may indicate that Bank 1 was implying that the account had been frozen rather than closed. However, there is no evidence that the account at issue was frozen, and a statement by Bank 1 with respect to the disposition of the account cannot be given decisive weight considering that the Swiss banks adopted a policy of not providing information, or providing inaccurate and misleading information, to victims of Nazi persecution seeking to access accounts after the Second World War. Although this policy was not formally adopted by the Swiss banks until 1954, actions by the banks consistent with that policy were nevertheless carried out prior to that time.[12]

The continued deposit recovery efforts of Appellant's father were the apparent cause of his indictment in 1959 on suspicion of holding accounts in a Swiss bank. Appellant has stated that his father's letters to the Swiss counsel in Bucharest concerning the recovery of his Swiss accounts were leaked to the Romanian authorities,[13] and that his father was released after four months in prison only after he convinced the Romanian authorities that his efforts to obtain dominion over the Swiss accounts had been unsuccessful. Regardless of the source of the information that resulted in the indictment, the actions by the Romanian authorities of briefly imprisoning Appellant's father constitute credible evidence of the existence of the accounts and that his father had not recovered the proceeds.

In a 1962 Letter written by the Appellant's father to his lawyer, Dr. Jaccober, the Appellant's father explained that he had made several written attempts in the post-War period to contact the Banks regarding the accounts, but that he had not received a response. The Appellant's father also indicated in the 1962 letter that the Romanian authorities indicted him in 1959, long after the Account Owner's death, for holding bank accounts in Switzerland; and that the indictment was based on evidence obtained by the Romanian government with respect to previous efforts made by the Appellant's father after the Second World War to obtain his uncle's assets at Bank 1 and Bank 2.

In 1970, the Appellant, under pressure from the Romanian authorities, in a statement dated March 30, 1970 to the Romanian Ministry of Internal Affairs, swore that while Lazar

---
[12] Independent Commission of Experts Switzerland—Second World War, Final Report: Switzerland, National Socialism and the Second World War 446 (2002).
[13] In a statement given by the Appellant's mother in 1997, she indicated that the Romanian government intercepted and censored her husband's mail, which included several attempts by the Appellant's father to contact the Banks regarding the accounts.

Bujaker held two Swiss accounts in Zurich valued at approximately SFr. 225,000.00, his father, as sole heir, never received the proceeds of these accounts. Additionally, the Appellant's mother's last will and testament, dated April 1, 1984, again indicates that the accounts in Switzerland had not been recovered since she leaves to her son two accounts held at Bank 1 and Bank 2 valued at SFr. 223,950.00 as of 1940 that her husband, Igor Alexander Bujaker, inherited from his uncle, Lazar Bujaker. Moreover, the Appellant's mother stated in a 1997 statement that in 1980 she and the Appellant's father were issued passports to travel to Western Europe, at which point they headed directly to Zurich in an attempt to access Lazar Bujaker's accounts, but they were rebuffed in a hostile manner by the Banks.

The Appellant's father and his family continued to make attempts to retrieve their relative's assets into the 1990s, including the submission of an Initial Questionnaire in 1999 prior to the commencement of the Claims Resolution Process the claim submitted to the Claims Resolution Process in 2001. The continued and consistent effort of the Appellant and his father over a period of 60 years supports the conclusion that the Account Owner's heirs did not receive the proceeds of the accounts. Considering the repressive nature of the Romanian regime of Nicolae Ceausescu, the persistent efforts of Appellant's father and of Appellant to obtain the Swiss account are impressive indeed, and clearly indicative of their failure to achieve this result.

Existence of the Swiss-Romanian Agreement

Additional support for the conclusion that the Account Owner or his heirs did not receive the proceeds of the accounts is suggested by the existence of an agreement between Switzerland and Romania, whereby unclaimed assets in Swiss banks of Romanian citizens were to be transferred to the Romanian government as part of a deal in which compensation would be paid by the Romanian authorities for Swiss property that had been nationalized by Romania's communist regime. As noted in several CRT decisions,[14] Swiss banks froze Romanian assets in 1948 pursuant to a Decree of the Swiss Federal Council. Romanian accounts were unfrozen in October 1950 and approximately one year later, in August 1951, Switzerland and Romania entered into an informal agreement, modeled after the formal agreements between the Swiss government and the governments of Poland and Hungary.

Given the death of the Account Owner in 1941; the indication in the 1947 Letter that the Appellant's father's representative encountered resistance from the Banks; the persecution of Jews in Romania; the indictment issued against the Appellant's father in 1959 for holding accounts at the Banks; the possibility that the Banks provided information about the accounts to the Communist authorities in Romania due to the Swiss-Romanian agreement; the existence of the Communist dictatorial regime in Romania, which acted as a barrier to the Account Owner's heirs from accessing the accounts after the Second World War; the consistency of the efforts made by the Appellant's father[15] and the Appellant from the 1940s through the present day to

---

[14] See *In re Account of Alfred and Marie Körner*; *In re Account of Samuel and Betty Leb*; *In re Accounts of Rachel Sperling and Julius Sperling*; *In re Account of F. Sufrin*; *In re Accounts of Stefan and Gisela Ullmann*; *In re Account of Iosif Varnay*; *In re Account of Theodor Victor*; and *In re Account of Avram Weinbaum*.
[15] Igor Alexander Bujaker died in 1984.

7/8

obtain the Account Owner's accounts; the description of the accounts held at the Banks in Jenny Bujaker's will from 1984; and the Swiss banks' practice of withholding or misstating account information to account owners and heirs after the War, it is plausible to conclude that the account proceeds were not paid to the Account Owner or his heirs.

**Conclusion**

Accordingly, the Appellant is awarded the Account Owner's account of unknown type at Bank 1 and safe deposit box account at Bank 2. The value of these accounts at the time of the Account Owner's death in 1941 was SFr. 225,100.00, and because these values derive from various contemporary and independent sources, including a 1947 letter from Dr. Jaccober to the Appellant's father in 1947, they are accepted as the value to be used in calculating the Award in this case. The current value of this amount is calculated by multiplying the original value by a factor of 12.5, in accordance with Article 31(1) of the Rules, to produce a total award amount of SFr. 2,813,750.00.

The Special Master is directed to make such payment to the Appellant from the Settlement Fund.

Recommended by:

*Michael Bradfield*

Michael Bradfield
Special Master

DATE: October 1, 2008