CLAIMS RESOLUTION TRIBUNAL

In re Holocaust Victim Assets Litigation
Case No. CV96-4849

**Certified Denial**

to Claimant [REDACTED],

to Claimant [REDACTED],
represented by [REDACTED]

to Claimant [REDACTED], Claimant [REDACTED],
and Claimant [REDACTED],
represented by the law firm of von Trott zu Solz Lammek[1]

and to Claimant [REDACTED]

in re Accounts of **Siegfried Levy, Sigfried Levy, Paula Levi,**
and *Schuhkonzern Aktiengesellschaft Zürich*

Claim Numbers: 213013; 213193; 400302; 501606; 501607; 501608; 753471[2]

FILED
IN CLERK'S OFFICE
US DISTRICT COURT E.D.N.Y.
★ DEC 2 8 2011 ★
BROOKLYN OFFICE

This Certified Denial is based upon the claims of [REDACTED], née [REDACTED], ("Claimant [REDACTED]") to the published accounts of Bertha Rothschild and Arthur Levi;[3] the claim of [REDACTED], née [REDACTED], ("Claimant [REDACTED]") to the published account of Paula Levi;[4] the claims of [REDACTED], [REDACTED], and [REDACTED] (the "[REDACTED] Claimants") to the published accounts of Siegfried Levy, Sigfried Levy, and Paula Levi; and the claim of [REDACTED], née [REDACTED], ("Claimant [REDACTED]")

---

[1] These claimants originally authorized Mr. Jost von Trott zu Solz to represent them. According to publicly available information, Mr. von Trott zu Solz passed away on 18 December 2009. Other members of the law firm of Trott zu Solz Lammek continue to represent these claimants.

[2] [REDACTED] ("Claimant [REDACTED]") did not submit a CRT Claim Form. However, in 1997 she submitted an ATAG Ernst & Young claim form ("ATAG Form"), numbered C-NYC-N-71-027-045-517, to the Claims Resolution Tribunal for Dormant Accounts in Switzerland ("CRT I"), which arbitrated claims to certain dormant Swiss bank accounts between 1997 and 2001. On 30 December 2004, the Court ordered that claims submitted to but not treated by either CRT I, the Independent Committee of Eminent Persons ("ICEP"), or ATAG Ernst & Young shall be treated as timely claims under the current Claims Resolution Process (the "CRT") as defined in the Rules Governing the Claims Resolution Process, as amended (the "Rules"). Order Concerning the Use of ICEP Claims as Claim Forms in the Claims Resolution Process for Deposited Assets (30 December 2004). Claimant [REDACTED]'s ATAG Form was forwarded to the CRT and has been assigned Claim Number 753471.

[3] In a separate decision, the account of Bertha Rothschild was awarded to [REDACTED] ("Claimant [REDACTED]"). See *In re Accounts of Bertha Rothschild* (approved on 3 June 2003). In another decision, the CRT treated Claimant [REDACTED]'s claim to the account of Arthur Levi. See *In re Account of Arthur Levi* (approved on 1 August 2008).

[4] In a separate decision, the accounts of Paula Levi were awarded to [REDACTED] ("Claimant [REDACTED]"). See *In re Accounts of Paula Levi* (approved on 17 November 2006).

(together the "Claimants") to the unpublished account of Siegfried Levi. This denial is to the published accounts of Siegfried Levy, Sigfried Levy, and Paula Levi and the unpublished accounts of *Schuhkonzern Aktiengesellschaft Zürich* ("*Schuhkonzern*"). The accounts of *Schuhkonzern* were held at the Zurich branch of the [REDACTED] (the "Bank").

All denials are published, but where a claimant has requested confidentiality, as in this case, the names of the claimants, any relatives of the claimants other than the account owner, and the bank have been redacted.

**Information Submitted by the Claimants**

The Claimants, who are related to one another, submitted claim forms identifying Siegfried Levi as their relative. Claimant [REDACTED] stated that Siegfried Levi, [REDACTED], and [REDACTED], née [REDACTED], were the siblings of her paternal grandfather, [REDACTED]. Claimant [REDACTED] stated that Siegfried Levi was her maternal grandfather and that [REDACTED] was his wife. Claimant [REDACTED] stated that [REDACTED] and Paula Levi, née [REDACTED], were her late husband's parents. The [REDACTED] Claimants, who are brothers, stated that Siegfried Levi was their maternal grandfather and that he married [REDACTED], née [REDACTED], in the 1920s in Stuttgart, Germany.[5]

According to the information submitted by the Claimants and information obtained by the CRT from archival and other public sources, Siegfried Levi, who was Jewish, was born on 6 February 1880 in Stuttgart. Levi had a daughter, [REDACTED] (Claimant [REDACTED]'s mother), who was born in 1907 in Stuttgart, from a relationship with [REDACTED], who passed away in 1923.[6] In 1926, Levi married [REDACTED], who was born on 2 June 1902 in Frankfurt an der Oder, Germany. Siegfried and [REDACTED], who resided in Stuttgart and Berlin, had one child, [REDACTED] (the [REDACTED] Claimants' mother), who was born in Berlin, Germany, in 1925. That same year, Siegfried Levi purchased Stettenfels Castle, which is situated above the town of Untergruppenbach, in the Heilbronn region near Stuttgart, and established a widely recognized stud farm upon its property.[7]

Siegfried Levi was the sole owner of *Schuhfabrik Luwal Aktiengesellschaft* ("*Luwal*"), a shoe manufacturing company located in Luckenwalde, Germany, (approximately 60 kilometers south of Berlin), which was capitalized at 600,000.00 Reichsmark ("RM"), consisting of RM 10,000.00 in preferred shares held personally by Levi, and RM 590,000.00 in common shares

---

[5] As noted above, the [REDACTED] Claimants claimed the published accounts of Paula Levi. In their claim forms, they identified this account owner as [REDACTED], née [REDACTED] (their maternal grandmother and wife of Siegfried Levi). However, the records clearly show that the owner of this account was not [REDACTED], née [REDACTED], but Paula Levi, née [REDACTED], who was the mother-in-law of Claimant [REDACTED] and the great-aunt of Claimant [REDACTED], Claimant [REDACTED], and the [REDACTED] Claimants. As noted above, these accounts were awarded to Claimant [REDACTED] in a previous decision.

[6] See http://www.alemannia-judaica.de/images/Images%20Bayern/SALAMANDER-LEVI.pdf (last viewed on 9 December 2011).

[7] See *http://www.burg-stettenfels.de/en/burg_historie.asp* (last viewed on 9 December 2011).

held by *Schukonzern*, a Swiss joint stock company that in turn was wholly owned by Levi.[8] Levi, together with other family members, including his siblings [REDACTED] and [REDACTED], was also a part-owner of the shoe and leather company *Salamander Aktiengesellschaft* ("*Salamander*") of Kornwestheim and Berlin, Germany. Siegfried was also the majority owner of the shoe company *Württembergische Schuhfabrik GmbH* of Faurndau (near Goppingen), Germany.

Siegfried's wife and daughter Levi left Germany for Southwest Africa (today Namibia) in July 1936, and Siegfried joined them there in May 1937.[9] By the end of 1938, *Schuhkonzern* had been dissolved,[10] and *Luwal*, *Salamander*, and *Württembergische Schuhfabrik* were "aryanized" through compulsory sale to non-Jewish owners. As detailed below, after the War, Siegfried Levi and other members of his family pursued claims in German courts for the restitution of assets which had been seized or forcibly sold during the Nazi era, including the three German companies noted above, Stettenfels Castle and other real estate, German bank accounts, insurance policies, as well as restitution of discriminatory taxes, including "flight tax" (*Reichsfluchtssteuer*) and atonement tax (*Judenvermögensabgabe*).

Siegfried Levi died in Johannesburg, South Africa, on 13 October 1954. His daughters [REDACTED] and [REDACTED] died in 1979 in Johannesburg and in 1985 in the United States, respectively. [REDACTED] died in Bedfordview, South Africa, on 31 July 1992.

Claimant [REDACTED] was born on 15 October 1923 in Stuttgart; Claimant [REDACTED] was born on 23 July 1939; Claimant [REDACTED] was born on 6 November 1939 in Cambridge, Massachusetts; and Claimants [REDACTED], [REDACTED] and [REDACTED] were born on 5 January 1948, 29 January 1951, and 9 June 1953, respectively, all in Johannesburg.

In support of her claims, Claimant [REDACTED] submitted [REDACTED]'s will, dated 3 May 1948 in Decatur, Michigan, naming [REDACTED]'s brother, [REDACTED], as her sole heir, and recommending that her brother, Siegfried Levi, as well as the heirs of her deceased sister, [REDACTED], and her deceased brother, [REDACTED], should share in any recovery of her assets that had been seized or forcibly sold in Nazi Germany.

---

[8] According to the Swiss corporate register, *Schuhkonzern* was a joint-stock company (*Aktiengesellschaft*) created when the board of directors of *Schuhfabrik Hornussen Aktiengesellschaft*, a shoe factory in Hornussen, Switzerland, decided on 18 November 1927 to discontinue shoe production, revise the corporate statutes, move the business to Zurich, and change the company name to *Schuhkonzern Aktiengesellschaft Zürich*. The Swiss corporate register indicates that *Schuhkonzern*'s purpose was to acquire and manage investments in businesses in the shoe industry, that its share capital was SF 100,000.00, consisting of 100 shares of SF 1,000.00 nominal value each. The available documentation does not indicate how Siegfried Levi came to be the *Schuhkonzern*'s sole owner. For general information about Swiss holding companies during this time, *see* Serge Paquier, "Swiss holding companies from the mid-nineteenth century to the early 1930s: the forerunners and subsequent waves of creations," in *Financial History Review*, vol. 8, part 2, October 2001.

[9] The territory of present-day Namibia was colonized by Germany from the end of the nineteenth century until its annexation to South Africa in 1920, followed by independence in 1990.

[10] Extracts from the Zurich corporate register show that *Schuhkonzern* was dissolved and expunged from the corporate register on 6 December 1938, pursuant to a resolution dated 3 December 1938.

Claimant [REDACTED] submitted the death certificate of her husband, [REDACTED], indicating that he died on 16 November 2000 in New York, New York, that he was born in Germany, that his parents were [REDACTED] and Paula Levi, née [REDACTED], and that he was married to Claimant [REDACTED]; and a certificate of inheritance, issued on 5 May 2003 by the district court in Frankfurt am Main, Germany, indicating that [REDACTED], née [REDACTED], was the wife and sole heir of [REDACTED].

In support of their claims, the [REDACTED] Claimants' legal representative submitted documents, including:

(1) an unsigned transcription of Siegfried Levi's will, dated 9 September 1954 in Johannesburg and Siegfried Levi's certificate of inheritance, issued on 19 April 1955 by the probate court (*Nachlassgericht*) in Stuttgart, together indicating that Siegfried Levi died on 13 October 1954 in Johannesburg and that his wife, [REDACTED], was his sole heir and executor of his estate;

(2) [REDACTED]'s certificate of inheritance, issued on 28 August 2003 by the local court (*Amtsgericht*) in Frankfurt am Main, Germany, indicating that she died on 31 July 1992 in Bedfordview, and that her sole heirs were the [REDACTED] Claimants;

(3) selected excerpts of Luwal annual reports and reports of *Luwal* shareholder meetings from the 1930s; and

(4) extracts from the Luckenwalde corporate registry and the state archives of Brandenburg, Germany, including extracts of reports prepared for the Reich's foreign exchange office (*Devisenstelle*), concerning Siegfried Levi and *Luwal*.

The [REDACTED] Claimants' legal representative also submitted a partial decision (*Teilbescheid*) of the Brandenburg Regional Authority for Settlement of Unresolved Property Issues (*Landesamt zur Regelung offener Vermögensfragen Brandenburg*, the "*Landesamt*"), dated 19 November 1998 (the "1998 Partial Decision"), concerning claims to assets that formerly belonged to *Luwal*. The 1998 Partial Decision was issued upon application by the Conference on Jewish Material Claims against Germany (the "Claims Conference").[11]

As set forth in the 1998 Partial Decision, *Luwal* was formerly located in Luckenwalde at Treuenbrietzener Strasse 78, which is now known as Rudolf-Breitscheid-Strasse 78. Prior to 1938, *Luwal*'s capital consisted of 590,000 common shares and 10,000 preferred shares, with a nominal value of 1.00 *Reichsmark* ("RM") each. In the decision, the *Landesamt* noted that, according to a declaration of assets as of 1 January 1936 submitted to the Regional Tax Authority in Stuttgart, both the preferred shares as well as all the common shares of *Luwal* were in the sole possession of Siegfried Levi of Stuttgart. The *Landesamt* noted that the *Luwal* common shares were held by a Swiss holding company, *Schuh-Konzern AG-Zürich*, and that Siegfried Levi had, with permission of the Foreign Exchange Control Office Stuttgart, acquired

---

[11] Following the reunification of Germany in 1990, laws were enacted for the restitution of property that had been nationalized in the former East Germany. After the expiration of claim filing deadlines in Germany on 31 December 1992 for real estate and 30 June 1993 for movable property, the Claims Conference became the legal successor to unclaimed Jewish assets in the former East Germany. Under the Claims Conference's Goodwill Fund, established in 1994, former Jewish owners and their heirs who had missed the German deadlines could apply for the proceeds of restituted properties or compensation payments that the German restitution authorities had awarded to the Claims Conference, minus a fee for services. Under this scheme, eligible applicants such as the [REDACTED] Claimants received approximately 80 percent of any amount awarded to the Claims Conference.

these common shares in exchange for his claim on the *Schuhkonzern* in the amount of 381,856.95 Swiss Francs ("SF"). As Siegfried Levi owned all *Luwal*'s outstanding shares, the Nazi regime considered *Luwal* to be a 100 percent Jewish-owned company.

In the 1998 Partial Decision, the *Landesamt* noted that *Luwal* was aryanized in 1938. According to the aryanization contract, dated 14 July 1938, Theodor Loeben of Luckenwalde acquired the 10,000 preferred *Luwal* shares and 390,000 of the common shares, and Dr. Albert Mülhaus of Hanover acquired the remaining 200,000 common shares. The total amount paid by the two purchasers combined was RM 240,000.00, or 40 percent of the share's nominal value of RM 600,000.00. According to the contract, the sale of *Luwal* meant that the entire capital of the company was transferred into "Aryan" hands ("*wurde das gesamte Aktienkapital in arische Hände überführt.*")

As detailed in the 1998 Partial Decision, on 12 June 1946 *Luwal*, which was located in what was to become the former German Democratic Republic (East Germany), was nationalized without compensation on the order of the Soviet Military Administration of Germany (SMAD). This order was upheld on 6 March 1948 by the Regional Government of Brandenburg.

In its decision, the *Landesamt* also noted that in 1953, as part of West German post-War restitution program, settlements relating to the *Luwal* shares were agreed between Siegfried Levi and the aryanizers of *Luwal*. According to those settlements, Siegfried Levi received 20,000.00 Deutsche Mark ("DM") from Theodor Loeben and DM 10,000.00 from Dr. Albert Mülhaus as compensation for the fact that the aryanizers had not paid Siegfried Levi full value for his *Luwal* shares. The total of DM 30,000.00 received represented RM 300,000.00, at the exchange rate of DM 1.00 equals RM 1.00.[12]

The *Landesamt* noted that Siegfried Levi's heirs brought a further equalization proceeding before the Stuttgart Compensation Office (*Ausgleichsamt Stuttgart*). In a 16 November 1976 decision, that Office held that Siegfried Levi had suffered damages in the amount of RM 1,290,000.00

---

[12] The DM 1.00 to RM 1.00 exchange rate is evidenced in Levi's claim against Theo Loeben dated 17 May 1952 filed before a Stuttgart court (*Amtsgericht*), in which Levi sought the difference (RM 240,000.00) between the amount Loeben paid (RM 160,000.00) and the actual value of the Luwal shares that Loeben "purchased" during the aryanization process (RM 400,000.00). The claim notes that this amount (RM 240,000.00) was equal to DM 24,000.00, at the exchange rate of 10:1. Levi ultimately settled his claim against Loeben for DM 20,000.00, which represents a one-sixth deduction (DM 4,000.00 or RM 40,000.00) from the full amount sought (DM 24,000.00 or RM 240,000.00). The same deduction and exchange rate was applied to Levi's settlement with Albert Mühlhaus for the difference (RM 120,000.00) between the amount Mühlhaus paid (RM 80,000.00) and the actual value of the Luwal shares that Mühlhaus "purchased" during the aryanization process (RM 200,000.00). A note to file regarding the Mühlhaus settlement dated 25 February 1960 states that the amount Mühlhaus paid in the settlement also included a one-sixth deduction. Thus, Levi settled his claim against Mühlhaus DM 10,000.00, which represents a one-sixth deduction (DM 2,000.00 or RM 20,000.00) from the full amount sought (DM 12,000.00 or RM 120,000.00). The German original reads: "*Zur Begründung dürfen wir zunächst auf unseren Sachvortrag in Sachen Levi – Löben Bezug nehmen, insbesondere auf den von uns erbrachten Nachweis, dass die entzogenen Aktien z.Zt. der Entziehung zumindest pari gestanden und somit entgegen dem tatsächlichen Kaufpreis von 40% mit 100% hätten bewertet werden müssen. Da Herr Dr. Mühlhaus insgesamt 200.000,-- RM Stammaktien für einen Betrag von 80.000,-- RM erworben hat, somit ein Nachzahlungsanspruch von 120.000,-- RM besteht, sind wir bereit, ... Herrn Dr. Mühlhaus einen Abstrich von 1/6 = 2.000,-- DM zu gewähren, sodass die Vergleichssumme bei Kostenvergleichung auf 10.000,-- DM zu stehen käme....*" [omissions in original]. The CRT notes that both settlements (with Loeben and with Mühlhaus) valued the *Luwal* shares at their nominal value.

through the forced sale of *Luwal*. That office determined that on basis of the Federal Restitution Law (*Bundesrückerstattungsgesetz*), Siegfried Levi had already received DM 30,000.00 in compensation for these damages (settlements of 20 July 1953 and 20 November 1953). As noted above, this DM 30,000.00 represented RM 300,000.00.

In the 1998 Partial Decision, the *Landesamt* noted that *Luwal*, was transformed into a limited liability company (*GmbH*) in 1990, and went into liquidation on 18 May 1993. In 1992 and 1993, two companies acquired the firm's real estate assets under the investment subsidy legislation relating to business assets in the former East Germany.

As detailed in the 1998 Partial Decision, the *Landesamt* determined that restitution of two of the three pieces of Luckenwalde property formerly held by Luwal was impossible, as the real estate had since been purchased by bona fide purchasers, and that restitution of the company itself was also impossible, as the company was now defunct.[13] Therefore, the claim for restitution of the assets that could not be restituted would be treated according to the compensation law for victims of Nazi persecution (*NS-Verfolgtenentschädigungsgesetz BGBl. 1994 Teil I S. 2623*). The *Landesamt* stated that the type and amount of compensation would be determined by authorities in Berlin (*Oberfinanzdirektion - Budesvermögensverwaltung*) in a separate decision.

According to a summary provided by the Claims Conference at the CRT's request, following the 1998 Partial Decision, German restitution authorities rendered decisions resulting in seven payments to the Claims Conference totaling 2,578,117.22 EURO ("€") for real estate and other assets of *Luwal*, of which the Cassel Claimants received € 2,039,234.03.[14]

According to archival records obtained by the CRT, after the War Siegfried Levi also secured the return of Stettenfels Castle and compensation for or restitution of other assets, including the value of shares he held in both *Salamander* and *Württembergische Schuhfabrik*, and personal and commercial real estate. The CRT notes that there is no evidence that Levi sought compensation of or restitution for other assets that may have been held by *Schuhkonzern*. After Levi's death, his widow and sole heir, [REDACTED], obtained additional compensation for flight tax and atonement tax that had been assessed against her and her husband, for German bank accounts belonging to them that had been confiscated; and for costs of the family's forced immigration to Southwest Africa.

---

[13] The *Landesamt* reserved its decision regarding restitution of the third piece of property. According to summary information provided to the CRT, title to this third piece of property was later transferred to the Claims Conference, which sold the property for the amount of € 20,569.48. In a similar manner, title to two other pieces of property was transferred to the Claims Conference and subsequently sold. The proceeds of these properties are included in the reference to seven "payments" received by the Claims Conference as a result of its claim. See discussion *infra*. The Claims Conference provided the CRT with a copy of the decision dealing with one of these payments. That decision addressed further assets belonging to *Luwal* ("*weiteren Vermögenswerte des Unternehmens*") that resulted in a payment of € 868,283.12, of which the [REDACTED] Claimants subsequently received € 694,329.96. This decision details further assessments of the losses associated with the aryanization of *Luwal*. See Letter to the Claims Conference from the Federal Office for Central Services and Unresolved Property Issues (*Bundesamt für zentrale Dienste und offene Vermögensfragen*), 27 June 2006.

[14] As noted above, included among these seven "payments" is the amount of € 20,569.48 received by the Claims Conference as proceeds from the sale of property that was restituted outright, as well as the amounts received as proceeds from the sale of other property that was restituted outright. See *supra*, note 13.

**Information regarding *Schuhkonzern*'s Accounts Available in the Bank's Records and Archival Sources**

The CRT notes that the auditors who carried out the investigation of Swiss banks to identify accounts of Victims of Nazi Persecution pursuant to instructions of the Independent Committee of Eminent Persons ("ICEP" or the "ICEP Investigation") did not report an account belonging to *Schuhkonzern* during their investigation. The documents evidencing the existence of accounts held at *Schuhkonzern* were submitted by the Claimant and obtained by the CRT from archival sources. Pursuant to Article 6 of the Rules, the CRT requested the voluntary assistance of the Bank to obtain additional information these accounts ("Voluntary Assistance"). The Bank provided documents consisting of customer account cards and mostly illegible handwritten account ledger extracts. These records indicate that *Schuhkonzern* held three accounts: a custody account numbered 5751, and a custody account and related demand deposit account under the account relationship number 26252. According to these records, the accounts were opened in 1928.

Notations on the customer account cards dated 24 January 1934 indicate that correspondence relating to a line of credit issued by the Bank to *Schuhkonzern* was to be sent to Siegfried Levi of Stuttgart, Germany, in care of Theo Loeben at *Luwal* in Luckenwalde, and that copies of any remaining general correspondence were to be sent to *Luwal*. Another undated notation indicates that attorney Dr. Max Schneider of Zurich was to receive copies of account correspondence.

With regard to the custody account numbered 5751, the Bank's records show that this account held a guarantee (*Bürgschaft*) extended by Siegfried Levi for a line of credit issued by the Bank to *Schuhkonzern*.[15] Specifically, the records show that on 24 February 1928, Siegfried Levi, who resided at Königstrasse 33 in Stuttgart, guaranteed a line of credit for *Schuhkonzern* in the amount of SF 300,000.00. The extracts from the Bank's handwritten ledger sheets are mostly illegible, but do show the amounts owed on various dates. The Bank's records indicate that custody account number 5751 was closed on 31 December 1936. According to a report prepared by the Chief Finance President of Brandenburg in the Berlin foreign currency control office (*Oberfinanzpräsident Brandenburg in Berlin-Devisenstelle*) and dated 23 August 1937, Siegfried Levi's declaration of guarantee (*Bürgschaftserklärung*) with regard to the credit of SF 300,000.00 extended to *Schuhkonzern* was returned to the company in a letter dated 14 January 1937 after the credit had been covered by the Bank.[16]

With regard to the custody account and demand deposit account held by *Schuhkonzern* under the account relationship number 26252, the Bank's records only show that the accounts were opened by 1928 and that they were closed on 2 March 1938.

---

[15] The CRT notes that a *Bürgschaft* is a guarantee by a third party to a lender to assume responsibility for the debt obligation of a borrower if the borrower defaults. Such guarantees were generally documented with a declaration of guarantee (*Bürgschaftserklärung*). In this case, the records indicate that this declaration was physically held by the Bank in custody account numbered 5751.

[16] Report of the Chief Finance President of Brandenburg in Berlin foreign exchange office (*Oberfinanzpräsident Brandenburg in Berlin-Devisenstelle*), 23 August 1937, p. 9. The German original reads: "*Die Bürgschaftserklärung wurde der Firma nach der Abdeckung des Kredits durch den* [Bank] *mit Schreiben vom 14. Januar 1937 zurückgesandt.*"

In a 19 December 1936 asset report prepared in anticipation of his emigration and obtained by the CRT from archival sources, Siegfried Levi listed among his assets shares of *Schuhkonzern* which he valued at RM 215,000.00. He explained that *Schuhkonzern* was a holding company which held *Luwal* common shares worth RM 590,000.00. In this report, Levi noted that he did not include among his list of assets a claim he had against the company *Titania AG* in Budapest (whose shares were in the possession of *Schuhkonzern*) in the amount of approximately 10,000.00 Hungarian Pengo, because he would likely not be able to recover that amount, as the company had been in liquidation since 1931.[17] In the report, Levi also noted that *Schuhkonzern* owed a debt on its current (demand deposit) account (*Kontokorrentforderung*) in the amount of SF 20,651.00, which he stated was equivalent to RM 16,720.00. Based upon the information in the report, Levi apparently guaranteed and/or covered this debt, so that he listed this amount as a debt (*Forderung*) owed to him.

In a declaration of assets (*Vermögensverzeichnis*) dated 27 October 1937 and prepared by Stuttgart attorney Dr. Alfred Schweizer on behalf of Siegfried Levi (who by this time was already in Africa), Schweizer included the *Schuhkonzern* shares in a list of securities (*Wertpapiere*) owned by Levi. Schweizer did not include a value for these shares. In fact, Schweizer wrote that the shares of *Schuhkonzern* had no value ("*Die Aktien der Schuhkonzern AG. sind wertlos*"), and that the only assets held by the firm were the *Luwal* common shares with a nominal value of RM 590,000.00. Schweizer noted that the *Luwal* preferred shares with a nominal value of RM 10,000.00 were held by Siegfried Levi personally. Schweizer also wrote that the RM 590,000.00 (nominal value) of *Luwal* common shares held by *Schuhkonzern* were pledged as security (*verpfändet*) to the Bank for a debt in the amount of approximately SF 42,000.00 owed to the Bank by *Schuhkonzern*. It is not clear from the documents, but this amount may be related to the remaining part of the line of credit (originally in the amount of approximately SF 300,000.00) for which Levi had provided a declaration of guarantee and that was later covered by the Bank when the declaration was returned to the company in January 1937 (*see* discussion *supra*).

According to Schweizer, negotiations were underway to have the *Reichsbank* pay this debt owed by *Schuhkonzern* to the Bank in exchange for a payment already made by Siegfried Levi on 18 September 1937 to the *Deutsche Golddiskont-Bank* in the amount of RM 100,000.00.[18] Upon payment of the debt owed to the Bank and subsequent release of the *Luwal* shares from the pledge to the Bank, *Schuhkonzern* agreed to transfer the shares to a blocked account (*Sperrdepot*) at a German bank in the name of Siegfried Levi. Schweizer noted that, at that time, Siegfried Levi would hold the entire share capital of *Luwal*, and that he planned to sell the shares with the approval of the foreign currency control office (*Devisenstelle*). Schweizer noted that the *Luwal* shares were to be valued at RM 600,000.00.

---

[17] Asset Report of Siegfried Levi, 19 December 1936, p. 8. The German original reads: "*In der Vermögensaufstellung ist meine dubiose Forderung an die seit 1931 in Liquidation befindliche Titania AG in Budapest nicht aufgeführt; sie betägt heute rd. 10,000.—Pengö. Die Liquidation dieser Gesellschaft, deren Aktien sich im Eigentum der Schuhkonzern AG Zürich befinden, ist noch nicht beendet.*" The CRT notes that the pengo was the currency of Hungary between 1 January 1927, when it replaced the korona, and 31 July 1946, when it was replaced by the forint.

[18] The CRT notes that this arrangement was likely set up to conform to *Reich* foreign currency regulations regarding the transfer of currency abroad.

According to a report dated 25 March 1938 of the *Luwal* board regarding the business year 1937/38, the RM 590,000.00 nominal value common shares of *Luwal* that had belonged to *Schuhkonzern* had been delivered to an account at the *Deutsche Bank und Diskonto-Gesellschaft* in Stuttgart.

**The CRT's Analysis**

<u>The Published Accounts</u>

As noted above, the [REDACTED] Claimants claimed the published accounts of Siegfried Levy, Sigfried Levy, and Paula Levi; Claimant [REDACTED] claimed the published account of Paula Levi; and Claimant [REDACTED] claimed the unpublished account of Siegfried and Wiggi Levi.

The list below contains the names of account owners that match the names of the Claimants' relatives, Siegfried Levi and [REDACTED], née [REDACTED], and the reasons why the CRT has concluded that they and an account owner are not the same person. If an account owner's place of residence was published, that place of residence is also listed.[19]

*Published Name and Residence on ICEP List: Siegfried Levy (Poland)*
*Account Identification Number: 4019885*
*Specifically, according to the information submitted by the Claimants and obtained by the CRT, the Claimants' relative, Siegfried Levi, resided in Germany and Southwest Africa (today Namibia). In contrast, the records show that the owner of account 4019885 resided in Poland.*

*Published Name and Residence on ICEP List: Sigfried Levy (Kassel, Germany)*
*Account Identification Number: 5024268*
*Specifically, according to the information submitted by the Claimants and obtained by the CRT, the Claimants' relative, Siegfried Levi, resided in Stuttgart and Berlin, Germany, and in Southwest Africa, and was married to Hedwig Levi from the 1920s until his death in 1954. In contrast, records show that the owner of account 5024268 resided in Kassel, Germany, and that he was married to a different person.*

*Published Name on 2005 List: Paula Levi*
*Account Identification Numbers: 1014629, 1014629.1, 1014629.2, 1014629.3, 1014643, 1014643.1*

---

[19] The CRT matched the name of the Claimants' relatives, Siegfried Levi and [REDACTED], née [REDACTED], to the names of all account owners in the Account History Database ("AHD") and identified accounts belonging to individuals whose names match, or are substantially similar to, the name of the Claimants' relatives. In doing so, the CRT used advanced name matching systems and computer programs, and considered variations of names, including name variations provided by Yad Vashem, The Holocaust Martyrs' and Heroes' Remembrance Authority, in Jerusalem, Israel, to ensure that all possible name matches were identified. However, a close review of the relevant bank records indicated that the information contained therein was inconsistent with the information the Claimants provided regarding their relatives, Siegfried Levi and [REDACTED]. Accordingly, the CRT was unable to conclude that any of these accounts belonged to the Claimants' relatives, Siegfried Levi and [REDACTED].

*As noted above, the [REDACTED] Claimants identified this account owner as their maternal grandmother, [REDACTED], née [REDACTED], whom Claimant [REDACTED] also identified as her maternal grandfather's second wife, [REDACTED]. However, the owner of accounts 1014629, 1014629.1, 1014629.2, 1014629.3, 1014643, 1014643.1 is actually the great-aunt of Claimant [REDACTED], Claimant [REDACTED], and the [REDACTED] Claimants, namely, Paula Levi, née [REDACTED], whose accounts were awarded to Claimant [REDACTED] in an award approved on 17 November 2006.[20]*

The Unpublished Account of *Schuhkonzern*

The Bank's records indicate that *Schuhkonzern* held three accounts at the Bank: a custody account numbered 5751, which was closed on 31 December 1936; and a custody account and a demand deposit account held under the account relationship number 26252, which were closed on 2 March 1938.

With regard to the custody account numbered 5751, as noted above, the Bank's records show that this account held a declaration of guarantee (*Bürgschaftserklärung*) extended by Siegfried Levi for a line of credit in the amount of approximately SF 300,000.00 issued by the Bank to *Schuhkonzern*. There is no evidence that the account contained any assets. According to a report prepared dated 23 August 1937, this declaration of guarantee was returned to the company in a letter dated 14 January 1937 after the credit had been covered by the Bank. The CRT therefore concludes that this account, which contained only the declaration of guarantee, was closed properly on 31 December 1936 after the outstanding credit was covered, and that the declaration of guarantee was returned shortly thereafter on 14 January 1937.

With regard to the custody account and demand deposit account held under the account relationship number 26252, the CRT concludes that the custody account held the RM 590,000.00 (nominal value) in Luwal common shares, and that the demand deposit account had been established to receive any dividend payments due on the shares.

The CRT notes that in his 19 December 1936 asset report, Siegfried Levi valued his shares of *Schuhkonzern* at RM 215,000.00, and explained that *Schuhkonzern* was a holding company which held *Luwal* common shares worth RM 590,000.00. In this report, Levi also noted that *Schuhkonzern* also held shares of the company *Titania AG* in Budapest, but that this company had been in liquidation since 1931, so that he considered these assets to be without value. As detailed above, in the declaration of assets dated 27 October 1937, Schweizer included the *Schuhkonzern* shares in a list of securities owned by Levi. Schweizer stated that the shares had no value, that the only assets held by the firm were the *Luwal* common shares with a nominal value of RM 590,000.00, and that these shares were pledged as security to the Bank for a debt in the amount of approximately SF 42,000.00 owed to the Bank by *Schuhkonzern*. Schweizer noted that upon payment of this debt, *Schuhkonzern* agreed to transfer the shares to an account at a German bank in the name of Siegfried Levi. As noted above, according to a report dated 25 March 1938 of the *Luwal* board, these shares had been delivered to an account at the *Deutsche Bank und Diskonto-Gesellschaft* in Stuttgart. The CRT therefore concludes that the *Luwal* shares, which comprised the sole asset of value in the account, were transferred to an account in

---

[20] See *supra*, note 5.

Germany in the name of Siegfried Levi, and the account, along with the related demand deposit account, was subsequently closed.

With regard to the value of the *Luwal* shares and the value of any dividends that may have accumulated in the demand deposit account, the CRT notes that after the War, Siegfried Levi and his heirs pursued numerous claims to reclaim the value of *Luwal*. As detailed in the 1998 Partial Decision, the aryanizers "purchased" the shares for RM 240,000.00, or 40 percent of the total RM 600,000.00 nominal value of the shares. In 1953, Siegfried Levi received a total of DM 30,000.00, which represented the *Reichsmark* equivalent of RM 300,000.00. The 1998 Partial Decision noted that in 1976, the Stuttgart Compensation Office held that Levi had suffered damages in the amount of RM 1,290,000.00 through the forced sale of *Luwal*, and that he had already received DM 30,000.00 (RM 300,000.00) in 1953 as compensation for these damages.

As noted above, the 1998 Partial Decision formed the basis for seven additional payments to the Claims Conference issued as compensation for the loss of Luwal. These payments totaled € 2,578,117.22, of which the [REDACTED] Claimants received € 2,039,234.03.[21] The CRT notes that *Landesamt* in Brandenburg, which issued the 1998 Partial Decision, carefully reviewed the history of *Luwal*, and that the subsequent payments covered both real estate and other assets owned by the company. The CRT also notes that the *Luwal* shares that had been in custody account 26252 at the Bank did not have any intrinsic value, but rather represented the value of the company. Given that the value of the company was extensively reviewed and considered by the *Landesamt* in reaching its decision, and that payments totaling € 2,578,117.22 – in addition to the payments equaling RM 540,000.00 previously received by Levi – were made as compensation for the losses associated with the aryanization of *Luwal*, the CRT concludes that Siegfried Levi and/or his heirs were fully compensated for the value of the *Luwal* shares, as well as any dividends that might have accumulated. Therefore, no additional award is appropriate.

With regard to all three accounts, the CRT notes in all the claims for restitution and compensation filed after the War by Siegfried Levi and his heirs, no claim was made for any other assets held by *Schuhkonzern*. This strongly supports the conclusion that the *Schuhkonzern* accounts at the Bank did not contain any assets other than the *Luwal* shares, the value of which were fully restituted to Siegfried Levi's heirs. Accordingly, and given the considerations listed above, no award is appropriate in this case.

**Right of Appeal**

Pursuant to Article 30 of the Rules, the Claimants may appeal this decision within thirty (30) days of the date of the letter accompanying this decision. Any appeal must be based upon a plausible suggestion of error regarding the CRT's conclusions. Any appeal which is submitted

---

[21] The CRT notes that on 31 December 1998, the European Central Bank fixed the irrevocable exchange rate, effective 1 January 1999, for German *Deutschmark* to EUROs as DM 1.95583 = € 1.00. Therefore, the € 2,578,117.22 amount received by the Claims Conference with regard to its claim for *Luwal* was equal to DM 5,042,359.00. *See* European Central Bank Press Release, 31 December 1998, available at http://www.ecb.int/press/pr/date/1998/ html/pr981231_2.en.html (last viewed on 21 December 2011).

without a plausible suggestion of error shall be summarily denied. Appeals should be delivered in writing to the following address:

Honorable Judge Edward R. Korman
United States District Court
225 Cadman Plaza East
Brooklyn, NY 11201

**Certification of the Denial**

The CRT certifies this Denial for approval by the Court.

Claims Resolution Tribunal