**Talia Cohen**

---

**From:** NYED_Korman_Chambers
**Sent:** Monday, June 21, 2021 2:40 PM
**To:** 'dannezhunter@hotmail.com'
**Subject:** Your letter to Judge Korman
**Attachments:** 96cv4849 HVAL_ERK banks behavior_Feb 19 2004.pdf

Dannez Hunter,

We received your letter to Judge Korman dated May 27, 2021.

Please find the attached Court decision to which you refer to in your letter.

Sincerely,

Talia Cohen
Case Manager
Chambers of Honorable Edward R. Korman
U. S. District Court for the Eastern District of New York
225 Cadman Plaza East
Brooklyn, NY 11201

H
Briefs and Other Related Documents

United States District Court,E.D. New York.
In re HOLOCAUST VICTIM ASSETS LITIGATION.
This Document Relates to: All Cases.
**Nos. CV-96-4849 (ERK)(MDG), CV-99-5161, CV-97-461.**

June 1, 2004.

**Background:** Swiss banks filed objections regarding process for distributing proceeds of settlement of consolidated class actions brought by Holocaust victims against these banks.

**Holdings:** Amending and superseding its prior opinion, 302 F.Supp.2d 59, the District Court, Korman, Chief Judge, held that:

(1) presumptions employed by claims resolution tribunal, in attempting to identify Swiss bank accounts belonging to victims of the Holocaust for purpose of making distribution from settlement fund established by Swiss banks in consolidated class actions brought on behalf of Holocaust victims, were appropriate on spoliation of evidence principles; and

(2) to assist claims resolution tribunal in identifying accounts belonging to Holocaust victims, court would allow tribunal unfettered access to total accounts database.

Objections rejected.

West Headnotes

**[1] Evidence 157 ⚷78**

157 Evidence
  157II Presumptions
    157k74 Evidence Withheld or Falsified
      157k78 k. Suppression or Spoliation of Evidence. Most Cited Cases

Presumptions employed by claims resolution tribunal, in attempting to identify Swiss bank accounts belonging to victims of the Holocaust for purpose of making distribution from settlement fund established by Swiss banks in consolidated class actions brought on behalf of Holocaust victims, were appropriate, on spoliation of evidence principles, based on evidence of banks' allegedly improper transfer of account funds on signatures which Jewish account holders allegedly executed under duress, of banks' allegedly improper stonewalling in response to inquiries regarding accounts that may have belonged to Holocaust victims, and of banks' systematic destruction of records that were more than ten years old even though they allegedly knew that records were relevant to claims that were being made on behalf of Holocaust victims.

**[2] Evidence 157 ⚷78**

157 Evidence
  157II Presumptions
    157k74 Evidence Withheld or Falsified
      157k78 k. Suppression or Spoliation of Evidence. Most Cited Cases

Party's intentional destruction of evidence relevant to proof of issue at trial can support inference that the evidence would have been unfavorable to party responsible for its destruction.

**[3] Evidence 157 ⚷78**

157 Evidence
  157II Presumptions
    157k74 Evidence Withheld or Falsified
      157k78 k. Suppression or Spoliation of Evidence. Most Cited Cases

Any adverse inference drawn, under principle of spoliation, from party's intentional destruction of evidence relevant to proof of issue at trial should serve function, insofar as possible, of restoring the prejudiced party to same position he would have been in absent this wrongful destruction of evidence.

**[4] Compromise and Settlement 89 ⚷72**

89 Compromise and Settlement
  89II Judicial Approval
    89k72 k. Construction, Operation, and Effect;

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Supervision. Most Cited Cases

In dispute arising out of distribution of proceeds of settlement fund established by Swiss banks in consolidated class actions brought on behalf of Holocaust victims, district court would overrule derivative objections filed by banks, based upon privacy rights of their account holders, to proposed publication of those accounts identified as "possibly" belonging to Holocaust victims, because account holder's name matched name of known victim of Nazi persecution, but for which further confirming documentation was lacking in account records; banks failed to substantiate their concerns that publication of such accounts would "open the floodgates" and lead to countless claims, and publication would allows heirs and representatives of Holocaust victims to quickly check whether there was a record of accounts and facilitate the filing of legitimate claims.

**[5] Compromise and Settlement 89 ⟹72**

89 Compromise and Settlement
 89II Judicial Approval
  89k72 k. Construction, Operation, and Effect; Supervision. Most Cited Cases

To assist claims resolution tribunal in identifying Swiss bank accounts belonging to victims of the Holocaust, for purpose of making distribution from settlement fund established by Swiss banks in consolidated class actions brought on behalf of Holocaust victims, district court, despite banks' derivative claim that their account holders were entitled to privacy, would allow tribunal unfettered access to total accounts database, and not simply to those accounts that had previously been identified by fact-finding commission as "probably" or "possibly" belonging to Nazi victims.

***302** Burt Neuborne, New York University Law School, New York, NY, lead class counsel.

Samuel J. Dubbin, Dubbin & Kravetz, LLP, Coral Gables, FL, for Holocaust Survivors Foundation-USA, Inc.

Roger M. Witten and Christopher P. Simkins, Wilmer Cutler Pickering, LLP, Washington, DC, for defendants Credit Suisse and Union Bank of Switzerland.

**AMENDED MEMORANDUM & ORDER**[FN*]

> FN* This memorandum and order amends and supersedes *In re Holocaust Victim Assets Litigation*, 302 F.Supp.2d 59 (E.D.N.Y.2004).

KORMAN, Chief Judge.

On August 2, 2000, I approved the historic settlement in this case. *See* *In re Holocaust Victim Assets Litig.*, 105 F.Supp.2d 139 (E.D.N.Y.2000). On July 26, 2001, when the Second Circuit affirmed my decision, the settlement became final. *See* *In re Holocaust Victim Assets Litig.*, 14 Fed.Appx. 132 (2d Cir.2001). Since then, we have distributed the following sums from the settlement fund: $160,086,140 to 2,021 claimants in the Deposited Assets Class in connection with 2,191 bank accounts found by the Claims ***303** Resolution Tribunal ("CRT") to have belonged to victims of the Holocaust; $230,677,900 to 159,088 surviving members of the Slave Labor Class I; $95,000 to 95 members of the Slave Labor Class II; $8,181,775 to 3,053 surviving members of the Refugee Class; and $205,000,000 to needy survivors of the Holocaust through application of the *cy pres* doctrine to the Looted Assets Class. Indeed, we have succeeded on a great many fronts.

What compels me to write is that over the past year-and-a-half, the bank defendants have filed a series of frivolous and offensive objections to the distribution process, and most recently to Special Master Judah Gribetz's Interim Report on Distribution and Recommendation for Allocation of Excess and Possible Unclaimed Residual Funds (hereafter "Interim Report"). These objections bring to mind the theory that, "if you tell a lie big enough and keep repeating it, people will eventually come to believe it." The "Big Lie" for the Swiss banks is that during the Nazi era and in its wake, the banks never engaged in substantial wrongdoing.

The banks have repeatedly insisted that they never engaged in "systematic document destruction" and that they should not be assigned blame for any difficulty we have in distribution. *See* Letter from Roger Witten to Michael Bradfield, dated April 18, 2003; Letter from Roger Witten to Judge Edward R. Korman, dated May 16, 2002; Response of Defendants UBS AG and Credit Suisse Group to Special Master's

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Interim Report and to Declaration of Burt Neuborne, dated December 16, 2003 (hereafter "Response"). They claim that during the Nazi era, they did not engage in widespread forced transfers of customers' assets to the Nazis, as "[i]n the vast majority of cases, the circumstances of closure are just unknown." Witten Letter, dated May 16, 2002, at 3. And they claim that the allegations that they engaged in massive destruction of Nazi era bank records in the post-war era "are incorrect and could be characterized as malicious in light of specific conclusions to the contrary in the ICEP and Bergier Reports." Response, at 14. They continue: "As we have previously and repeatedly advised the Court and its Special Masters, the ICEP Report and the Bergier Report confirm that the banks never engaged in systematic document destruction and certainly did not do so in any effort aimed at hiding assets belonging to victims of Nazi persecution." *Id.* The bank defendants' statements are not merely incorrect; they are detrimental to the process of justice. These statements continually distort and obscure the truth, and now that they form the basis of the bank defendants' response to the Special Master's Interim Report, I am forced to address them.

Simply put, the Swiss banks' objections to the Interim Report are based on an egregious mischaracterization of historical accounts. In Part I, I turn to these accounts to set the record straight. In Part II, I address the banks' claim that the CRT presumptions are inappropriate because the banks never engaged in widespread document destruction or any other systematically deceptive behavior toward victims of Nazi persecution. In Part III, I address the banks' objection to the publication of dormant accounts not previously designated as "probably" related to the Holocaust and their objection to providing the CRT with unfettered access to the records of all dormant accounts of which we possess records through a consolidated Total Accounts Database ("TAD"), objections premised on the same mischaracterization of historical accounts.

***Part I: Decades of improper behavior by the Swiss banks***

In the mid-1990s, the treatment of Holocaust victims by Switzerland and its financial***304** industry emerged as a source of increasing controversy. The Swiss Parliament and the Federal Council responded by establishing the Independent Commission of Experts Switzerland-Second World War ("ICE" or "Bergier Commission"). The Swiss Bankers Association ("SBA"), the World Jewish Restitution Organization and the World Jewish Congress established the Independent Committee of Eminent Persons ("ICEP" or "Volcker Committee"). The Bergier Commission "was mandated to conduct a historical investigation into the contentious events and incriminating evidence" of Switzerland's conduct during the Second World War and the post-war period. *See* Independent Commission of Experts Switzerland-Second World War, Final Report, at 5 (Zurich: Pendo Verlag GmbH 2002) (hereafter "Bergier Report"). It employed historians, researchers and economists in an effort to " 'obtain the historical truth' and to examine and report on 'the role of Switzerland, particularly that of the Swiss financial center, as well as on the manner in which Switzerland dealt with this period of its history.' " Interim Report, at 36 n. 53 (quoting Swiss Federal Council Decree, December 19, 1996, "Historical and Legal Investigation into the Fate of Assets which Reached Switzerland as a Result of the National-Socialist Regime: Appointment of the Independent Commission of Experts," available at *www.uek.ch* ). The Volcker Committee pursued a more focused objective, "conduct[ing] what is likely the most extensive audit in history, employing five of the largest accounting firms in the world at a cost of hundreds of millions of dollars to defendants." *In re Holocaust Victim Assets Litig.,* 105 F.Supp.2d at 151. Its auditors had two major goals: "(a) to identify accounts in Swiss banks of victims of Nazi persecution that have lain dormant since World War II or have otherwise not been made available to those victims or their heirs; and (b) to assess the treatment of the accounts of victims of Nazi persecution by Swiss banks." Independent Committee of Eminent Persons, Report on Dormant Accounts of Victims of Nazi Persecution in Swiss Banks, 1-2 (Berne: Stæmpfli Publishers Ltd.1999) (hereafter "Volcker Report").

The investigations faced challenging odds. "There were approximately 6,858,116 accounts that were [open or] opened in Swiss banks between 1933-45.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Of these, no records existed for approximately 2,757,950 accounts, 'an unfillable gap ... that can now never be known or analyzed for their relationship to victims of Nazi persecution.' " In re Holocaust Victim Assets Litig., 105 F.Supp.2d at 155 (quoting Volcker Report, Annex 4, ¶ 5). Nonetheless, the Volcker Committee, which released its findings on December 6, 1999, succeeded in initially identifying nearly 54,000 accounts that it believed either "probably" or "possibly" belonged to victims of Nazi persecution. The number of accounts was subsequently reduced to 36,000 by a "scrubbing" process that I discuss later. Whatever the number, the Volcker Committee's estimates were clearly conservative. Indeed, the Bergier Commission recognized that the Volcker Committee's findings "constitute[d] only part of the total." Bergier Report, at 446. This is why, in my order approving the settlement in this case, I wrote:

A fair and efficient claims process in connection with the Deposited Assets Class must *build on* the fact that the Volcker Committee's auditors, despite the massive destruction of relevant records over the past 60 years, were able to identify the approximately 54,000 Swiss bank accounts [then deemed probably or possibly belonging to Nazi victims].

***305** In re Holocaust Victim Assets Litig., 105 F.Supp.2d at 154 (emphasis added). The words "build on" were not chosen lightly. I recognized then, as I do today, that the Volcker Committee had only begun to identify and reveal the scope of the Deposited Assets Class. The Bergier Commission, which announced its final conclusions on March 22, 2002, helped complete the historic picture. A deep understanding of its findings is necessary to comprehend why the defendants' recent submissions are both baseless and deceptive.

The Nazi era and post-war actions by the Swiss banks are perhaps best summarized by the concise statement of Bergier Commission member Helen Junz. In a monograph prepared for Special Master Bradfield and appended hereto, she wrote: "[T]he Swiss banks acted with an eye to their own bottom line." Helen B. Junz, Bergier Commission: Analysis of Swiss Bank Behavior, at 2. "[T]he banks systematically put aside the interests of the clients they had so ardently solicited with assurances that their assets would be kept safe for them and theirs, in favor of business interests they perceived at that moment to be more promising." *Id.* Perceived economic self-interest not only dominated the banks' actions during the war; it drove the banks to act against their clients' interests for decades thereafter, leading to the dormancy and elimination of an unknowable number of accounts once held by victims of Nazi persecution.

### *A. The Nazi era*

In the 1930s, as the threat of National Socialism rose, many Europeans began to turn to Swiss financial institutions for asset protection. Known for stability and secrecy, the banks purported to provide a safe haven for customers' savings. "The greatest influx of capital [during this period] came from France," as the French began to fear increased taxes and changing exchange rates. Bergier Report, at 258. But the French were not alone in turning to the Swiss banks. "The increasing persecution of, and discrimination against, certain population groups practised by the Nazis in Germany and in other areas of Central Europe led these people to attempt to protect their assets from usurpation by transferring them abroad, notably to Switzerland." *Id.* As Germany instituted ever stricter controls on capital flow, the allure of Swiss banks only grew.

Swiss banks proved less of a safe haven than many of their customers had hoped. While not every Swiss bank acted in the same way on every occasion, the Bergier Commission's findings reveal that *in general* the banks placed their own perceived economic self-interest ahead of their customers as *a matter of policy*. The most glaring example of this was the practice of engaging in questionable account transfers during the Nazi era. Time and time again, banks completed transfer orders which they knew were requested only because of Nazi persecution, and which they suspected were not in their customers' best interest. An example that reflects the concerted policy of the Swiss banks is described by the Bergier Commission as follows:

After overrunning Poland in September 1939, the new ruling [Nazi] power endeavoured to acquire Polish assets deposited in Switzerland. As early as 20

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

November 1939, the Polish bank Lodzer Industrieller GmbH asked Credit Suisse to transfer assets deposited with it to an account at the German Reichsbank in Berlin. The bank saw a fundamental problem in this procedure and asked its legal affairs department to examine the matter. The latter recommended not complying with the request since the customer's signature had most likely been obtained under duress by the occupying***306** authorities. A further reason for refusing the request was that it had come from Berlin and contained incorrect information about the amount deposited with Credit Suisse. The legal affairs department also pointed out that for Poland, German foreign exchange regulations represented a war measure taken by an occupying force and that Switzerland had not yet recognized the new political situation. **Managing Director Peter Vieli subsequently discussed the issue with Rudolf Speich, his counterpart at the Swiss Bank Corporation.** The latter contacted the Reichsbank, which agreed that in view of the unclear constitutional situation in Poland, Swiss banks were not obliged to comply with requests from German administrators (*Reichskommissäre* ). Nevertheless, according to a file note 'the directors of the Reichsbank and Dr. Speich were of the opinion that duly signed requests from customers for their assets held in Switzerland to be transferred to an account with the Reichsbank must be executed since absolutely no justification could be found for not doing so.' **Although there were legal and moral objections to transferring the funds, the consideration that they 'still had important interests in Germany, and should avoid friction and unpleasantness whenever possible' prevailed at CS [Credit Suisse].** They complied with the request and opted for the principle of carrying out legally signed orders even when they were not received directly from customers, but via the Reichsbank in Berlin. Their comportment in Poland was in this respect typical of how the banks dealt with the assets of Nazi victims: **as a rule, they complied with transfer orders from foreign customers without properly checking whether the signatures they bore had been obtained under duress by the Nazi authorities and whether the orders were in fact in the customer's interest.**

Bergier Report, at 276-77 (emphases added) (footnote omitted). The two major banks in this example (Credit Suisse and Swiss Banking Corporation) consulted with one another and *together* decided to disregard the legal advice of Credit Suisse's legal department. It is possible to imagine situations where a bank's decision to order a forced transfer would have been morally justified as a way to protect a client's life, but that was clearly not the case for these banks. These banks did not decide to order forced transfers because they thought it would serve their clients well-they did so to "avoid friction and unpleasantness" with their business interests in Germany. Unpleasantness for their clients was not even a consideration.

"The question which arises is not whether [the Swiss banking industry] should or could have maintained its [business contacts with Nazi powers], but rather how far these activities went: in other words, where the line should have been drawn between unavoidable concessions and intentional collaboration." Bergier Report, at 497. The banks drew a line quite near intentional collaboration. They made a collective decision that long-term economics counseled in favor of authorizing transfers to Germany, and, as Helen Junz explains, "[t]he focus on Germany as a desirable business partner persisted beyond the period when Swiss business believed in a Nazi victory as there was a widespread conviction that the German economy would either survive or quickly regenerate after the war." Junz, at 3. This policy constituted a clear violation of the banks' fiduciary duty to their account holders-individuals who were being persecuted daily.

***307** The dearth of records makes it difficult to determine the overall impact of improper transfers by the Swiss banks during the Nazi era, but the Bergier Report provides some estimates. The Bergier Commission cited as an "example" that, between 1933 and 1939, Credit Suisse transferred about 8 million francs worth of securities to the Deutsche Bank; the Zurich office of the Swiss Banking Corporation transferred over 6 million francs worth of securities in accordance with the 1936 German Law on Compulsory Deposits; and the Swiss Banking Corporation sold 8 million francs worth of securities on behalf of German customers who were likely forced to transfer the proceeds to German banks. Bergier Report, at

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

275. These transfers alone total 22 million francs. Assuming conservatively that these francs were measured in 1945 and using the CRT's 2003 multiplier of 12 and an exchange rate of 1.35 Swiss francs to the dollar, this sum, undoubtedly a small fraction of the total forced transfers by Swiss banks during the war, would correspond to over $195 million today.

Perhaps more significantly, forced transfers continued throughout the duration of the war even though the Swiss courts recognized that they were illegal under Swiss law. *Id.* at 276 (finding that when opponents of forced transfers had been "able to take legal action in Switzerland, the requests made by the [Nazi authorities] were rejected by the judges and the blocked assets were deposited with the court."). The Bergier Commission member Helen Junz explained that, "[a]lthough there are documented cases where banks acted to safeguard clients' assets-by moving them to numbered accounts or into other-named accounts-current evidence shows that *the cases in which accounts were released predominated.*" Junz, at 2 (emphasis added). She also notes that independent researchers Barbara Bonhage, Hanspeter Lussy, and Marc Perrenoud "estimate that in this way the major banks released some SF 200 million worth of deposits and securities to the German banks and/or the Reichsbank." *Id.* (citing UEK study, no. 15, *Nachrichtenlose Vermögen bei Schweizer Banken* ). Again using the CRT's conservative conversion rate, this sum would equal over $1.7 billion today.

Of course, as the forced transfer discussed earlier demonstrated, the banks had a choice. They could have chosen to adhere to their fiduciary obligation and refused to honor transfers requested under duress. They could have frozen customer assets or otherwise blocked transfers as a matter of policy. Their failure to do so is revealing. As study number 15 prepared for the Bergier Commission explained:

An effective protection of customers' assets might have only been possible through a general blockage/freeze. Because public opinion would have likely welcomed a freeze of German and Austrian assets in 1933 and 1938, respectively, and because [Swiss] courts hindered the forced transfers when they were called in to decide such cases, it is very hard to understand today why Swiss politicians and banks did not vehemently take steps against the implementation of the German laws forcing the repatriation of foreign-held assets-either through a freeze or through some other effective intervention.

UEK study, no. 15, *Nachrichtenlose Vermögen bei Schweizer Banken,* at 166. It is less "hard to understand" when one considers the premium banks placed on "avoid[ing] friction and unpleasantness" with their interests in Nazi Germany. This also explains their willingness to accede to forced transfers even though "the banks during the Nazi period had considerable leeway in determining their response to the Nazi authorities' demand ***308** that they cooperate in making their foreign clients comply with Nazi laws and regulations." Junz, at 2 (citing UEK study, no. 15, *Nachrichtenlose Vermögen bei Schweizer Banken* ).

### *B. The post-war period*

After 1945, there was a jump in the number of "dormant" accounts in Swiss banks, accounts for which the banks received no contact from the account holder. *See* Bergier Report, at 444. This "sharp rise in dormant accounts must have made it obvious that an unknown number of people, the majority of them Jews who had deposited assets with the Swiss banks, had become victims of the Holocaust." *Id.* "To take account of the exceptional situation of mass extermination by the Nazis, the banks would have had to depart from the requirements they usually made before paying out an account." *Id.* at 448. They did not. Instead, throughout the post-war period, the banks routinely hid the existence of bank accounts from heirs and representatives of Nazi victims. I explain below why the problem of dormant accounts remained a problem for six decades, and why there was, and apparently still is, "considerable reluctance on the part of the banks to admit that there was any problem." *Id.* at 445.

#### *1. Reasons for stonewalling by the Swiss banks*

First, Swiss banks were often aware of the fact that they had made improper transfers during the Nazi era and that they could be held liable if they released information. As noted above, the banks' own legal departments had warned them that authorizing a forced

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

319 F.Supp.2d 301
319 F.Supp.2d 301
**(Cite as: 319 F.Supp.2d 301)**

Page 7

transfer could be understood as a breach of their fiduciary duty, and the Swiss courts had repeatedly affirmed this view. *See* Bergier Report, at 276. After the war, many surviving account holders or their heirs approached the banks seeking information about accounts, often with valid legal claims. The banks, which had improperly transferred the funds in the accounts to the Nazis, were afraid that they would be called to account for the breach of their fiduciary duties. *See, e.g., Albers v. Credit Suisse,* 188 Misc. 229, 234, 67 N.Y.S.2d 239, 244 (N.Y.City Ct.1946) (holding Credit Suisse liable for transferring a client's assets to a German bank pursuant to the client's orders because "above all it knew that the plaintiff was not likely of his free will to transfer property of his located in Switzerland to a bank in German territory controlled by the German government"). Equally important, the problem was not disappearing. "Although assets transferred to the Third Reich were left out of the inventory of unclaimed assets of Nazi victims in Swiss banks, they were nevertheless part of the restitution claims" that had been filed against the banks. Bergier Report, at 443. In sum, former account holders and their heirs were complaining, and access to records could have shown their claims to be legitimate.

Second, the banks received a direct economic benefit from their silence. The Volcker Committee found that, "the problems with dormant accounts appear to be partly a byproduct of the absence of a Swiss escheat law dealing with unclaimed property in banks." Volcker Report, at ¶ 45. "Unlike other countries (such as the United States) where dormant assets are transferred to state governments, in Switzerland dormant assets remain indefinitely with the banks." *Id.* If no one claimed the assets in an account (or if a bank simply refused to comply with a claim) a Swiss bank could keep the money. The Bergier Report summarized the troubling result:

Unclaimed safe-deposit boxes and safeguard deposits generated income from the fees charged and-in the case of ***309** interest-bearing assets-commission earnings. The banks lost nothing if the dormancy persisted; on the contrary, the monies entrusted to them that affected the balance sheet continued to improve their interest balance-particularly as the banks usually stopped paying interest on the dormant accounts.

Bergier Report, at 449.

Third, the banks anticipated an indirect economic benefit from stonewalling. Before the war, the Swiss banks had been seen as an attractive repository because of their commitment to secrecy and "private property rights." Many bank officials anticipated that steadfast devotion to secrecy would be critical going forward. The ironic result is that the banks turned on Nazi victims based on the very same principles that had previously led the Nazi victims to turn to the banks. *See* Volcker Report, at ¶ 48. Helen Junz explains the situation as follows:

The banks quickly realized that post-war political developments were bringing new opportunities to the field of asset management. They were well-positioned, having come out of the war with a stable and convertible currency, but perceived that hewing to their commitment to bank secrecy and protection against cross border compliance with tax and foreign currency regulations of other countries would give them a further material advantage. Compared with the cold-war generated new client potential, the Holocaust survivor clientele held no interest-on the contrary. Basic policies, though not enunciated as such, thus generally aimed-of course with some exceptions-to ignore this clientele.

Junz, at 4. Put differently, "[t]op executives in the banks ... assumed that they would enhance their appeal to new customer segments by a resolute defence of banking secrecy." Bergier Report, at 457. The "new customer segments" to which the interests of victims of Nazi persecution and their heirs were sacrificed were none other than tax evaders, money launderers, and corrupt foreign dictators who needed a place to hide their assets. *See e.g.,* Jonathan Kandell, *Baer Market,* Institutional Investor, January 2004, at 94 (recognizing that, after Italy offered blanket amnesty to people with undeclared offshore accounts through a small one-time tax in 2002, it was able to lure $83 billion back to the country, mostly from Switzerland, in just 12 months); *In re Estate of Ferdinand Marcos Human Rights Litigation,* 94 F.3d 539, 543 n. 5 (9th Cir.1996); *Republic of the Philippines v. Marcos,* 862 F.2d 1355, 1363 (9th Cir.1988)

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

(explaining that Ferdinand Marcos used Swiss bank accounts to hide $1.3 billion of the Philippines' money, and while the banks eventually froze the assets, they fought against returning the assets to the Philippines).

*2. The extent of the Swiss Banks' stonewalling*

The Swiss banks stonewalled as a matter of course. Because claimants typically lacked information as to the exact location or nature of the items deposited, the banks could routinely "entrench themselves behind banking secrecy" and cite the claimant's inability to sufficiently document a legal entitlement as a reason to deny payment. Bergier Report, at 449. Where the claimants had precise information, the banks turned to still more deceitful tactics. "A situation was reached where even death certificates were being demanded for people who had been killed in the [concentration] camps." *Id.* Of course, no such documents were issued. It is thus not surprising that, as the Bergier Commission explained,

[t]he unwillingness of the Swiss financial institutions in the immediate post-war period to find the legal owners of unclaimed***310** assets or to support rightful claimants in their search, constitutes the main point of criticism of the banks' behaviour, behaviour already tainted by certain dubious decisions and questionable attitudes in the period between January 1933 and May 1945.

*Id.* at 277.

To illustrate what was likely the most common method of stonewalling, I turn first to a poignant example provided by the CRT award to the heirs of Prof. Dr. Albert Uffenheimer, who at one time had a bank account at the Zurich branch of Credit Suisse. *See* CRT Awards, Group XXXVII, award number 40, available at *www.crt-ii.org.* Born in 1876, Dr. Uffenheimer lived in Germany at the time of Hitler's rise. He remained there until 1938, when he fled to England. His wife remained in Germany. In December 1938, bank records show that Dr. Uffenheimer contacted his bank from London and instructed it to pay out the assets in his account (securities valued at 3,000 francs) to the Constance, Germany branch of the *Deutsche Bank.* The bank complied with the request. Passing over the complicated moral question of whether completing this transfer was proper or improper, I turn to the far clearer issue of the bank's post-war conduct. The bank received a letter dated May 11, 1949 on behalf of Dr. Uffenheimer's widow requesting information regarding the account. It responded with a letter that stated:

In response to your query of 11 May 1949, we must unfortunately inform you that, pursuant to Swiss legal requirements regarding banking secrecy, we cannot provide information about activities that pertain to the business dealings of our customers during their lifetime, not even to their heirs. In addition, we draw your attention to the fact that the activities referred to in your letter happened more than ten years ago, while we are only obligated to preserve our correspondence for ten years.

*Id.* This response was not simply a form letter. Indeed, an internal memorandum from the bank's legal department, dated May 17, 1949, reveals how considered a strategy it was. The memorandum indicates that the bank knew it had transferred Dr. Uffenheimer's securities to the *Deutsche Bank.* It quotes Dr. Uffenheimer's request, which explained that he was making the request pursuant to an order from a German Finance Minister who threatened that noncompliance would be penalized. With his wife still in Germany, Dr. Uffenheimer had agreed to make the request. The bank's memorandum correctly reasoned that, "from this correspondence it follows that Professor Uffenheimer was forced by the German authorities to hand over his assets deposited with us to the *Deutsche Bank.*" *Id.* What is troubling is that the memorandum then concludes: "*for these reasons,* we are careful about providing information and withhold information. If necessary, we should rely on the fact that, since then, more than ten years have passed, so that we no longer today are obligated to preserve this correspondence." *Id.* (emphasis added). Precisely because the bank was aware that it had acted in a way that could expose it to liability, the bank refused to divulge information. This stonewalling, which prevented Dr. Uffenheimer's heirs from gaining restitution, was the principal basis for the CRT's award.

The example of Dr. Uffenheimer is extraordinary only in its documentation. In other cases of forced

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

transfers, all bank records have been destroyed. Nevertheless, uncommon research has been able to document such transfers. The recent award to the heirs of Karoline Sonnenfeld ***311** is one example. *See* CRT Awards, Group XL, award number 30, available at *www.crt-ii.org*. The CRT awarded $769,320 despite a total lack of bank records. The only evidence of an account was found in a Nazi party newspaper stored in the Austrian census records. The article revealed that police raided Mrs. Sonnenfeld's house after receiving a confidential tip. "[R]ecords were found showing that the Jew also held a safe deposit box with a substantial amount in Pounds Sterling at the *Schwizerische Kreditanstalt* [Credit Suisse] in Zurich. Search of the house produced a key to this safe, also found in Mrs. Sonnenfeld's apartment. After further investigation, 3,600 Pounds Sterling was seized." *Id.* at 2 n. 2. Because the bank destroyed any record of Mrs. Sonnenfeld's safe deposit box, this article was the only record of any account.

In 1950, the General Director of Union Bank of Switzerland and former Secretary of the SBA stated that "the best solution" would be "never to mention the entire affair [of forced transfers] again." Bergier Report, at 445-46. He was apparently not the only Swiss bank official to hold this view. The Bergier Commission made the following discovery:

In May 1954, the legal representatives of the big banks co-ordinated their response to heirs so that the banks would have at their disposal a concerted mechanism for deflecting any kind of enquiry. They agreed not to provide further information on transactions dating back more than ten years under any circumstances, and to refer to the statutory obligation to keep files for only ten years, even if their records would have allowed them to provide the information.

*Id.* at 446. As was the case with the decision to transfer assets when the account holder was making the request under duress, the most noteworthy aspect of this Bergier Commission finding may be the fact that it was such a collective decision by the banks. The banks, as a matter of policy, refused to disclose information regarding accounts, even where they had it. It is no surprise that the letter received by Dr. Uffenheimer's representative matched the major banks' agreed upon language almost exactly. Indeed, because the response to Dr. Uffenheimer's heirs preceded by five years the conspiracy to obstruct heirs in their efforts to obtain information regarding accounts that had been the subject of forced transfers, it suggests that the May 1954 meeting simply formalized existing practice.

Notably, the banks' understanding of where they could be liable and where they most needed to employ stonewalling turned on the identity of account holders. The Volcker Committee described records found in one of Switzerland's large commercial banks as follows:

Legal department documents from 1953 to 1969 outline recommended procedures for responding to claims of Jewish account holders and their heirs whose assets were transferred to Germany in the 1930s. A letter from 1969 recommends that

in the case of inquiries about Jewish clients whose assets had to be transferred on their instructions to Germany during the 1930s, or with regard to inquiries received from their heirs, we have always responded that we could not supply the requested information as we are only obliged to retain ledgers and correspondence for a period of 10 years.

The legal department recognized that because the transfer orders were made under duress the risk existed that the bank might be liable to restore the accounts to the rightful owners. **However, the legal department noted that *312** claims by non-Jewish German nationals were not considered a liability, which suggests that the bank treated inquiries from Jewish customers differently from those received by non-Jewish German nationals. The management of the bank apparently endorsed these procedures in December 1969.

Volcker Report, Annex 5, at 83 (emphasis added). The banks considered Jewish account holders a special problem.

The stonewalling by Swiss banks was not only in response to individual claimants; the banks also employed this strategy in the face of broad-based efforts to uncover assets of Nazi victims. "[T]he banks and their Association lobbied against legislation that would have required publication of the names of such so called 'heirless assets accounts,' legislation that if

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

enacted and implemented, would have obviated the ICEP investigation and the controversy of the last 30 years." Volcker Report, at ¶ 48. Indeed, in order to thwart such legislation, the SBA encouraged Swiss banks to underreport the number of such accounts in a 1956 survey. " 'A meager result from the survey,' " it said, " 'will doubtless contribute to the resolution of this matter [the proposed legislation] in our favor.' " Volcker Report, Annex 5, ¶ 37 (quoting a letter from the SBA to its board members, dated June 7, 1956). The banks adhered to the SBA's recommendation: "For instance, Swiss Bank Corporation (*Schweizerischer Bankverein, SBV* ) indicated in 1956 that it could not state 'with certainty' that it had such accounts but there were 13 cases (with a total value of 82,000 francs) where this was probable." Bergier Report, at 451. Given what the Volcker Committee was able to find 40 years later, these estimates were clearly nothing more than a lie.

When external pressure forced Switzerland in 1962 to adopt the Registration Decree, which was "meant to provide a genuine solution [to] the problem that had remained unresolved throughout the 1950s," the banks again put forth "concerted resistance." *Id.* at 451. This time the banks did not vigorously resist the law's passage; rather, they completely frustrated its implementation. Pursuant to the Registration Decree, banks were obliged to "report any assets whose last-known owners were foreign nationals or stateless persons of whom nothing had been heard since 9 May 1945 and who were known or presumed to have been victims of racial, religious or political persecution." *Id.* at 452. "A total of 46 banks reported 739 accounts containing a sum total of 6,194,000 francs." *Id.* at 453. They declined to report accounts of people who died after May 9, 1945 (even where one customer had died in the Dachau concentration camp on May 13, 1945), accounts held in the name of a trustee, and accounts where the account holder's name was arguably not Jewish. *Id.* at 454. "In short, a whole raft of measures was adopted with the aim of deliberately minimising the results of the investigation." *Id.* And again, this raft of measures was not adopted by isolated banks in isolated situations-it was a collective decision to deceive by the Swiss Banking Association that delayed justice in some cases for several decades, but in most cases indefinitely.

Where more isolated but sensational external events threatened to breach the banks' wall of secrecy and appearance of propriety, the banks employed one more measure: Ignore the event. The Bergier Commission explained:

There were some cases-the most recent in the 1990s-in which bank employees stole unclaimed assets. Out of fear that such incidents could cause a ***313** public outcry, offenders were often not subjected to criminal prosecution. In an actual case in 1990, the Federal Banking Commission went so far as to back the decision by the Swiss Bank Corporation to refrain from bringing criminal charges as "the offender was willing and able to fulfil his duty of loyalty within the time required."

Bergier Report, at 447. The banks were more concerned with keeping the matter quiet than doing what was right.

It is important to reiterate that the Swiss banks' devotion to secrecy and their repeated acts of stonewalling were not based on principles-they were profit-driven. Put differently, "the banks' rhetorical efforts to uphold the existing 'legal system,' guarantee the [v]iability of the law and protect 'property rights' on the basis of banking secrecy" were merely that-rhetoric. Bergier Report, at 448. As the Bergier Commission found, "it is apparent that the claims of surviving Holocaust victims were usually rejected under the pretext of banking secrecy and a clear preference for continuity in private law. Over the many years of such rejections, a large number of accounts were reduced to zero or almost." *Id.* at 455. Where economics counseled against upholding secrecy, private law and property rights, however, the banks were quick to abandon their supposedly entrenched values.

A particularly telling example of profits being placed over "banking secrecy" is the secret post-war deals reached by the Swiss with Poland and Hungary to loot unclaimed accounts belonging to Holocaust Victims. "[T]he primary aim of [these deals] was to favour Swiss interests in the wake of nationalisation of assets in Poland and Hungary." Bergier Report, at 450. The Bergier Commission was conservative

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

when it wrote that this was "the primary aim" of the deals. What actually happened was that money was taken from dormant accounts of murdered Polish and Hungarian citizens and transferred to Swiss citizens to ameliorate the claims these citizens were raising against the Polish and Hungarian governments after their assets had been nationalized. And yet, "[t]he agreement[s] got no or very little publicity. It was therefore virtually impossible even for heirs living abroad to assert their claims." *Id.* at 451. Gerhard Weinberg, an eminent historian of the Nazi era, explained the deal with Poland as follows:

[I]n 1949 the Swiss government signed a secret agreement with the Communist government of Poland under which the Swiss government with the agreement of the regime in Warsaw located the accounts in Swiss financial institutions of those Polish citizens who had been murdered and who either had no heirs or whose heirs had been stonewalled. The proceeds of this looting operation were then paid over to Swiss citizens who had claims on Poland arising out of the nationalization and / or confiscation of their property in Communist Poland.

*Swiss Banks and Nazi Gold: Hearings before the House Comm. on Banking and Financial Servs.,* 105th Cong. (June 25, 1997) (statement of Gerhard L. Weinberg). The deal with Hungary was similar in operation. *See* Special Master's Proposed Plan of Allocation and Distribution of Settlement Proceeds, G-32 n. 94 (hereafter "Proposed Plan") (citing Gerhard L. Weinberg, "German Wartime Plans and Policies Regarding Neutral Nations," statement before American Historical Association, January 10, 1998 (hereafter "Weinberg, AHA Statement")). While the "primary aim" of "favour[ing] Swiss interests" through these deals is clear, it is hard to imagine what secondary aim there could have been.

***314** What is most striking about these secret agreements is that, as the Bergier Commission pointed out, "[s]urprisingly, it was now apparently possible to conduct an internal investigation so that a list of dormant accounts relating to these countries could be drawn up." Bergier Report, at 450. Indeed, "[n]either private property rights nor banking secrecy had been a barrier to the release of these assets." *Id.* at 451. Dr. Weinberg explained:

[A]ccounts which previously have been announced in diplomatic negotiations as either not existing or incapable of being located, and which have been withheld from the heirs either for those reasons or because the heirs cannot produce documents acceptable to the financial institutions, can suddenly be identified, their contents removed, and legal title to the assets transferred to Swiss citizens whose claims against Poland or Hungary might hinder future profitable Swiss trade with those countries.

Proposed Plan, at G-33 n. 94 (quoting Weinberg, AHA Statement, at 3-4). The United States opposed the agreement with Poland because "such an agreement would be inconsistent with the declarations previously made by Swiss officials regarding the disposition of heirless assets found in Switzerland." *See* Stuart E. Eizenstat, U.S. and Allied Efforts to Recover and Restore Gold and Other Assets Stolen or Hidden by Germany During World War II, 200 (May 1997). But its opposition was to no avail. Again, the banks' focus was on profits, and the deals went forward.

*3. Document destruction*

While stonewalling was generally an effective way for the Swiss banks to insulate themselves from liability and benefit economically, wholesale destruction of records was still more successful. Document destruction is likely the most contentious subject regarding the banks' behavior in the post-war period, and it is naturally the subject on which it is the most difficult to obtain information. As noted at the outset, there are records pertaining to 4,100,166 accounts out of an estimated 6,858,116 accounts open or opened between 1933 and 1945. Of those 4.1 million accounts for which some record exists, it is quite common to find nothing more than a customer registry card. Records of account activity or closing documents are rare. The findings of the Bergier Commission and Volcker Committee help explain why records are so often lacking.

The Swiss banks generally complied with Swiss law on record keeping, but this is precisely the ruse. The Swiss Code of Obligations requires only that banks keep correspondence and accounting records for a

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

period of ten years, regardless of whether an account is open or closed. Volcker Report, Annex 7, ¶ 3. If the banks could stonewall for ten years, then they could "legally" destroy the very documents which might answer claimants' questions. This is exactly what they did. Banks "regularly and systematically" destroyed material that was ten years old. *See* Volcker Report, Annex 7, ¶ 11. In some banks, the document destruction was annual, in some it was semi-annual, and in some it was simply intermittent. But it happened across the board. And thus the banks destroyed countless records that might have been critical in explaining their Nazi era actions with respect to accounts once held by Nazi victims. The destruction was part of the banks' ordinary course of business, and it was massive.

The Volcker Committee explained how unexceptional this practice of document destruction was for the banks. One commercial bank it highlighted made no special exception for maintaining its dormant accounts, which it simply considered open accounts for which the account holder ***315** might one day appear. *See* Volcker Report, Annex 7, ¶ 21. Moreover, this bank "did not retain lists of records destroyed in the normal course of business and in accordance with Swiss law." *Id.* "Therefore, large quantities of documents [from this bank] relating to accounts from the Relevant Period have been destroyed in the normal course of business without record." *Id.* at Annex 7, ¶ 22. This reveals the critical issue-the banks made no effort to save relevant documents, despite the fact that they knew Nazi victims and their representatives were clamoring for them.

Even given the banks' policy of destroying decade-old records, some records of dormant but still open accounts (the most recent ten years worth) would presumably have survived. In the case of large dormant accounts, banks would often "manage the assets in the interest of customers about whom no further information was available." Bergier Report, at 455; *see* Junz, at 5. The banks could use these accounts to generate substantial commissions and fees, and records would persist. In the case of small dormant accounts, however, the banks devised ways to eliminate the accounts altogether, and then eliminate all record of them. For instance, the banks would continue to charge activity fees on dormant, non-interest bearing accounts, and when claimants would request that the bank perform a search for their account, the bank would charge high search fees. The search fees could reach 25 francs in the 1950s, 250 francs in the 1960s, and 750 francs by the 1980s. Bergier Report, at 446. "The practice of opening safes and selling assets to pay for the cost of hiring the safe also is documented for that period." Junz, at 3. The Bergier Commission summarized the effect of such fees:

Because dormant accounts often contained small amounts, these fees frequently exceeded the value of the assets being sought and, together with the routinely charged administrative or other costs, reduced them substantially ... Due to the deduction of such fees, unclaimed accounts, deposits and safe-deposit boxes could also disappear in the space of a few decades.

Bergier Report, at 446. Once accounts were closed, "all traces of individual accounts disappeared because banks could destroy all records relating to customers whose accounts had been closed out after a ten-year archiving period." *Id.* at 447. The Bergier Commission concluded:The disappearance of all traces of assets from the Nazi era created a kind of higher level of dormancy: the 'dormant account' itself became 'dormant.' In other words, not only did the banks not have any information on the customers concerned, but researchers were also no longer able to obtain documents on these accounts at the bank during the period in question.

*Id.* at 447-448.

This practice of routine document destruction and account erasure not only flourished in the immediate post-war period, it continued until the Bergier Commission and ICEP were established in 1996. Indeed, in the 1980s, the Union Bank of Switzerland issued instructions on how to close accounts: "The closure is to be effected by charging as many fees, expenses, etc. for different services to the accounts as to wipe out any balances they contain. The fees and expenses to be charged are to be credited to the internal account 'SV inheritances.' " Bergier Report, at 447. As the policy flourished, the banks never lost sight of their purpose-economic gain. For example, in one

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

dormant deposit account held in the Swiss Bank Corporation (SBV), the balance decreased from 3,255 francs in 1939 to zero in 1980. *See* Junz, ***316** at 4. Still, the bank did not close the account. Instead, it kept the account open and charged fees that by 1992 had led to a negative balance of 4,793 francs. This seemingly inexplicable decision is easily understood once one recognizes that the client also had a safe at the bank. The safe contained gold coins that the bank used to cover the accumulated charges of the deposit account.

In any event, one might assume that the Federal Decree of 1996, which commanded that all documents from the relevant period be preserved, would have put an end to the Swiss banks' destruction of records. This has apparently not been the case. Though the rate of destruction has undoubtedly slowed greatly, the Volcker Committee and the Bergier Commission still found that certain banks have engaged in destruction of relevant materials since 1996. The Bergier Commission highlights an example of the Union Bank of Switzerland attempting to destroy potentially relevant documents in early 1997:

[A]n observant night-watchman [named Christoph Meili] rescued documents that were already in the bank's shredder room awaiting destruction. Among other information, they included minutes of the Federal Bank (*Eidgenössische Bank* ) which went bankrupt in 1945 when its German business collapsed and whose most important records had been taken into the possession of the Union Bank of Switzerland. The fact that the documents intended for destruction included records relating to house renovations in Berlin between 1930 and 1940 and after 1945 gave rise to the suspicion that these may have been cases of 'Aryanisation,' or at very least touched upon sensitive issues.

Bergier Report, at 40-41. The bank, for its part, then "initiated proceedings against the night-watchman, who was accused of having breached bank secrecy." *Id.* at 41. The Volcker Committee also addressed this incident and noted that despite increased scrutiny, the bank was caught on three subsequent occasions having approved the destruction of potentially relevant records where destruction was clearly barred by the Federal Decree. *See* Volcker Report, Annex 7, ¶¶ 27-34.

Ultimately, it is impossible to know how common such incidents were or what relevant documents were destroyed. What we do know is that for 40% of bank accounts open or opened in Switzerland between 1933 and 1945, there is no record at all, and for the rest, there is often no more than a customer registry card.

***Part II. The banks' objections to the CRT presumptions***

[1] In light of this history, it is not surprising that individuals seeking to make claims as members of the Deposited Assets Class have had trouble establishing legal entitlement to accounts once held in Swiss banks. Despite decades of requests by claimants, records were denied to people under the auspices of private property law. Now that the records are ostensibly open, they often do not exist. As a way to account in some measure for this void, the rules governing the Claims Resolution Tribunal ("CRT") process codify "Presumptions Relating to Claims to Certain Closed Accounts" that include the following:

In order to make an Award under Article 22 for claims to Accounts that were categorized by ICEP as 'closed unknown by whom', a determination shall be made as to whether the Account Owners or their heirs received the proceeds of the Account prior to the time when the claim was submitted to the CRT. In the absence of evidence to the contrary, the CRT presumes that neither the Account Owners, the Beneficial Owners, nor their heirs received the proceeds of a claimed ***317** Account in cases involving one or more of the following circumstances:....

h) the Account Owners, the Beneficial Owners, and/or their heirs would not have been able to obtain information about the Account after the Second World War from the Swiss bank due to the Swiss banks' practice of [destroying records or] withholding or misstating account information in their responses to inquiries by Account Owners and heirs because of the banks' concerns regarding double liability; .... and/or

j) there is no indication in the bank records that the Account Owners, Beneficial Owners, or their heirs received the proceeds of the Account.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

CRT Rules, Art. 28 (footnotes omitted).

[2][3] As explained in the CRT rules, these two foregoing presumptions are based on the principle of spoliation. "It is a well-established and long-standing principle of law that a party's intentional destruction of evidence relevant to proof of an issue at trial can support an inference that the evidence would have been unfavorable to the party responsible for its destruction." Kronisch v. United States, 150 F.3d 112, 126 (2d Cir.1998). "[A]n adverse inference should serve the function, insofar as possible, of restoring the prejudiced party to the same position he would have been in absent the wrongful destruction of evidence by the opposing party." *Id.* While these presumptions can of course never return account holders to the position they would have been in were it not for decades of bank stonewalling and document destruction, they can help to balance the equities.

A complete statement of legal justification for these CRT presumptions is provided in footnote 5 to Article 28 of the CRT rules. It sets forth a condensed summary of the Volcker and Bergier Reports' relevant findings and explains the justification as follows:
[T]he Swiss banks destroyed or failed to maintain account transactional records relating to Holocaust-era accounts.... The wholesale destruction of relevant bank records occurred at a time when the Swiss banks knew that claims were being made against them and would continue to be made for monies deposited by victims of Nazi persecution who died in the Holocaust and that were (i) improperly paid to the Nazis, *see* Albers v. Credit Suisse, 188 Misc. 229, 67 N.Y.S.2d 239 (N.Y.City Ct.1946); Bergier Final Report at 443, (ii) that were improperly paid to the Communist controlled governments of Poland and Hungary, *see* Bergier Final Report at 450-51, and possibly Romania as well, *see* Peter Hug and Marc Perrenoud, *Assets in Switzerland of Victims of Nazism and the Compensation Agreements with East Bloc Countries* (1997), and (iii) that were retained by Swiss Banks for their own use and profit. *See* Bergier Final Report at 446-49.
"The discussion on 'unclaimed cash' persisted throughout the post-war period due to claims for restitution by survivors and heirs of the murdered victims, or restitution organizations acting on their behalf." *Id.* at 444. Nevertheless, the Swiss Banks continued to destroy records on a massive scale and to obstruct those making claims. ICEP Report, Annex 4 ¶ 5; *In re Holocaust Victim Assets Litig.*, 105 F.Supp.2d 139, 155-56 (E.D.N.Y.2000).... Under these circumstances, using the fundamental evidentiary principles of United States law that would have applied to Deposited Assets claims had the class action lawsuits been litigated through trial, the CRT draws an adverse inference against the banks where documentary evidence was destroyed or is not provided to assist***318** the claims administrators. *See* *In re Holocaust Victim Assets Litig.*, 105 F.Supp.2d 139, 152 (E.D.N.Y.2000); *Reilly v. Natwest Markets Group, Inc.*, 181 F.3d 253, 266-68 (2d Cir.1999); *Kronisch v. United States*, 150 F.3d 112, 126-28 (2d Cir.1998).

CRT II Rules, Article 28 n. 5. The bank defendants object to subsection (h) of the presumptions and to this footnote. *See* Letter from Roger Witten, dated April 18, 2003; Letter from Roger Witten, dated May 16, 2002; Response, at 14-19. They argue that, "[t]here is no reason for the CRT II to draw 'adverse inferences' against anyone." Response, at 17.

As the defendants admit, the banks have "no role in the settlement distribution process." *Id.* at 6. The amount of their liability is fixed and the distribution is being administered by the court. Their objections on this score are therefore legally irrelevant and appear to be little more than efforts to better the banks' public image through hair-splitting arguments. Nonetheless, it is to these frivolous objections that I now turn in the hope that they can be put to rest.

### *A. Improper transfers as a basis for an adverse inference:*

The banks object to the CRT's drawing any adverse inference from the Bergier Report's findings regarding forced transfers during the war. They dispute that the Report's findings on forced transfers were significant: "Professor Neuborne characterizes the Bergier Report as disclosing, assertedly for the first time, damaging evidence concerning the conduct of Swiss banks during the Nazi Era. Those attacks are unfair, inaccurate, and not supported by the Bergier Report."

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Witten Letter, dated May 16, 2002, at 2.

The defendants refer specifically to the Bergier Commission's finding that between 1933 and 1939, Credit Suisse transferred about 8 million francs to the Deutsche Bank; the Zurich office of the Swiss Banking Corporation transferred over 6 million francs in accordance with the 1936 German Law on Compulsory Deposits; and the Swiss Banking Corporation sold 8 million francs worth of securities on behalf of German customers who were likely forced to transfer the value to German banks. Defendants claim that the figures provided "cannot conceivably support" allegations that "many, perhaps most, of the Holocaust-related accounts marked closed under doubtful circumstances by the Volcker Committee were actually transferred to the Nazis or otherwise paid to faithless fiduciaries under circumstances that should have led the banks to refuse payment." *Id.* at 2-3. "After all," they continue, the 22 million francs cited "represent[s] a small fraction of the foreign deposits at Swiss banks, which, according to the Bergier Report, amounted to CHF 917 million in 1937 and to CHF 709 million in 1939." *Id.* at 3.

I have already discussed the extent of forced transfers in Part I. It suffices to say here that the 22 million francs cited came from two banks over a shortened time span. They were cited by the Bergier Report only as an "example" of forced transfers made during the war. The Bergier Report suggests that such transfers continued at all the banks for another six years until the War's completion. Indeed, study number 15 undertaken for the Bergier Commission estimated that a more accurate total for the forced transfers completed by Swiss banks would be 200 million francs (or $1.7 billion in today's dollars). *See* Junz, at 2 (citing UEK study, no. 15, *Nachrichtenlose Vermögen bei Schweizer Banken* ). Such large-scale transfers do more than "conceivably support" Professor Neuborne's submissions, and no amount of ***319** spinning by public relations flacks can alter this truth. It was the banks' stated policy throughout the Nazi era to authorize forced transfers of huge amounts of money, a policy from which the defendants cannot now disassociate themselves.

***B. Stonewalling as a basis for an adverse inference:***

The banks argue that "[t]here is no factual basis for accusing the banks of systematically 'lying' to victims about accounts." Response, at 16 (citing Volcker Report, at 13-14). Indeed, they object to "a presumption that the account holders could not have obtained information from the banks about their accounts because of a 'practice of withholding or misstating account information.' This presumption ... is directly contradicted by and cannot be reconciled with the ICEP Report." Response, at 18. Given the Bergier Commission's specific findings of calculated decisions by multiple banks and by the SBA to withhold information about forced transfers even when they had it, to minimize survey results in an effort to block legislation that would have helped identify dormant accounts, and to frustrate the success of the Registration Decree of 1962, this statement is impossible to accept.

The banks do not dispute that legal representatives of the major banks met in 1954 to "coordinate[ ] their response to heirs so that the banks would have at their disposal a concerted mechanism for deflecting any kind of enquiry" from Holocaust survivors and their heirs about accounts that had gone dormant or which had been transferred to the Nazis. Bergier Report, at 446. Nor do they dispute that the legal representatives "agreed not to provide further information on transactions dating back more than ten years under any circumstances, and to refer to the statutory obligation to keep files for only ten years, even if their records would have allowed them to provide the information." *Id.* Nevertheless, the banks contend: "It is important to recall that the Bergier Commission's earlier Dormant Accounts Study [which formed part of the basis for its final report] also reported on the 1954 meeting, but pointed out that the banks did not strictly implement the practices discussed at that meeting, and that some banks actively searched for heirs." Witten Letter, dated May 16, 2002, at 3-4 (internal citations omitted). This is simply not responsive. Of course, some banks may not have "strictly implemented" the policies discussed at the 1954 meeting. The Volcker Committee investigated 254 banks. Not every bank was deceptive in every instance. What is striking, and what is relevant, is that *as a matter of policy,* Swiss banks repeatedly put up a

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

conscious wall of silence in the face of claims by victims of Nazi persecution and their heirs.

### *C. Document destruction as a basis for an adverse inference:*

The banks' most vigorous claim appears to be that the presumptions in the CRT II Rules are unwarranted because, "the ICEP Report and the Bergier Report confirm that the banks never engaged in systematic document destruction and certainly did not do so in any effort aimed at hiding assets belonging to victims of Nazi persecution." Response, at 14, 18. But again, given the history I have recounted in Part I, this statement appears to be little more than a frivolous attempt by the banks to better their public image without regard to historical accuracy.

The banks repeatedly cite two statements in the Volcker Report as the principal ground for their objection. First is the statement that "no evidence of systematic destruction of account records for the purpose***320** of concealing past behavior has been found." Volcker Report, at ¶ 22. Second is the statement that "[t]he auditors have reported no evidence of systematic destruction of records of victim accounts, organized discrimination against the accounts of victims of Nazi persecution, or concerted efforts to divert the funds of victims of Nazi persecution to improper purposes." *Id.* at ¶ 41. Defendants argue that these statements conclusively show that the Swiss banks never engaged in the "wholesale destruction of relevant bank records" that provides justification for the CRT presumptions. I cannot accept this semantic twisting of history.

As an initial matter, the historical conclusions of the Volcker Committee must be understood in context-they were made by auditors who were seeking to identify accounts related to Holocaust victims. It was an "exhaustive, detailed, independent search for victim accounts." Response, at 3. Indeed, I have written that the Volcker Committee represented "what is likely the most extensive audit in history." *In re Holocaust Victim Assets Litig.*, 105 F.Supp.2d at 151. Yet that is precisely what it was-an audit performed by accountants. Their conclusions regarding historical fact merit less weight than those of the Bergier Commission.

Regardless, it is revealing to parse the statements on which the defendants so firmly rely. Again, the principal Volcker Committee statement to which the defendants cling is that "no evidence of *systematic* destruction of account records *for the purpose of concealing past behavior* has been found." Volcker Report, at ¶ 22 (emphasis added). What the Volcker Committee did find is that banks "regularly and systematically" destroyed documents that were over ten years old, as permitted by Swiss law. *Id.* at Annex 7, ¶ 11. Only if one ignores the strong financial incentives for destruction, such as the avoidance of further liability for forced transfers and the ability to generate fees and keep assets that would not be claimed, and if one ignores the fact that the banks "treated inquiries from Jewish customers with assets transferred to Germany in the 1930s differently from those received by non-Jewish German nationals" can it be argued that this routine destruction of records was not "for the purpose of concealing past behavior" or "for the purpose of obliterating the history of the accounts of these victims." *See* Volcker Report, Annex 5, at 83.

In any event, however the banks' motives for destruction are described, their motives are wholly irrelevant to the question of whether the banks committed wholesale destruction of documents that would have allowed Nazi victims and their heirs to locate accounts on which they had claims. Read in context, the statements of the Volcker Committee on which the banks rely cannot stand for the proposition that the banks are asserting. The Volcker Committee, and later the Bergier Commission, both found that the Swiss banks engaged in "systematic" destruction of relevant documents once those documents were ten years old. Any spin the defendants choose to put on that fact is irrelevant. The critical fact, and the one that the defendants appear to miss, is that the Swiss banks did not comport with basic notions of equity. For over half a century they destroyed evidence they knew to be relevant to legitimate claims that were being made and that, if substantiated through documentation, would expose the banks to liability. The fact that the destruction may not have violated Swiss law-which was not amended to accommodate the

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

claims of heirs of account holders who the Swiss knew were slaughtered in the Holocaust and who could not make a successful claim if records were destroyed***321** -is nothing more than a sad commentary on the manner in which the banks were permitted to operate.

In what can only be construed as another act in disregard of the truth, the bank defendants also claim that the Bergier Report echoes the Volcker Committee's conclusion that there was no evidence of systematic document destruction. They support this with the following: "The Bergier Report states 'it would be an expression of an *ill-considered conspiracy thesis* if the assumption were made that [Swiss] entrepreneurs systematically and concertedly attempted to cover up their tracks' through document destruction." Response, at 15 (quoting Bergier Report, at 40). The defendants' lawyers have now quoted the phrase "ill-considered conspiracy thesis" twice in submissions to me to argue that the CRT cannot assume that the banks consciously destroyed documents. *See id.;* Witten Letter, dated May 16, 2002, at 4. This quotation is indeed from the Bergier Report, but the defendants' lawyers have taken it wholly out of context and given it meaning it cannot bear. The Bergier Commission wrote this language in the context of Swiss corporations accused of document destruction, not banks, which the Commission considered in a later section of its report.

Ultimately, the true findings of the Bergier Report likely explain why the defendants' lawyers felt they had to turn to ill-considered objections. The conclusions are unequivocal that massive document destruction took place in Swiss banks. Indeed, it took place every year as another set of documents became ten years old. If this is not "systematic," it is hard to know what is. The destruction was considered routine and was motivated primarily (though not entirely) by profit rather than anti-Semitism-the banks thought that they could avoid liability for improper transfers, keep the deposits that they did not pay out, and curry favor with potential clients who had a desire of secret financial arrangements-but it was wholesale destruction nonetheless.

***Part III: Publication of accounts and access to the Total Accounts Database***

The parties are engaged in an ongoing controversy about how to provide access to records of bank accounts that may have belonged to Holocaust victims. Before turning to the claims and objections, I revisit background that I set forth in approving the settlement in this case. I wrote:

Chairman Volcker has stated that "there will be some limited but significant number of Holocaust related accounts to be found among the millions of savings and Swiss address accounts that we arbitrarily excluded from our research." Letter of Chairman Volcker to Swiss Federal Banking Commission Chairman K. Hauri (Apr. 12, 2000) at 2. This is in part because many victims of Nazi terror may have opened Swiss bank accounts using a secondary residence address in Switzerland, or a false Swiss address designed to confuse the Nazis, or the Swiss address of a friend, business associate or lawyer. Chairman Volcker made this point in explaining language in the Volcker Report, *see* Volcker Report Annex 4 ¶ 8, which suggested that domestic Swiss accounts and small savings accounts were not relevant to its investigation:

These convenient shorthand descriptions [ (i.e., "relevant" or "irrelevant" accounts and "probable" or "possible" relationships to Holocaust victims) ], perhaps too cryptic in light of lawyers determination to split hairs, cannot contradict the uncontestable fact that the exclusion of millions of small savings***322** accounts and Swiss address accounts from the ICEP analysis in the interest of speedy and manageable results does not, and cannot, mean that none of those accounts were Holocaust related. To the extent that such accounts can be practically and expeditiously identified, which is what the test experiment suggests is entirely feasible, the effort should be done to put this matter to rest.

Volcker Letter at 3. This, he explained, was the reason for the need to create a central database of 4.1 million accounts, including the Swiss address and small bank accounts.

On March 30, 2000, after an inordinately long and unexplained delay of four months following the publication of the Volcker Report, the Swiss Federal Banking Commission ("SFBC") authorized publica-

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

tion of relevant information relating to approximately 26,000 of the accounts referred to in the Volcker Report that were identified as having a "probable" link to Holocaust victims. Neuborne Decl. II ¶ 21 & Ex. 7. No authorization was given by the SFBC for the publication of information relating to the approximately 28,000 remaining accounts identified in the Volcker Report as "possibly" related to Holocaust victims. Moreover, unlike earlier SFBC rulings concerning publication of information relevant to Holocaust-related accounts, the SFBC merely "authorized" publication of much of the relevant information, but did not mandate complete publication. Perhaps even more disturbing was the failure of the SFBC to mandate the creation of a central database of 4.1 million accounts that were opened in Switzerland between 1933-45. In sum, the SFBC, by its actions, has made it much more difficult to carry out the mandate of the Volcker Committee that "victims who have been long denied justice by circumstances beyond their control-often poor and now aged-deserve every reasonable assistance in establishing a claim." Volcker Report ¶ 70.

The failure of the SFBC to implement fully the recommendations of the Volcker Committee raised serious questions over whether it would be possible to administer a fair claims process in connection with the Deposited Assets Class. This is because access would be denied to information necessary (i) to provide notice to all potential claimants of the existence of bank accounts with a "probable" or "possible" connection to Holocaust victims, (ii) to permit victims of Nazi persecution to have names matched against the database of 4.1 million accounts for which records exist and (iii) to permit a deposited assets claims resolution process to operate fairly, efficiently and in accordance with procedural due process of law.

*In re Holocaust Victim Assets Litig.,* 105 F.Supp.2d at 155-56. Unfortunately, the "serious questions" that I referred to then remain serious questions today.

The Special Master has reported that limited access to certain accounts remains an ongoing hindrance to the success of the distribution process. In particular, he has expressed concern that the portion of the Accounts History Database ("AHD") comprised of accounts "possibly" related to Holocaust victims has never been published (meaning, a list of the account holders' names has not been made available to the public generally); that the AHD, to which the CRT has consistent access, is artificially limited to the accounts that the Volcker Committee's auditors, after a second round of auditing, determined "probably" or "possibly" related to Holocaust victims; and that the claims officials have not yet been provided with unfettered access to a ***323** centralized Total Accounts Database ("TAD").

The bank defendants object to the Special Master's report, stating that none of these factors should be construed as a hindrance of the distribution process. They argue that the limited access, to the extent they admit that there is any, is entirely consistent with the Volcker Committee's findings. Indeed, the banks claim that because 21,000 accounts identified as probably related to Holocaust victims have been published, because the CRT has full access to the accounts ultimately found to have been probably related to Nazi victims by the Volcker Committee's auditors, and because the CRT can access a sufficiently large portion of the databases making up the TAD, the Special Master is wrong to complain about incomplete access to data.

The banks have limited standing to make these objections. Because they are not a part of the distribution process, the banks' only claim to standing is based on a derivative claim that their account holders are entitled to privacy. Making objections under the "pretext of banking secrecy," however, does not render them legitimate. Bergier Report, at 455. The banks have been submitting these objections for nearly five years, attempting to influence the Volcker Committee's recommendation and to prevent unfettered access to account information that may hold the key to certain claims. The defenses are neither new nor valid-they are just the latest attempt by the Swiss banks to delay justice and prevent access to the truth. I address them individually after explaining what degree of access currently exists for Swiss bank account records dating from the Nazi era.

***A. Current access to account information***

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Critical to understanding the current debate over access is an understanding of the Volcker Committee's findings. Its initial estimate that there were 54,000 accounts possibly or probably belonging to victims of Nazi persecution was conservative. First and foremost, the 2.8 million accounts for which absolutely no records exist were, of course, excluded from the Volcker Committee's audit. More relevant to the current debate is the fact that the Committee adopted certain auditing strategies and assumptions that helped facilitate the identification process, but which necessarily entailed overlooking some victims' accounts. The most significant step was that all accounts opened using a Swiss address and all small savings accounts were "excluded from the accounts databases for the purposes of matching and research" because of the limited likelihood that they would have belonged to Nazi victims. Volcker Report, Annex 4, ¶ 8. This simple step removed nearly 1.9 million accounts from consideration even though Chairman Volcker has acknowledged that some number of the 1.9 million accounts would have been opened by Nazi victims using false Swiss addresses or the addresses of Swiss intermediaries in an effort to hide assets. *See* In re Holocaust Victim Assets Litig., 105 F.Supp.2d at 155. In a second relevant auditing strategy, all accounts with evidence of activity occurring after 1945 were excluded, even if the activity did not indicate that the accounts were properly paid. For instance, the Holocaust Claims Processing Organization describes an account that was closed in March 1951 and excluded by the auditors because it indicated that, "the funds were credited." HCPO, TAD Preliminary Progress Report, Account number 524225. "The Auditors interpreted this term as closed to authorized party absent other information," even though the account holders were both killed in concentration camps in 1944 and there is no affirmative ***324** evidence that the account was ever paid to a proper party. *Id.*

Nonetheless, the conservative estimate of 54,000 relevant accounts was met with surprise and disfavor by the SBA and the Swiss Federal Banking Commission ("SFBC"). The SBA and SFBC thus turned to the same auditors the Volcker Committee had employed and asked them to further "scrub" the accounts the auditors had identified. The banks came forward with additional information from bank records and asked the auditors to once again eliminate from the list accounts that were opened after 1945, accounts that had closing dates before the dates of occupation, accounts with any activity after 1945, and duplicate accounts from the list of probable and possible accounts. *See* CRT-II Rules, at 2. After completing two rounds of this "scrubbing," the auditors decided that of the 54,000 accounts previously identified, there were only 21,000 accounts that "probably" belonged to Nazi victims, and 15,000 accounts that "possibly" belonged to Nazi victims. The auditors arrived at this conclusion even though they were theoretically searching for the same excluding characteristics as they had sought when employed by the Volcker Committee.

The 21,000 accounts identified as probably belonging to Nazi victims were published on the Internet on February 5, 2001 with the endorsement of the SFBC. The rest were not. Instead, a single Accounts History Database ("AHD") was created containing all the information related to the 36,000 accounts deemed probably or possibly belonging to Nazi victims after the scrubbing process. For the remaining 4.1 million accounts, we have not one database, but many. The Volcker Committee's audit "by its nature" resulted in the creation of databases of the 4.1 million accounts found at various banks. Volcker Report, at ¶ 65. These databases were never compiled into a single database-at present, there are over 50 databases containing the accounts. As the Volcker Committee recognized in its report, "these databases are scattered among individual Swiss banks and are not now freely available for examination." *Id.* Regardless, for the sake of clarity if not accuracy, I will refer to this compilation of databases the Total Accounts Database ("TAD").

The AHD and the TAD are administered through what has been termed the Data Librarian. The role of the Data Librarian (an accountant who is appointed by and reports to Special Masters Volcker and Bradfield and the SFBC) was created in an effort to make the information available to the CRT while "assuring compliance with Swiss laws on data privacy and confidentiality, and the rules on data confidentiality es-

tablished by the SFBC in its decisions of March 30, 2000." CRT-II Rules, Appendix A. Essentially, if the CRT is able to match the name of a claimant to a name on an account in the AHD through computer searches, the Data Librarian will provide the CRT with whatever relevant information exists for the account. For accounts in the TAD, the CRT has more limited access. For example, with respect to accounts that bear a Swiss address and for small savings accounts (accounts excluded from name-matching by the Volcker Committee), the Data Librarian will only perform a name-matching analysis of accounts in the TAD after being provided with "credible evidence" that the specific account sought is likely to have belonged to a Nazi victim who used a Swiss address.

Before turning to the specifics of the current debate over the level of access, I address a particularly frivolous argument for the status quo that the banks have repeatedly put forth. The banks argue that the decision to provide the current ***325** level of access to the account records was not made by the banks or even by the Swiss government, but by the Volcker Committee. They write: "[T]he criticism directed at the Swiss Government ignores the fact that it was the ICEP, not the banks or the Swiss Government, that recommended authorizing (not ordering) publication of only the 'probable' accounts." Response, at 10.

I was personally apprised by the Volcker Committee of the negotiation process that led to its recommendations. The Volcker Committee, while independent, was constrained by the fact that it was seeking to make recommendations that would be followed. At the outset of its discussions with the Volcker Committee, the Swiss Federal Banking Commission ("SFBC") was only willing to agree to permit the publication of fewer than 5,000 accounts. The banks themselves also sought limited disclosure, as indicated by a letter sent by the Chairmen of Credit Suisse and UBS AG to Chairman Volcker before the Volcker Committee published its recommendations. *See* Letter from Peter E. Calamari to Judge Korman, dated November 29, 1999 (enclosing letter from Lukas Mühlemann and Marcel Ospel to Chairman Volcker, dated November 25, 1999). Had the banks and the SFBC remained in steadfast opposition, the successes of the Volcker Committee would have become meaningless; without access to accounts, justice could not be rendered. Thus, a compromise was brokered. The Volcker Committee, in a decision both wise and reasonable given the circumstances, decided to recommend that certain accounts be published. Essentially, it recommended that of the 54,000 accounts it had deemed "probably" or "possibly" belonging to Holocaust victims, those with the higher likelihood of having belonged to Nazi victims be published while not publishing those with a lesser likelihood, though they too may have in fact belonged to Nazi victims. Meanwhile, it recommended that a centralized database be created for the rest of the accounts. The fact that the Volcker Committee made this measured recommendation in the face of such pressure in order to get the banks and the SFBC to go along does not eliminate the banks' active role in limiting the CRT's subsequent access to accounts. Nor does the fact that, for pragmatic reasons, I approved the settlement even though it involved less than full publication.

***B. Publication of accounts "possibly" related to Nazi victims***

[4] The bank defendants oppose the Special Master's recommendation to publish the 15,000 accounts the Volcker Committee's auditors, after scrubbing, deemed "possibly" belonging to Nazi victims. For these accounts, the account holder's name matched the name of a known victim of Nazi persecution who resided in Germany or an Axis-occupied country, but the account records lacked further confirming documentation. In many ways, the bank defendants first lodged this objection when they wrote me a letter on October 29, 1999, before the Volcker Committee finalized its report. I had advised the banks that I intended to urge the Volcker Committee to recommend publication of all accounts deemed possibly or probably belonging to Holocaust victims, which included accounts then referred to as Category 3 accounts, and the bank defendants argued against any such recommendations. *See* Letter from Roger Witten and Carol Clayton to Judge Korman, dated October 29, 1999. Category 3 consisted of accounts that were open or opened in the relevant period, which had an exact or near-exact name match to a victim of Nazi persecution, and which were closed, unknown***326** by whom. Volcker Report, Annex 4, ¶ 25. Because of

document destruction, it is impossible to tell whether these accounts were active or inactive after the close of the war. *Id.* But they were deemed possibly belonging to Holocaust victims.

The banks wrote: "[B]ecause of serious deficiencies in Category 3 as the ICEP apparently now envisions it, publishing the Category 3 Accounts would be unfair to the banks, add nothing to the comprehensive class notice program just completed, mislead and confuse the public, and encourage claims by non-class members." Witten Letter, dated October 29, 1999, at 1. First and foremost, one has to wonder how the publishing of accounts that have been designated possibly belonging to Nazi victims would be *unfair to the banks.* The settlement is complete and distribution is all that remains. *Fairness to the banks* in this context is not a major concern. Given the history that I recounted in Part I, I suggest that the banks stop being so concerned about what would be fair to them, and start thinking about what would be fair to their clients and their heirs.

In the October 29, 1999 Witten letter, the defendants also argued against the publication of Category 3 accounts on the grounds that, "the majority of Category 3 Accounts with a known closing date were closed *before* the account holders could have been victimized, thereby dispelling any inference that the Swiss banks somehow took advantage of the account holders." Witten Letter, dated October 29, 1999, at 3. They continued: "Of those [Category 3] accounts with a known closing date, the ICEP auditors found that more than *70%* were closed before 1940 (i.e., before the onset of the Holocaust)." *Id.* The banks forget their history. Adolf Hitler was appointed Chancellor of Germany on January 30, 1933. In that year, he began persecuting and victimizing Jews and others. He passed restrictive laws, including laws aimed at Jews with foreign assets, he established the Gestapo, and he opened Dachau and other concentration camps. Hitler's persecution increased through the decade, and by the late-1930s, he was ready to geographically expand it. On March 12, 1938, he announced the *Anschluss,* the annexation of Austria. Shortly thereafter, he occupied Czechoslovakia. On September 1, 1939, he invaded Poland. And on May 10, 1940, he invaded Holland, Belgium, and France. Throughout this period, Jews and others were victimized and killed. Perhaps more relevant to the banks' objections, they were forced to transfer whatever assets they had (including, of course, the contents of Swiss bank accounts) to the Nazis. A recent award based on the bank accounts of Anna and Karl Kaiser, transferred to the Nazis in 1933, demonstrates this:

The Bank's records indicate that the Account Owners submitted their savings booklet in December 1933 to the Bank with an order to transfer the proceeds of the accounts to the *Oeffentliche Sparkasse Säckingen* [a German savings bank]. Given these facts, that in 1933 the Nazis embarked on a campaign to seize the domestic and foreign assets of Jewish nationals in Germany through the enforcement of flight taxes and other confiscatory measures including confiscation of assets held in Swiss banks; that the Account Owners resided in Germany in 1933 when the transfer order was made, and thus they would not have been able to repatriate their accounts to Germany without their confiscation; that the accounts were on a list in the Bank's records of accounts for payment to the German Reichsbank; and given that the accounts were transferred to a German bank for payment to the Reichsbank; the CRT determines that it ***327** is plausible that the Account Owners were forced to transfer the proceeds of their accounts to Nazi authorities.

CRT Awards, Group XL, award number 18, available at *www.crt-ii.org.* For the defendants to have suggested that bank accounts which were closed before 1940 could not have belonged to Nazi victims is an affront to the truth.

More relevant, and deserving a more involved response, is the banks' claim that publishing Category 3 accounts would only serve to mislead and confuse the public, and encourage claims by non-class members. This is the objection to which they continue to adhere today with respect to the 15,000 accounts identified as possibly belonging to Nazi victims. The defendants have stated, "the public would surely see the decision to publish as confirmation that the Category 3 Accounts in fact belonged to Holocaust victims and were in some way mishandled by the banks." Witten Letter, dated October 29, 1999, at 3. They argued:

Hundreds of thousands of people throughout the

world would share a family name that appears on the Category 3 list, and would be given essentially false hope that they are entitled to some kind of distribution from the settlement fund based on the publication. In reality, however, there would simply be insufficient information from the ICEP's investigation to determine whether the applicant was indeed entitled to make a claim, the circumstances of account closure, or the amount in the account.

*Id.* at 3-4. First, the suggestion that publishing the names of 15,000 more account holders on accounts in the AHD will somehow "open the floodgates" and lead to countless claims is simply unsubstantiated. Only 33,000 claims have been filed thus far, hardly a floodgate. More to the point, there is no reason for this to be of concern to the Swiss banks. The settlement diverted the path of any potential flood of claims from the Swiss banks to the settlement fund.

Second, I fail to see why the full publication of Category 3 Accounts, or those deemed possibly belonging to Nazi victims, would create "false hope" materially different from whatever hope publication of accounts deemed probably related to Nazi victims would create. Indeed, there may be "false hope" throughout this process, but the reason comes back to the banks. Because they stonewalled for so long and destroyed so many documents, we are often left without clear answers for claimants. It is disingenuous at best for the banks to have provided so little hope to claimants for so many decades, and now, when they have an opportunity to make amends, for them to worry about providing *false* hope.

In any event, whether to publish accounts has little to do with providing hope; it has to do with getting legitimate claimants to file claims. Only 33,000 claims have been filed, and those most often successful have been in connection with the published accounts. Undoubtedly, part of this is due to the fact that the published accounts were the accounts deemed most likely belonging to Holocaust victims by the Volcker Committee. But in some part, the success of claims based on published accounts is due to the increased interest that publication generates. *See e.g.,* Letter from Ms. D to Special Master Gribetz, dated December 15, 2003, at 3 (stating, "I know that my mother would not have known of her parents' accounts, if it were not for the publication of the Accounts Owners list on February 2001."). Publication allows heirs and representatives of Holocaust victims to quickly check whether there is a record of a bank account they believe existed. This will never resolve their questions, but it is a good start.

### *328 *C. Unfettered access to the Total Accounts Database*

[5] In his Interim Report, the Special Master expressed concern that the CRT's access to the Total Accounts Database ("TAD") has been artificially and arbitrarily limited and that "the negotiated amendments to the Settlement Agreement concerning access to 'TAD' have resulted in a claims resolution mechanism that is at best complex and time-consuming." Interim Report, at 32-33. Because the Data Librarian serves as a gatekeeper to the TAD in an effort to assure compliance with Swiss privacy laws, "Swiss banking authorities continue to be involved in the claims resolution process." *Id.* at 33 n. 49. The Special Master claims that this involvement has placed the banks' desire for secrecy ahead of the search for Nazi victims' accounts. Specifically, he objects to the process whereby the CRT is unable to search for possible matches between claimants' names and the names on accounts in the TAD unless it can provide credible external evidence of why the account may have been that of a Nazi victim and still excluded from the Volcker Committee's list of those accounts probably or possibly belonging to Nazi victims.

The Volcker Committee and the Chairman of the Committee himself recommended the creation of a centralized database of the 4.1 million accounts of which there is some record. *See* Volcker Report, at ¶ 67. Chairman Volcker wrote: "The establishment of this central archive of data on all 4.1 million accounts for which records exist is absolutely essential to the deposit claims resolution process that would consider not only claims to published accounts but also claims from other sources." Letter from Chairman Volcker to Judge Korman, dated February 18, 2000, at 1-2. As noted above, a centralized database was never created. Moreover, the current restrictions on the Total

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Accounts Database as it is now constituted effectively undermine much of the beneficial purpose it could serve. At one point, it may have made sense to limit searches of the TAD because of the extreme administrative costs and the frequent false positives that could occur through trying to match claimants' names to those of account holders. But, as Professor Neuborne has noted, there is now "improved information technology recently made available to the CRT rendering it possible to computer match on a more accurate basis." Decl. at ¶ 42. The Total Accounts Database, especially if centralized, could provide a resource-a great resource-that could be the only way for claimants who lack precise information about accounts to determine whether an ancestor actually possessed an account in a Swiss bank. It is disappointing that the Swiss banks are not anxious to take advantage of this new name-matching technology and expand access to the TAD.

The Swiss banks, despite their claims of non-involvement, have great influence over the SFBC. More than anyone else, it has been the banks that have determined the extent of the CRT's access to the AHD and the TAD. For them to continually claim (as they have) that access is properly limited because (1) the Volcker Committee so recommended, (2) it is good for the distribution process in that it prevents excess claims and false hope, and (3) it would be unfair to the banks to require further disclosure, is unacceptable. Not one of these reasons is valid. The truth appears to be that the banks fear the embarrassment that will come from further access to accounts, deeper probing into their history, and further successful claims by Nazi victims and their heirs. This embarrassment cannot outweigh the good that could come from more open cooperation.

***329 *Conclusion***

The defendants' various objections are rejected, and I reaffirm the challenged language of the Special Master's Interim Report. Over the past two years, I have ignored the recurring submissions of the Swiss banks, because, as they acknowledge, the banks have "no role in the settlement distribution process." Response, at 6. The amount of their liability is fixed and the distribution is being administered by the court. Their objections on this score are therefore legally irrelevant and their only purpose has been to burden the record with spin and distortion. The banks' last submission, however, was one too many.

SO ORDERED:

*APPENDIX*

April 6, 2002

**Bergier Commission: Analysis of Swiss Bank Behavior** FN**

FN** Material cited, unless otherwise indicated, is drawn from the *Final report of the Independent Commission of Experts Switzerland-Second World War,* Pendo, Berne, 2002 and Barbara Bonhage, Hanspeter Lussy, Marc Perrenoud, *Nachrichtenlose Vermögen bei Schweizer Banken,* UEK Band 15, Chronos, Zurich, 2001.

Helen B. Junz

The press reports on what the final Report of the Bergier Commission had to say about the behavior of Swiss banks in the Holocaust era give a somewhat misleading impression of the actual findings. It draws entirely on rather broader remarks made by Prof. Bergier, the Commission's chairman, at the final press conference. On that occasion, addressing the issue of restitution and the failure of Swiss society to respond adequately, he said: "There is no maliciousness at the origin of this shortcoming nor is it to be imputed to a desire to capitalize on the misfortune of the victims. First and foremost, it was due to negligence and to the non-recognition of a problem which, at best, was perceived as marginal;" Though he went on to say: "... or even more, due to a concern for safeguarding the strategic trump card of discretion, namely bank secrecy," only the first part of the quote was picked up by the press as representing the overall verdict of the Commission, without a further reading of what the Report and the associated research actually said.

Of course, the Commission's Report went materially further that Prof. Bergier's full remarks implied. With respect to the restitution issue in the banking area, it

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

concludes, inter alia, that: "Where the banks were concerned, it seems unlikely that the amounts needed for complete restitution of the accounts really represent a [valid] obstacle to their willingness to cooperate. It is more likely that the efforts made in the post-war era to reinforce and expand their commercial position as regards asset management ... made [it desirable that] the unassailability of banking secrecy appear absolute, and thus no consideration was given to the special circumstances of clients who had suffered during the Holocaust era."

Even though the original English version of this finding was negotiated into a German text acceptable to all and then not very elegantly retranslated for the English version of the Report, I think the intent is very clear. The point is that the red thread that runs through the documentation of the behavior of the Swiss financial and economic community during both the Nazi period and the post-war era, is one of perceived economic self-interest. Thus, the general finding, in the Report and in the study on dormant accounts (UEK No. 15), that banks did not systematically seek ***330** to enrich themselves at the expense of their victim clients is very restrictive. It neglects the fact that the banks systematically put aside the interests of the clients, they had so ardently solicited with assurances that their assets would be kept safe for them and theirs, in favor of business interests they perceived at that moment to be more promising. Surely this must be counted as "systematically enriching themselves" at the expense of their Holocaust victim clientele.

The manner in which the Swiss banks acted with an eye to their own bottom line is documented and analyzed in the UEK's study no. 15, *Nachrichtenlose Vermögen bei Schweizer Banken,* authored by Barbara Bonhage, Hanspeter Lussy, and Marc Perrenoud. The researchers set out, on the basis of case examples, that the banks during the Nazi period had considerable leeway in determining their response to the Nazi authorities' demand that they cooperate in making their foreign clients comply with Nazi laws and regulations. They show that the courts generally would side with the original client in cases where client deposits were moved to the deposit accounts of Nazi approved "Devisenbanken," even when requested by the owner. The bank secrecy legislation of November 8, 1934, augmented by the "Spitzelgesetz" (spy law) of June 21, 1935 (in January 1942 replaced by articles in the Penal Code) all prevent banks from providing information on clients and clients' deposits to outside authorities and make clear that Swiss law does not allow foreign authorities to seek to enforce compliance with their own regulations and laws on Swiss territory.

Although there are documented cases where banks acted to safeguard clients' assets-by moving them to numbered accounts or into other-named accounts-current evidence shows that the cases in which accounts were released predominated. The researchers conclude that especially the big banks, with an eye to their business interests in and with the Reich, did not resist complying with the Nazi authorities' laws and regulations on capital flight. These required that externally-held deposits be moved to the accounts of designated Devisenbanks. They estimate that in this way the major banks released some SF 200 million worth of deposits and securities to the German banks and/or the Reichsbank (p. 165). While there is no evidence that in this process Jewish clients were treated more unfavorably than other clients resident in the Reich, it was also clear that by 1938 the banks had no excuse for failing to recognize what they already knew-that persecutees provided the Nazi regime with release authority for their Swiss accounts under duress. But this awareness was not reflected in any action that would provide greater protection to these clients. Bonhage et al note, however, that the banks also had to weigh whether the foreign client was in a life-threatening situation when he signed the release authority for his account and acknowledge that this could have motivated banks to comply with Nazi demands.

Bank files also show instances where policy discussion in the particular Bank Board makes it clear that clients who had become Nazi persecutees were considered a nuisance. Sales of securities from and closures of accounts "pas de correspondence"-that is where, often at the expressed wish of the client, no correspondence had been exchanged for some time-are also documented (e.g. Kantonalbank von Bern 1937-1940).

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Beyond the indications showing, as noted above, that dormant accounts tended to be closed already during the Nazi years and their contents or proceeds put in omnibus or loss and profit accounts, the researchers***331** found little evidence of the fate of security deposit accounts. With respect to current and savings accounts, these fell under general no-interest provisions so that they even before the end of the war began to be eroded by the levying of administrative costs. The practice of opening safes and selling assets to pay for the cost of hiring the safe also is documented for that period.

The move of some accounts into omnibus accounts held at headquarters is cited in part as a measure that helped prevent the accounts from being emptied by bank employees. Such fraud was apparently sufficiently frequent to be mentioned in this context.

The Nazi period, according to this research therefore, is characterized mainly by closures of accounts and the release of assets to Nazi entities, often in the interest of business relationships in and/or with the Reich and less so by arrogation of dormant accounts to balance sheet positions. The focus on Germany as a desirable business partner persisted beyond the period when Swiss business believed in a Nazi victory as there was widespread conviction that the German economy would either survive or quickly regenerate after the war.

The general attitudes toward Germany and the turning away from business relationships with persecutees is corroborated in UEK study no. 13, *La place finaqnciere et les baques Suisse à l'époque du national-socialisme* FN***

FN*** Marc Perrenoud, Florian Adank, Jan Baumann, Alain Corta, Rodrogo Lopez, Suzanne Peters, *La place finaqnciere et les banques Suisse à l'époque du national-socialisme,* UEK Band 13, Chronos, Zurich, 2002.

The behavior of the Swiss banks in the post-war period illustrates yet more clearly the dominance of bottom line motivations. The banks quite quickly realized that post-war political developments were bringing new opportunities to the field of asset management. They already were well-positioned, having come out of the war with a stable and convertible currency, but perceived that hewing to their commitment to bank secrecy and protection against cross border compliance with tax and foreign currency regulations of other countries would give them a further material advantage. Compared with the cold-war generated new client potential, the Holocaust survivor clientele held not interest-on the contrary. Basic policies, though not enunciated as such, thus generally aimed-of course with some exceptions-to ignore this clientele. And how better to ignore them than by making the relationship disappear-either literally by dissolving the accounts or indirectly by minimizing the issue.

By 1945 still existing dormant accounts already had been hollowed out to some extent. If securities were held in "closed" deposits, the bank was not required to manage them. This meant, for example, that bonds that should have been exchanged would be allowed to lapse, etc. More generally, as noted above, no interest was paid for most of the period while administrative costs were levied. These practices continued after the war, but now there clearly was a demonstrable desire to allow accounts to diminish sufficiently so they could be closed or remains transferred to the banks' profit and loss accounts. Banks, accordingly, revised their decision about the extent to which they would manage a specific account more than once. Bonhage et al. cite a case where the Schweizerische Bankverein (SBV) held a SF 20,000 deposit of a Polish client in a non-interest bearing current account from 1939-1957-over which period***332** the value had diminished; from 1957-1982 the bank invested the funds in securities and the account grew to SF 30,000; between 1982 and 1994 it reverted to the status of a non-interest bearing current account and shrank accordingly; in 1994 the bank again decided to manage the account actively. No reasons are given for these switches in management decisions.

A further example shows the total erosion of a SBV account: the levy of administrative costs reduced a deposit shown in 1939 to amount of SF 3, 255 to nil by 1980. But the bank continued to carry the account-by 1992 it had a negative balance of SF 4,793 as the

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

bank charged between 5.25-10.25 percent for extending the requisite credit to carry the account. Unlike other accounts, this account was neither put into an omnibus account-which would have obviated the administrative charges-nor closed. This management decision probably was not unrelated to the fact that the client also had a safe at the SBV containing gold coins. In 1992 the SBV began to sell these coins to cover the accumulated charges (p. 403-4).

Other examples confirm the assumption that banks not infrequently put assets held in dormant accounts into their own paper. While this may have been a proper asset management decision from a portfolio point of view, it obviously was helpful to the bank to be able to sell its paper off market.

The documentation shows how the Schweizer Bankgesellschaft (SBG) in the 1970s, like others, debated ways of finding a systematic treatment for dormant accounts. It discussed a plan whereby small current and savings accounts would be liquidated, current accounts between SF 50 and 10,000 would be put in an omnibus account, that was to be non-interest bearing, but also would not be charged administrative costs. But this plan foundered on the concerns of the Bank's legal department. In the 1980s there again was an attempt to consign accounts of clients, who had died between 1994 and 1961, to an internal account. This was to happen by creating sufficiently large charges for various costs and services so that the deposits would be wiped out. This again came to nought over the objections of the legal advisers. But the policy intent was clear; inactive accounts were a cost and should be made to disappear. (P. 406-7). Only large accounts appeared to have been managed actively-presumably commissions charged to the accounts made this worthwhile and, as noted above, they could be a source of roll-over finance for the bank.

The researchers were not able to quantify the effects of these policies on the stock of dormant accounts. But there can be no question that in the majority of cases and certainly for accounts of average value-it would be realistic to presume that the initial deposit amount, in absolute terms, was significantly greater than that shown currently.

E.D.N.Y.,2004.
In re Holocaust Victim Assets Litigation
319 F.Supp.2d 301

Briefs and Other Related Documents (Back to top)

• 2006 WL 1020180 (Trial Motion, Memorandum and Affidavit) Final Supplemental Memorandum of Law In Support of Fee Application of Burt Neuborne (Feb. 24, 2006) Original Image of this Document (PDF)
• 2006 WL 1020179 (Trial Motion, Memorandum and Affidavit) Memorandum of Law in Support of Lead Settlement Counsel's Application for Counsel Fees (Jan. 3, 2006) Original Image of this Document (PDF)
• 2000 WL 34498383 (Trial Motion, Memorandum and Affidavit) Supplemental Declaration of Burt-neuborne in Support of an Application for an Order Pursuant to Rule 23(e) Approving the Settlement Agreement as Fair, Adequate and Reasonable (Jun. 26, 2000)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.