February 13, 2026

**VIA EMAIL**

Hon. Edward R. Korman
United States District Judge
Eastern District of New York
Room 918
225 Cadman Plaza East
Brooklyn, New York 11201

> **Re:**   *In re Holocaust Victims Asset Litigation*, Civ. No. 96-4849 (ERK)

Dear Judge Korman:

We represent nonparty Simon Wiesenthal Center ("SWC"). We respectfully submit this letter brief in opposition to UBS's[1] January 28, 2026, letter requesting that the Court issue an order of "clarification" regarding the 1999 Settlement (ECF 5086) ("Request for Clarification").[2]

## Introduction

The Court must reject UBS's request for at least two reasons: (1) it seeks for this Court to issue an improper advisory opinion regarding a hypothetical dispute about the 1999 Settlement; and (2) UBS's proposed "clarification" order actually modifies and enlarges the scope of the 1999 Settlement, and in so doing raises serious constitutional concerns.

**UBS seeks an improper advisory opinion.** This Court retains jurisdiction "for purposes of **enforcing** th[e] Settlement Agreement."[3] However, UBS expressly disavows seeking relief from this Court to enforce the 1999 Settlement against nonparty SWC or anyone else. As stated in its Request for Clarification, "**UBS does not seek enforcement of the Settlement Agreement against any party**."[4] Neither UBS nor SWC have sued each other over the 1999 Settlement Agreement, nor have they stated that they intend to sue each other. Indeed, at the recent hearing before the Senate Judiciary Committee, UBS represented, under oath, that it would not sue SWC nor was it trying to silence SWC. Thus, as this Court has previously held, "[there is not] a live case

---

[1] As used herein, "UBS" or the "Bank" refers to UBS AG, including Credit Suisse, unless otherwise indicated.

[2] Although seeking an order from the Court, UBS has not filed a motion stating with particularity the grounds for the relief requested as required under FRCP 7(b).

[3] Settlement Agmt. § 14. Emphasis is added throughout unless otherwise indicated.

[4] Request for Clarification, at 1.

pending before [the Court],"[5] and issuing the advisory opinion UBS requests exceeds the judicial authority of the Court under well-established constitutional principles.

**UBS seeks to modify and enlarge the 1999 Settlement.** Multiple problematic aspects of UBS's proposed "clarification" order in actuality would *alter* and *expand* the 1999 Settlement. UBS has not (i) moved for such modification, (ii) articulated the proper factual and legal standard for doing so (let alone even attempted to satisfy those standards) or (iii) complied with the 1999 Settlement's own terms for modification, which requires notice and agreement by all parties.

Yet the proposed order would materially change and enlarge the 1999 Settlement. For example, the proposed order asserts that the "Settlement's scope explicitly covers all the subjects of the investigation into Credit Suisse's history that were and are being performed since 2020 by the independent Ombudspersons … including "any historical fact whether known or unknown at the time the Settlement was entered into."[6] But the Bank hasn't even attempted to either give notice to all relevant parties nor, separately, to demonstrate the factual and legal basis for the Court to reach this Settlement-altering conclusion (that is for a reason: no such basis exists).

The proposed order likewise asserts that "the Settlement was not dependent on representations of any party."[7] But the 1999 Settlement does not say that, and again, there has been no notice and consent by the parties to this material revision, nor has there been any legal or factual submission on whether that assertion is correct or separately what the import of any such representations (or lack thereof) might be.

UBS's proposed order also asserts that organizational endorsers such as SWC "may not, with respect to any matters covered by the Settlement … promote, assist in promoting or cause to promote **any public controversy (in the media or otherwise)** …."[8] Again, however, the parties have not been notified of or consented to this material change given that the 1999 Settlement does not require this, and UBS's proposed prohibition is so vague and overly broad that it undoubtedly would act as an improper prior restraint on SWC's (and the other organizational endorsers') core First Amendment speech and petitioning rights. Indeed, the Independent Ombudsperson has testified to his substantial concern that if the Court were to enter UBS's requested order, it would chill SWC's ability to continue cooperating with his and the Senate Judiciary Committee's investigations into Nazi assets concealed by UBS. Separately, the inappropriate, stealth insertion of these terms underscore yet another problem with UBS's advisory opinion submission: by its own terms the proposed order potentially would impact not just SWC but all of the other organizational endorsers, none of whom have been given notice or an opportunity to be heard concerning this proceeding, but who would necessarily be interested, affected, and entitled to be heard.

These and the many other deeply troubling aspects of UBS's Request for Clarification highlight why courts are constitutionally prohibited from issuing advisory opinions, because, as

---

[5] Ex. 1, May, 17, 2023 Email from Chambers of Hon. Edward R. Korman.
[6] ECF 5086-1, Proposed Order ¶ 1.
[7] *Id.*
[8] *Id.*

here, they can unnecessarily and unfairly impact the interests of persons (known and unknown) without a clear case or controversy warranting action by the Court.

The Court should recognize UBS's strategy for what it is: an end run attempt to avoid the criticism and scrutiny it would receive were it to actually sue SWC or any other organizational endorser, while bolstering the Bank's position for future, hypothetical, disputes, if it is able to persuade the Court to modify and expand the 1999 Settlement without proper notice and agreement by the parties as the Bank urges. That is a wholly improper request which exceeds this Court's judicial authority, disregards the 1999 Settlement's plain terms, and would violate not only a well-founded search for justice related to hidden Nazi assets, but would also violate SWC's (and the other organizational endorsers') well-settled constitutional rights.

SWC has done nothing more than exercise its First Amendment rights to investigate and document historical truths concerning heretofore undisclosed Nazi assets that appear to remain in the Bank's possession. If UBS files a motion to enforce based on alleged violations by SWC of the 1999 Settlement, it would be entirely meritless, as SWC would have numerous valid defenses to enforcement. But those issues simply are not before the Court, and it should decline UBS's current, unfounded Request for Clarification.

## **Relevant Background**

SWC is a section 501(c)(3) nonprofit charitable organization that has, since its founding, carried out the mission of its namesake: combatting antisemitism and teaching the lessons of the Holocaust. Central to that mission is investigation, advocacy, and education concerning the crimes and atrocities committed by the Nazi Germany regime and its enablers before, during, and after World War II.

The 1999 Settlement resolved the litigation before this Court between Swiss banks and Holocaust survivors, which concerned the "actions and omissions of [the Swiss banks] … relating **principally to financial transactions with or affecting Victims or Targets of Nazi Persecution as defined herein**." 1999 Settlement, p. 1 (first "Whereas" clause). The 1999 Settlement was conditioned on its endorsement by SWC and other leading Jewish organizations; absent such endorsement, the defendant banks had the unilateral right to declare the settlement ineffective. *Id.* Related Agmt. ¶ 3. Given its mission in pursuing justice for Holocaust victims and survivors, and based on what information it had at the time, SWC endorsed the 1999 Settlement Agreement.

Notwithstanding its endorsement, SWC is not and was not a party to this litigation; it never asserted "Claims" as defined in the 1999 Settlement, and it did not receive any payments from Credit Suisse, UBS, or any of the other Swiss institutions identified as settling defendants in the 1999 Settlement. Nor has SWC invoked this Court's jurisdiction or initiated litigation. The 1999 Settlement Agreement did not end SWC's nonprofit mission, nor did it terminate the right of SWC or other organizational endorsers to conduct and publish new research about the Holocaust, even if that research and investigation implicated the role of Swiss financial institutions. Since 1999, SWC has engaged in numerous investigations of myriad issues related to the Holocaust and published its findings, none of which raised any concern from Swiss banks, including Credit Suisse and UBS.

In March 2020, more than twenty years after the 1999 Settlement Agreement, and as part of its ongoing mission to uncover historical truth, SWC revealed its discovery of undisclosed information about Nazi assets (not linked or traceable to specific Holocaust victims) at Swiss banks.[9] SWC voluntarily brought this information to Credit Suisse, and in response, the Bank embraced the information's significance.[10] The Bank did not assert a violation of the 1999 Settlement Agreement, nor did it invoke the 1999 Settlement Agreement in any way including requesting "clarification" of the Agreement. Rather, Credit Suisse asked SWC to agree to carry its findings forward in a private investigative process. After extensive negotiations, SWC agreed. For years, Credit Suisse did not assert that SWC breached the 1999 Settlement Agreement, nor did it notify the Court of a putative breach.

Contemporaneous documents reflect the mutual intention of Credit Suisse and SWC to enter into an agreement to fully and transparently investigate the Nazi Assets and subsequently address any remediation and monetary compensation claims based on the outcome. The substance of that agreement was clear: Credit Suisse pledged its full support for a transparent and thorough investigation by an independent and respected third party ("Independent Ombudsperson") leading to a published report. In return, SWC agreed to collaborate with and disclose its confidential investigation work product to Credit Suisse and the Bank's selected Independent Ombudsperson. As part of the agreement, Credit Suisse selected Neil Barofsky of Jenner & Block LLP as an Independent Ombudsperson to oversee a forensic investigation into the full scope of Nazi assets at Credit Suisse.[11]

In or around November 2021, Mr. Barofsky provided Credit Suisse's Executive Board with a comprehensive investigative plan.[12] The Executive Board approved the plan, which defined the scope of the investigation to include information SWC publicly revealed in March 2020, other SWC information on Nazi assets, and additional leads that Mr. Barofsky identified, including newly discovered "Ratlines" (the escape routes used by Nazis fleeing prosecution following World War II).[13] Mr. Barofsky spent six months intensively overseeing the investigation of Nazi assets at the Bank. Among other findings, the Independent Ombudsperson located or verified troubling

---

[9] *See* https://wiesenthal.org/news/credit-suisse-ag-and-nazi.

[10] Ex. 2, March 4, 2020, Letter from Credit Suisse's Romeo Cerutti and Lydie Hudson to SWC's Dr. Shimon Samuels and Dr. Ariel Gelblung ("We would like to acknowledge the importance of the concerns that you have raised in your email of March 2, 2020. Credit Suisse is committed to finding the truth as best we can using the information and means available still today. We are prepared to investigate the information you have provided to us and lay open – to the extent we are legally permitted – the results."). *See also* Ex. 3, July 21, 2021, Ltr. from Credit Suisse's Thomas Grotzer and Mindy Silverstein to Rabbi Marvin Hier ("Mr. Barofsky and Mr. Forman were engaged explicitly to ensure that the review we now have underway is conducted appropriately, and that the concerns for which you have provided specific information to us are thoroughly and transparently addressed. . . . We urge you to engage with them directly at your earliest convenience.").

[11] *See* Feb. 15, 2023, Report of the Independent Ombudsperson and Independent Advisor to Credit Suisse, *available at* https://www.budget.senate.gov/imo/media/doc/2023-02-15_neil_barofsky_report_on_credit_suisse.pdf ("Barofsky Report").

[12] *Id.*

[13] *Id.*

evidence about Credit Suisse's Nazi clients that the Bank concealed during and well after the 1990s.

In 2022, Credit Suisse underwent an executive level reorganization. The Bank's new leadership prematurely ended the Nazi Assets investigation and terminated Mr. Barofsky.[14]

On March 14, 2023, the Senate Budget Committee issued a bipartisan subpoena to Mr. Barofsky, seeking the draft report of his findings that he had prepared prior to his termination by Credit Suisse. Two days later, in an obvious attempt to deflect the Senate's scrutiny of its conduct, Credit Suisse submitted a letter to this Court requesting an "emergency status conference to obtain guidance from the Court" concerning SWC's activities.[15] But in that letter, Credit Suisse did not claim that SWC had threatened litigation. Instead, UBS complained that SWC had been investigating and reporting on matters supposedly covered by the 1999 Settlement, and engaging in discussions with Mr. Barofsky and the U.S. Senate concerning such matters. For the first time, three years after agreeing to carry SWC's findings forward in an independent investigation, Credit Suisse asserted that such actions were "at odds with [SWC's] obligations under the 1999 Settlement."[16]

On March 20, 2023, SWC responded via e-mail to apprise the Court of key facts misstated or omitted in Credit Suisse's March 16, 2023, letter and respectfully requested that the Court deny Credit Suisse's requested relief.[17] Thereafter, Credit Suisse wrote to the Court on May 8, 2023, again asking "for the Court's assistance in bringing relevant stakeholders together in the status conference that we have requested."[18] Based on these submissions, the Court appropriately advised via email on May 17, 2023, that it did not intend to hold a status conference regarding the issues raised in Credit Suisse's letters of May 8 and March 16 because they "**do not relate to a live case pending before [the Court]**."[19]

On May 22, 2023, Credit Suisse submitted yet another letter via e-mail to the Court, requesting that "the Court to appoint Ambassador Eizenstat to assist the parties in resolving this matter."[20] SWC responded on May 24, 2023, to affirm its position that, as the Court had previously determined, there is no present case before the Court and, for the same reason, there was no basis for the Court to consider Credit Suisse's request for the appointment of a mediator, whether Ambassador Stuart Eizenstat or someone else.[21]

---

[14] *Id.* at 7. Mr. Barofsky was later reinstated in December 2023, after UBS AG acquired Credit Suisse earlier that year. *See* "Credit Suisse Reinstates Independent Ombudsperson to Review Nazi-Linked Accounts As a Result of Senate Budget Committee Investigation" *available at* https://www.grassley.senate.gov/news/news-releases/credit-suisse-reinstates-independent-ombudsperson-to-review-nazi-linked-accounts-as-a-result-of-budget-committee-investigation.

[15] Ex. 4, Mar. 16, 2023 Ltr. from Credit Suisse's counsel to Hon. Edward R. Korman.

[16] *Id.*

[17] Ex. 5, Mar. 20, 2023 Ltr. from SWC's counsel to Hon. Edward. R. Korman.

[18] Ex. 6, May 8, 2023 Ltr. from Credit Suisse's counsel to Hon. Edward R. Korman.

[19] Ex. 1, May 17, 2023 Email from Chambers of Hon. Edward R. Korman.

[20] Ex. 7, May 22, 2023 Ltr. from Credit Suisse's counsel to Hon. Edward R. Korman.

[21] Ex. 8, May 24, 2023 Ltr. from SWC's counsel to Hon. Edward R. Korman.

On June 16, 2023, with no change in status since the Court's May 17, 2023 email, and no request from either party to do so, the Court nevertheless converted the Bank's request to a motion to enforce the 1999 Settlement Agreement against SWC, and, over SWC's objection, appointed Amb. Eizenstat and later Mark Donig as Mediators.

UBS and SWC engaged in a Court-directed mediation with the Mediators, which continued into January 2026. Then, on January 27, 2026, the Court issued the following order:

> ORDER. The Court is aware that the Senate Judiciary Committee is scheduled to hold a hearing on 02/03/2026 with respect to "The Truth Revealed: Hidden Facts Regarding Nazis and Swiss Banks." There is pending before me a motion to enforce the settlement agreement on behalf of Credit Suisse against the Simon Wiesenthal Center (ECF No. [5082]). If either party requests or thinks it would be helpful for me to decide that motion in advance of the Senate Judiciary Committee hearing, I would consider doing so. That party would be directed to make such a request on the docket as soon as possible. Ordered by Judge Edward R. Korman on 1/27/2026. (LM)

In response, however, UBS only submitted its January 28, 2026 Request for Clarification. In that letter, UBS stated explicitly: "**UBS does not seek enforcement of the Settlement Agreement against any party**. Instead, UBS respectfully requests that the Court enter an order clarifying the scope of the Settlement and the obligations of the parties." Request for Clarification, at 1.

If there was any confusion about UBS's intentions, the Bank's statements in the past two weeks have re-confirmed that it is not moving to enforce the settlement, is not suing SWC, and is not trying to silence SWC or keep it from carrying out its mission. In email correspondence with counsel for SWC on February 3, 2026, UBS's counsel stated expressly: "One more point of clarification to your email below: we have sought an order to clarify the scope of the settlement agreement; **we have not submitted a motion to enforce the settlement**."[22]

Moreover, in its recent sworn testimony before the U.S. Senate Judiciary Committee, UBS confirmed that it was not seeking to sue or silence SWC. UBS first submitted prepared written testimony to the U.S. Senate Judiciary Committee. In in his pre-filed written testimony, Robert Karofsky, the head of UBS's American arm, stated unequivocally: "**Let me be clear: any suggestion that we have sued or are attempting to silence today the Simon Wiesenthal Center is false**."[23] And during their live sworn testimony, Mr. Karofsky as well as UBS's general counsel, Barbara Levi, testified under oath repeatedly that "we have not sued the Simon Wiesenthal Center[,]" "**we have no intention to sue the Simon Wiesenthal Center**[,]" and whatever UBS is trying to do, it is "**not to silence organizations**" like SWC or others.[24]

---

[22] Ex. 9, Feb. 2, 2026 D. Burns Email to J. Missner.

[23] Ex. 10, Feb. 3, 2026 Written Testimony of Robert Karofsky, President of UBS Americas, before the Senate Judiciary Committee, at 6.

[24] Feb. 3, 2026, Video Recording of "The Truth Revealed: Hidden Facts Regarding Nazis and Swiss Banks" Hearing before U.S. Senate Judiciary Committee, at 49:43-47, 1:54:02-06,

Rather than seek enforcement of the 1999 Settlement, which UBS has expressly disavowed, it seeks to surreptitiously *modify and expand* the Settlement. To take several particularly egregious examples:

- The proposed order asserts that the "Settlement's scope explicitly covers all the subjects of the investigation into Credit Suisse's history that were and are being performed since 2020 by the independent Ombudspersons … including "any historical fact whether known or unknown at the time the Settlement was entered into."[25] Obviously, the 1999 Settlement itself does not state this or anything close to it. The Bank has not submitted any grounds for the Court to issue this factual finding, and it has not explained what the vague and open-ended "any historical fact" means or what import that phrase has.

- That same paragraph of the proposed order also claims that "the Settlement was not dependent on representations of any party."[26] Such an assertion appears nowhere in the 1999 Settlement, and the Bank does not present a basis for the Court to reach that finding.

- In addition, the proposed order also includes a prohibition that organizational endorsers such as SWC "may not, with respect to any matters covered by the Settlement … promote, assist in promoting or cause to promote **any public controversy (in the media or otherwise)** …."[27] That prohibition, again, is not found in the Settlement, and UBS does not explain what "public controversy" means in any event.

UBS presents these proposed material expansions and alterations of the 1999 Settlement despite having provided no notice to affected parties, nor the written consent of the parties, which the Settlement itself expressly requires for modification.[28]

In fact, during the February 3, 2026 Senate Judiciary Committee hearing, in response to a direct question on the Bank's proposed order, Mr. Barofsky testified: **"I am concerned about the breadth of the order, that it could potentially inhibit or prevent [SWC] from continuing to provide information and be a gateway for information relevant to this investigation."**[29]

---

1:55:20-33, *available at* https://www.judiciary.senate.gov/committee-activity/hearings/the-truth-revealed-hidden-facts-regarding-nazis-and-swiss-banks.

[25] Proposed Order ¶ 1.

[26] *Id.*

[27] *Id.* ¶ 2.

[28] Settlement Agmt. § 16.2.

[29] Feb. 3, 2026, Video Recording of "The Truth Revealed: Hidden Facts Regarding Nazis and Swiss Banks" Hearing before U.S. Senate Judiciary Committee, at 1:56:55, *available at* https://www.judiciary.senate.gov/committee-activity/hearings/the-truth-revealed-hidden-facts-regarding-nazis-and-swiss-banks. Mr. Barofsky then went on to rebut in detail the numerous falsehoods contained in Credit Suisse's March 16, 2023 letter to the Court that precipitated the current proceedings.

### Argument

I.  **Because UBS identifies no live controversy between the parties, but rather seeks an order to address hypothetical disputes that have not arisen, UBS's Request for Clarification seeks an improper advisory opinion.**

Under Article III, section 2 of the United States Constitution, federal courts' "'power to adjudicate is limited to 'cases' and 'controversies.'" *Chovon v. Hot Pot Flushing LLC*, 2020 WL 3051442 (E.D.N.Y. June 8, 2020) (Korman, J.) (quoting *Spencer v. Kemna*, 523 U.S. 1, 7 (1998)). To satisfy the case-or-controversy requirement under Article III, a plaintiff must allege: (1) an injury in-fact; (2) fairly traceable to the defendant's action; that is (3) capable of being redressed by a favorable decision from the court. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992). The asserted injury must be both (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical. *Lujan*, 504 U.S. at 560. Moreover, a plaintiff must demonstrate standing separately for each form of relief sought. *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 185 (2000). Thus, as the Supreme Court has explained, "[w]e have long understood [the case or controversy] constitutional phrase to require that a case embody a genuine, live dispute between adverse parties, **thereby preventing the federal courts from issuing advisory opinions.**" *Carney v. Adams*, 592 U.S. 53, 58 (2020). For a dispute to be "genuine" and "live" it must involve "a real and substantial controversy admitting of specific relief through a decree of a conclusive character, **as distinguished from an opinion advising what the law would be upon a hypothetical state of facts.**" *Preiser v. Newkirk*, 422 U.S. 395, 401 (1975) (relief sought by inmate who no longer faced negative consequences of transfer to high security prison was improper advisory opinion).

Although UBS has not invoked the Declaratory Judgment Act expressly, what it seeks is in effect a declaration broadening the meaning of the 1999 Settlement, untethered to a live dispute. The Supreme Court has warned against this use of federal judicial authority. "[T]he declaratory judgment procedure is available in the federal courts **only in cases involving actual controversies and may not be used to obtain an advisory opinion in a controversy not yet arisen.**" *United Pub. Workers of Am. (C.I.O.) v. Mitchell,* 330 U.S. 75, 116 (1947). Accordingly, "[f]or a declaratory judgment to issue, there must be a dispute which 'calls, not for an advisory opinion upon a hypothetical basis, but for an adjudication of present right upon established facts.'" *Ashcroft v. Mattis,* 431 U.S. 171, 172 (1977) (quoting *Aetna Life Ins. Co. v. Haworth,* 300 U.S. 227, 242, (1937)). "**The mere fact that there is a dispute over some question ... is not dispositive**; if it were, the Declaratory Judgment Act could be invoked to answer any and every hypothetical question. Our constitutional system gives courts no such power." *U.S. Dept. of the Treasury v. Official Comm. of Unsecured Creditors of Motors Liquidation Co.,* 475 B.R. 347, 359 (S.D.N.Y. 2012)).

UBS asks the Court to issue an order as to the abstract meaning of the 1999 Settlement. Federal courts, however, do not have plenary authority to interpret and adjudicate matters concerning a settlement absent an express term in the settlement authorizing it to do so. *See Kokkonen v. Guardian Life Ins. Co.*, 511 U.S. 375, 378 (1994). The 1999 Settlement, however, does not give the Court free-ranging authority to offer advisory opinions concerning its meaning. Rather, it provides that "[a]s part of the Final Order and Judgment, the Court shall retain jurisdiction for the purpose of overseeing the administration and distribution of the Escrow Fund

and the Settlement Fund and **for the purpose of enforcing this Settlement Agreement**."[30] But in its submission to this Court, its statements by its counsel, and in sworn testimony to the Senate Judiciary Committee, UBS has expressly and repeatedly **denied** that it seeks to (1) enforce the 1999 Settlement against SWC, or (2) silence SWC or otherwise impede its mission to investigate and document the full scope of the Holocaust—including those that profited from aiding the Nazis during and after World War II. "[A] controversy does not exist where 'the defendant ha[s] not taken any action, even of a preliminary nature, against the plaintiff, and the defendant ha[s] not indicated that it intend[s] to take any future legal action against the plaintiff.'" *United Fin. Cas. Co. v. Paddon*, 248 F. Supp. 3d 368, 373 (N.D.N.Y. 2017) (quoting *Jones v. Sears Roebuck and Co.*, 301 F. App'x 276, 282 (2d Cir. 2008)).

Likewise, SWC has not sued UBS and is not threatening to sue UBS. SWC has not filed any sort of motion with this Court (or any other) challenging the 1999 Settlement. SWC has always been, and remains, a nonparty and has never invoked this Court's jurisdiction to do anything against UBS or Credit Suisse.[31]

There is thus no live case or controversy before the Court, and UBS's Request for Clarification regarding the 1999 Settlement asks the Court to opine on a hypothetical dispute that has yet to come about and which neither party has claimed any intention to initiate. At most, UBS "has simply expressed an intangible worry, unanchored in time, that is insufficient to support an actual or imminent injury and fails to present a justiciable controversy. Without a specific dispute over imminent activity, a declaratory judgment here would simply be an opinion advising what the law would be upon a hypothetical state of facts." *Velvet Underground v. Andy Warhol Found. for the Visual Arts, Inc.*, 890 F. Supp. 2d 398, 409 (S.D.N.Y. 2012) (internal quotations and citations omitted).

Following these principles, courts in the Second Circuit repeatedly have rejected motions for "clarification" like UBS's here on the grounds that they seek improper advisory opinions. In *Honeybee Robotics LLC v. Ensign-Bickford Aerospace & Def. Co.*, for example, the district court denied a request "to make a specific conclusion as to the proper interpretation of the [plaintiff's first amended complaint]" as an "issue that was not properly before it" and was thus "essentially a request for an advisory opinion on legal principles." 2026 WL 82452, at *3 (S.D.N.Y. Jan. 12, 2026) (citations and internal quotations omitted).

Similarly, in *City of Almaty, Kazakhstan v. Ablyazov*, the district court rejected a clarification motion asking that it "analyze submitted evidence and make factual findings in the

---

[30] Settlement Agmt. § 14.

[31] UBS may try to fall back on a statement in SWC's March 7, 2025 motion for reconsideration of this Court's order regarding SWC's access to certain docketed material, which SWC sought "in anticipation of litigation pertaining to [SWC's] claims and defenses in the pending Motion to Enforce the Settlement Agreement filed by Credit Suisse ("Motion"). Dkt. 5083." But that was not SWC "threatening" litigation. Rather, SWC explained that, were the Bank to seek to enforce the Settlement against SWC, then SWC might raise claims and defenses, for which access to court filings in this action might prove necessary. The reference to SWC's "claims" was in the context of UBS's March 16, 2023 submission, which the Bank now has effectively withdrawn and stated repeatedly it does not seek.

absence of a dispute over a particular set of factual circumstances" as in essence, "a request that the Court issue an advisory opinion." 2018 WL 3104453, at *2 (S.D.N.Y. May 29, 2018), *report and recommendation adopted*, 2018 WL 3093961 (S.D.N.Y. June 20, 2018). The *Almaty* court emphasized that "[t]o the extent that there are facts giving rise to a claim that [the opposing party] breached the Attachment Order, the [moving party] can make a motion upon such breach." *Id.* But unless and until such a motion asserting a breach of the order was filed, the court refused to issue an advisory opinion on that order's meaning. *Id.*

And in *Mears v. Montgomery*, the movant sought "clarification from the court declaring that the terms "Intruders Review" and "Intruders Revue" do not fall within the scope of [an] injunction prohibiting [the movant] from using the Intruders mark." 2013 WL 69221, at *2–3 (S.D.N.Y. Jan. 4, 2013), *aff'd*, 566 F. App'x 17 (2d Cir. 2014). The *Mears* court found that the movant had "set[] forth no explanation of the factual context in which the terms would be used, apparently seeking the court's blanket endorsement of his use of the terms." *Id.* Denying the motion for clarification, the court reasoned that "[i]n the absence of a dispute over a particular set of factual circumstances, we believe that such a ruling by the court would amount to an impermissible advisory opinion. This we cannot and will not provide." *Id.*[32]

The lone case UBS cites in its letter, *Manning v. New York University*, 299 F.3d 156 (2d Cir. 2002), *see* ECF 5086, at 1, provides no support for its clarification request. To the contrary, *Manning* actually illustrates why what UBS seeks is an improper advisory opinion, lacking a live case or controversy. There, the plaintiff had filed a Rule 60(b) motion seeking relief from the settlement, which had been incorporated into a judgment issued by the district court: "Manning … made a motion pursuant to Fed.R.Civ.P. 60(b) to vacate the settlement agreement and judgment so as to restore the action to the trial calendar." *Id.* at 160. Unremarkably, given the context of a live controversy between actual litigants, the Second Circuit found that the district court was empowered to "clarify subsequently the settlement and to impose clarifying terms[.]" *Id.* at 163. Were UBS and SWC in a similar controversy as in *Manning*—for instance, had SWC filed a Rule 60(b) motion for relief from the settlement, or had UBS filed a motion to enforce the settlement against SWC—then perhaps this Court properly could interpret the 1999 Settlement and apply it to the parties' dispute. But that is not what has happened here. UBS has repeatedly disclaimed trying to enforce the 1999 Settlement against SWC or any other party. And SWC itself has never sought to undo the 1999 Settlement.

---

[32] *See also Rhee v. SHVMS, LLC,* 2024 WL 449289, at *2 (S.D.N.Y. Feb. 5, 2024) (declining motion for clarification regarding evidentiary issues, before any party had filed a motion *in limine*, as an "impermissible advisory opinion on a hypothetical issue" (citation omitted)); *In re Google Digital Advert. Antitrust Litig.*, 2023 WL 196146, at *1 (S.D.N.Y. Jan. 17, 2023) (denying a request to clarify guidelines for document production as advisory opinion); *Rochester–Genesee Reg'l Transp. Auth. v. Hynes–Cherin,* 2008 WL 4906249, *1 (W.D.N.Y. Nov.13, 2008) (declining to clarify a prior decision because doing so "would be tantamount to rendering an advisory opinion, something federal courts are especially loath-indeed, are not empowered-to do."); *Corning Glass Works v. Sumitomo Elec. U.S.A., Inc.,* 683 F. Supp. 81, 82 (S.D.N.Y. 1988) (finding "no case or controversy ripe for decision by the Court" where plaintiff "is asking in effect for an advisory opinion as to the propriety of conduct in which it has apparently never engaged.").

## II.    Rather than mere "clarification," UBS's proposed order seeks improperly to modify and enlarge the 1999 Settlement, raising serious concerns.

UBS's proposed order submitted with its Request for Clarification would materially change and broaden the 1999 Settlement. This is an improper use of a clarification motion, as "a motion for clarification is not intended to alter or change a court's order, but merely to resolve alleged ambiguities in that order." *Metcalf v. Yale University*, No. 15-cv-1696 (VAB), 2019 WL 1767411, at *2 (D. Conn. Jan. 4, 2019). Rather, UBS's Request for Clarification is an attempt to modify or amend, or be relieved from, this Court's final order and judgment approving the 1999 Settlement without meeting any of the procedural requirements set forth in Fed. R. Civ. P. 59 or 60. That is entirely improper and without any basis. As an initial matter, "[a] motion to alter or amend a judgment under [Rule 59] must be filed no later than 28 days after the entry of judgment. [ ] Because [UBS] did not meet this time limitation, its motion is considered under Rule 60(b) and [UBS] must demonstrate 'excusable neglect.'" *Padilla v. Maersk Line, Ltd.*, 721 F.3d 77, 83 (2d Cir. 2013) (rejecting amendment of court-ordered settlement decree). UBS has not invoked either Rule 59 or Rule 60, let alone demonstrated that it should be excused from the regular requirements of timely seeking modification of a judgment. Critically, the 1999 Settlement by its own terms bars modification unless all parties agree in writing and the Court approves: "This Settlement Agreement may not be changed, modified, or amended except in writing signed by all parties, subject to Court approval."[33]

UBS's proposed order, however, does just that: it seeks to "change[], modif[y], [and amend" the 1999 Settlement, unilaterally and in UBS's favor. For example, take UBS's proposed finding that the scope of the 1999 Settlement supposedly encompasses every "historical fact" that the Independent Ombudsperson currently is investigating.[34] This assertion is unmoored from the express terms in the Settlement and unaccompanied by any factual basis concerning what Mr. Barofsky's investigation encompasses and has found and to what extent that intersects with the Settlement. Nor does UBS explain the import of this finding for any disputes that it posits may arise in the future.

Consider also UBS's request that the Court issue a finding that "the Settlement was not dependent on representations of any party."[35] Nowhere in the 1999 Settlement, however, is there a statement by the parties as to (1) whether there were any material representations by any party, or (2) if there were such representations, whether agreement to the Settlement in fact depended on such representations. UBS's submission does not explain why it asks the Court to enter such a finding, nor does it supply either the legal basis or factual support for it. Injecting a "no representations made" term into the 1999 Settlement would substantively modify and expand that agreement in violation of its express "no modification" provision. And the Court, not to mention litigants, are left to guess if the finding is justified and what impact this finding might have for future hypothetical disputes. *See Mears*, 2013 WL 69221, at *2–3 (denying clarification motion because "[i]n the absence of a dispute over a particular set of factual circumstances, we believe that such a ruling by the court would amount to an impermissible advisory opinion").

---

[33] Settlement Agmt. § 16.2.
[34] Proposed Order ¶ 1.
[35] *Id.*

Doubling down on its attempt to reinvent and broaden the 1999 Settlement, UBS asks the Court to order that organizational endorsers such as SWC "may not, with respect to any matters covered by the Settlement … promote, assist in promoting or cause to promote **any public controversy (in the media or otherwise)** …."[36] Again, however, the 1999 Settlement does not say that. UBS's incredibly vague and overbroad gloss on the 1999 Settlement would result in an order that is tantamount to barring SWC's and any other endorsing organization's constitutionally protected free speech and petitioning activity. The Supreme Court has interpreted the First and Fourteenth Amendments "to afford special protection against orders that prohibit the publication or broadcast of particular information or commentary that impose a 'previous' or 'prior' restraint on speech." *Nebraska Press Association v. Stuart*, 427 U.S. 539, 556 (1976). Thus, courts must decline to issue injunctions that would amount to a prior restraint on First Amendment protections. *See Metropolitan Opera Association, Inc. v. Local 100, Hotel Employees and Restaurant Employees International Union,* 239 F.3d 172, 177-78 (2d Cir. 2001). Underscoring these risks, in his recent testimony before the Senate Judiciary Committee, the Independent Ombudsman specifically warned of the chilling effect the proposed order would have on SWC's ongoing cooperation with his and the Committee's ongoing investigation—an investigation that, it bears emphasis, the Bank itself commissioned in response to SWC's presenting its own findings in the first place.

While UBS may try to argue that SWC waived its free speech and petitioning rights by endorsing the 1999 Settlement, "[a] waiver is 'ordinarily an intentional relinquishment or abandonment of a known right or privilege.'" *Doe v. Marsh,* 105 F.3d 106, 111 (2d Cir. 1995) (quoting *Johnson v. Zerbst*, 304 U.S. 458, 464 (1938))). And "waiver of a fundamental constitutional right must be undertaken 'voluntarily, knowingly, and intelligently.'" *Legal Aid Society v. City of New York*, 114 F. Supp. 2d 204, 226 (S.D.N.Y. 2000) (quoting *Marsh*, 105 F.3d at 111). What is more, "'[a] waiver of constitutional rights in any context must, at the very least, be clear.'" *Id.* at 226 (quoting *Fuentes v. Shevin*, 407 U.S. 67, 95-96 (1972)). Indeed, "'**courts must indulge every reasonable presumption against a waiver of fundamental constitutional rights**.'" *Id.* (quoting *Marsh*).

Fidelity to these standards precludes this Court from entering the proposed order UBS seeks. The supposed obligation for nonparty endorsers to refrain from "public controversy" concerning anything "controvers[ial]" relating to the Swiss banks, the Holocaust, World War II, or its aftermath, is breathtakingly broad in its potential scope and untethered to *anything* in the 1999 Settlement indicating that nonparty SWC knowingly agreed to such a broad surrender of its First Amendment rights. That is because, of course, SWC did no such thing. "Because the [1999 Settlement] does not explicitly waive [SWC's] free speech rights, there is no waiver of those rights here." *Legal Aid Soc'y*, 114 F. Supp. 2d at 227.

Finally, UBS's submitted order raises substantial uncertainty as to the obligations not just of SWC, but also for the many other leading Jewish organizations that endorsed the 1999 Settlement. None of those entities have had any interactions with this Court in the present circumstances. Yet if the "clarification" order issued, they, too, would potentially be impacted without being put on notice or being given an opportunity to come before the Court and address their concerns. *Cf. Vermont Alliance for Ethical Healthcare, Inc. v. Hoser*, 274 F. Supp. 3d 227,

---

[36] Proposed Order ¶ 2.

239 (D. Vt. 2017) (declining to issue advisory opinion given the impact on the actions of other organizations not before the court). Fundamental notions of fair play and due process cannot allow this current judicial proceeding to unfold in that manner; notice and an opportunity to be heard are the hallmarks of due process. *See Mullane v. Cent. Hanover Bank & Trust Co.,* 339 U.S. 306, 314 (1950) ("An elementary and fundamental requirement of due process in any proceeding which is to be accorded finality is notice reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections.").

## <u>Conclusion</u>

There is no live controversy between UBS and SWC, but rather a hypothetical dispute that may never arise. That is a paradigmatic example of a request for an impermissible advisory opinion. The Court must decline UBS's invitation to exceed the constitutional bounds of judicial authority. What is more, UBS's "Request for Clarification" in reality is an effort to impermissibly modify and expand the 1999 Settlement. But UBS has failed to make any showing for such a request, and doing so would violate fundamental free speech/petitioning and due process protections. Because (1) there is no actual live justiciable controversy, and (2) both SWC and other absent organizations could be significantly impacted by the Court adopting the (flawed and incorrect) interpretation of the 1999 Settlement UBS urges, it is imperative that the Court not grant the clarification order.

SELENDY GAY PLLC

Faith Gay, Esq.
Jennifer Selendy, Esq.

STEIN MITCHELL BEATO & MISSNER LLP

Jonathan E. Missner, Esq.
Andrew M. Beato, Esq.
Melissa S. Fox, Esq.

Enclosures

cc: Gibson, Dunn & Crutcher LLP (Counsel to Credit Suisse)
Marshall R. King (counsel to Credit Suisse/UBS) mking@gibsondunn.com
David P. Burns (counsel to Credit Suisse/UBS) dburns@gibsondunn.com
F. Joseph Warin (counsel to Credit Suisse/UBS) fwarin@gibsondunn.com

# EXHIBIT 1

**Subject:** RE: In re Holocaust Victims Asset Litigation, No. 96-cv-04849 (ERK)
**Date:** Wednesday, May 17, 2023 at 12:14:37 PM Eastern Daylight Time
**From:** Andrew Marrero
**To:** Warin, F. Joseph, NYED_Korman Chambers
**CC:** Talia Cohen, fgay@selendygay.com, Jonathan Missner, bberke_kramerlevin.com, iniles1@me.com, mcohen@mayerbrown.com, Burns, David P., Parr, Bryan

Good afternoon,

Judge Korman has asked me to inform counsel copied on this email that he does not intend to hold a status conference regarding the issues raised in Credit Suisse's letters of May 8 and March 16 because they do not relate to a live case pending before him.

_____

ANDREW W. MARRERO
Law Clerk for the Honorable Edward R. Korman
United States District Court for the Eastern District of New York
Tel.: (718) 613-2473

---

**From:** Warin, F. Joseph <FWarin@gibsondunn.com>
**Sent:** Monday, May 8, 2023 2:57 PM
**To:** NYED_Korman Chambers <korman_chambers@nyed.uscourts.gov>
**Cc:** Talia Cohen <Talia_Magnas@nyed.uscourts.gov>; fgay@selendygay.com; jmissner@steinmitchell.com; bberke_kramerlevin.com <bberke@kramerlevin.com>; iniles1@me.com; mcohen@mayerbrown.com; Burns, David P. <DBurns@gibsondunn.com>; Parr, Bryan <BParr@gibsondunn.com>
**Subject:** In re Holocaust Victims Asset Litigation, No. 96-cv-04849 (ERK)

**CAUTION - EXTERNAL:**

Dear Mr. Marrero:

On behalf of Credit Suisse, attached please find our correspondence to Judge Korman regarding the above-referenced matter.

**F. Joseph Warin PC**

GIBSON DUNN

Gibson, Dunn & Crutcher LLP
1050 Connecticut Avenue, N.W., Washington, DC 20036-5306
Tel +1 202.887.3609 • International Mobile +1 202.213.3597
FWarin@gibsondunn.com • www.gibsondunn.com • http://www.gibsondunn.com/lawyers/fwarin

This message may contain confidential and privileged information for the sole use of the intended recipient. Any review, disclosure, distribution by others or forwarding without express permission is strictly prohibited. If it has been sent to you in error, please reply to advise the sender of the error and then immediately delete this message.

Please see our website at https://www.gibsondunn.com/ for information regarding the firm and/or our privacy policy.

**CAUTION - EXTERNAL EMAIL:** This email originated outside the Judiciary. Exercise caution when opening attachments or clicking on links.

# EXHIBIT 2



**CREDIT SUISSE GROUP AG**

Paradeplatz 8        Phone    +41 44 333 11 11
CH-8070 Zurich       Fax      +41 44 332 33 10
                     www.credit-suisse.com

Dr. Shimon Samuels
Director for International Relations
Dr. Ariel Gelblung
Director for Latin America
Simon Wiesenthal Centre Europe
64 Avenue Marceau
F-75008 Paris

Zurich, March 4, 2020

**Your Mail to Christian Küng**

Dear Messrs. Samuels and Gelblung

We would like to acknowledge the importance of the concerns that you have raised in your email of March 2, 2020. Credit Suisse is committed to finding the truth as best as we can using the information and means available still today. We are prepared to investigate the information you have provided to us and lay open – to the extent we are legally permitted – the results. To coordinate that investigation, we invite you for a meeting at our offices in Zurich to jointly explore how best to find out the facts. Please contact Lydie Hudson, e-mail: lydie.hudson@credit-suisse.com, phone: +41 44 333 33 20 or Romeo Cerutti, e-mail: romeo.cerutti@credit-suisse.com, phone: +41 44 333 12 12) to arrange this meeting.

In the interim, we will explore how we can best access the comprehensive information collected between 1997 and 1999 by the Independent Committee of Eminent Persons, which was chaired by Paul A. Volcker and comprised representatives of major Jewish organizations. In its final report, the Committee concluded that it "*has provided as full and complete accounting of the status of accounts in Switzerland of victims of Nazi persecution as is now reasonably feasible*". We have preserved that accounting and will now seek to use it for investigating the information you have provided to us.

Sincerely yours,

Credit Suisse Group AG

Romeo Cerutti
General Counsel

Lydie Hudson
Chief Compliance Officer

# EXHIBIT 3



<u>**VIA ELECTRONIC MAIL**</u>
Rabbi Marvin Hier
President, CEO, Founder & Dean
Simon Wiesenthal Center
1399 South Roxbury Drive
Los Angeles, CA 90035

Zurich, July 21, 2021

Dear Rabbi Hier

We write today in response to the letter sent to us by Stein Mitchell Beato and Missner ("SMBM"), dated July 2, 2021.

Foremost, Credit Suisse ("CS") reiterates our pledge to working collaboratively with you to address the issues raised in your March 2020 press release, as well as any additional issues for which you provide specific information to us. Like you, we are committed to finding the truth.

As we explained to you in our letter of June 25, 2021, and again during our June 29 discussion, CS has engaged AlixPartners to conduct a thorough forensic review of the concerns noted in your March 2020 press release, and will share the findings of that effort with you upon its completion. We have also engaged Mr. Neil Barofsky to serve as an independent ombudsman of the work underway by AlixPartners, and Mr. Ira Forman to independently advise Mr. Barofsky and CS on these efforts.  At the completion of their work, we will also share a copy of their final report with you.

Mr. Barofsky and Mr. Forman were engaged explicitly to ensure that the review we now have underway is conducted appropriately, and that the concerns for which you have provided specific information to us are thoroughly and transparently addressed. Please know Mr. Barofsky and Mr. Forman are entirely available to you and your team to discuss any issues you may have with the review or any additional information you may choose to share. We urge you to engage with them directly at your earliest convenience.

During our June 29 discussion and in its July 2 letter to us, SMBM referenced concerns above and beyond those documented in the March 2020 press release. As we have asserted numerous times to you, we welcome the opportunity to better understand the specific nature of your investigation and to use the information you make available to us to consider how we may broaden the scope of our review. If you are unwilling to share this information with us, please consider sharing it with Mr. Barofsky and Mr. Forman, who can keep confidential what is provided to them, but otherwise use it to further direct the work of AlixPartners.



The July 2nd letter also raised issues with Mr. Barofsky's independence. Please know that his professional reputation is beyond reproach. Moreover, his previous work with CS was at the express direction of the New York Department of Financial Services ("DFS") and it was DFS who selected him for that project. To be clear, his relationship to us was adverse. Irrespective of our previous work with him, our decision to engage Mr. Barofsky was based on two considerations. First, it was the depth of his experience and impeccable international reputation. Second, because of his previous work on behalf of DFS and his familiarity with our operations as a result, he was and remains uniquely positioned to be thorough and efficient in his oversight of the instant effort.

With respect to the specific questions enumerated in the July 2nd letter, please note that had our repeated offers of mutually engaging an independent third party to review your concerns been accepted, none of what is being asked or directed in questions one through nine would be at issue. Using the framework we now have in place, we would like to work with you, or in the alternative you may prefer to work through Mr. Barofsky and Mr. Forman, to further explore collaboration between us including a means by which we may share information with one another as we work together to find the truth.

With respect to question 10, as relayed to you during our June 29 discussion, CS has noticed its prudential regulator, FINMA, of the matter at hand and its staff is available for you to contact directly. Finally, with respect to question 11, again, as we explained to you during the June 29 discussion, your request for this information should be directed to DFS.

We are steadfast in our commitment to learn the facts, and to work with you on these serious and important issues.


Yours sincerely,


Credit Suisse AG                                    Credit Suisse AG




Thomas Grotzer                                      Mindy Silverstein
Global Head of Compliance a.i.                      Senior Advisor to the Group CEO




cc:     Romeo Cerutti
        Jonathan Missner
        David Cohen

# EXHIBIT 4

# GIBSON DUNN

Gibson, Dunn & Crutcher LLP

1050 Connecticut Avenue, N.W.
Washington, D.C. 20036-5306
Tel 202.955.8500
www.gibsondunn.com

F. Joseph Warin
Direct: +1 202.887.3609
Fax: +1 202.530.9608
FWarin@gibsondunn.com

March 16, 2023

Hon. Edward R. Korman,
United States District Judge
United States Courthouse
Room 918
225 Cadman Plaza East
Brooklyn, New York 11201

Re:   *In Re: Holocaust Victims Asset Litigation*;
      Case No. CV-96-4849

Dear Judge Korman:

We are counsel for Credit Suisse Group AG ("Credit Suisse") and submit this letter to request an emergency status conference among the relevant parties to discuss certain issues that have arisen concerning the settlement agreement (the "Settlement Agreement" or "Settlement") approved by this Court on August 2, 2000, and the organizational endorsement (the "Endorsement") signed by the Simon Wiesenthal Center (the "Wiesenthal Center" or "Center") in connection with the Settlement. Specifically, we are concerned that recent actions the Wiesenthal Center has taken and appears to be contemplating including, as explained below, executing a statement on January 27 and likely instigating a March 14 subpoena from a congressional committee returnable the next day, are inconsistent with its obligations under the Settlement, and have negatively affected and threaten to further impair Credit Suisse's rights under the Settlement. We are hopeful that, with the Court's assistance, the parties will be able to reach an understanding that affirms the Settlement and avoids further legal proceedings.

## I.    **FACTUAL BACKGROUND**

This matter concerns the landmark global settlement—achieved under the auspices and guidance of this Court—that resulted in distribution of approximately $1.3 billion to more than 458,400 victims of Nazi persecution and their families, and achieved comprehensive closure of the larger controversy concerning all actions of Swiss banks, including Credit Suisse and its predecessor banks, relating to World War II, and its prelude and aftermath. The Wiesenthal Center, among other Jewish organizations, was an essential participant in the Settlement.

As this Court is aware, in 1996 and 1997, plaintiffs filed class action lawsuits against Swiss banks, including Credit Suisse, alleging that the defendants, following World War II, had refused to return the assets belonging to victims of Nazi persecution, and that they had

# GIBSON DUNN

various dealings with the Nazi regime including laundering assets the Nazis looted from victims of Nazi persecution, cloaking Nazi assets, and receiving the profits of slave labor.

As the Settlement Agreement makes clear, the class action litigation was part of a larger controversy that involved Jewish organizations (including the Wiesenthal Center), U.S., Swiss and Israeli officials, federal, state and local politicians (including multiple congressional hearings), historical commissions, and an unprecedented independent audit of Swiss banks, including Credit Suisse, headed by former Federal Reserve Board Chairman, Paul Volcker. This controversy received extensive media coverage in the United States, Switzerland and elsewhere and spawned threats of governmental sanctions and boycotts.

It was clear to all concerned parties that a successful conclusion would require more than a settlement of the litigation and would have to entail a global resolution of the controversy that would achieve "complete closure" and "an end to all confrontation." Settlement at 1 (7th Whereas clause). On January 26, 1999—as a result of extensive negotiations under the guidance of this Court—the parties reached a formal resolution of their dispute, the Settlement Agreement. In order to achieve a broader resolution of the controversy and as a condition precedent to the effectiveness of the Settlement Agreement, a "Related Agreement" required the Plaintiffs to obtain the written endorsements of seventeen Jewish organizations, including the Wiesenthal Center. On March 30, 1999, nearly 24 years ago, the last Organizational Endorsement was executed and the Settlement Agreement became final.

In the Settlement Agreement, the parties recognized that the actions in the cases that led to the Settlement included allegations that the defendants dealt with the Nazi regime, unlawfully retained class members' accounts, obtained assets looted from victims of Nazi persecution, and held assets belonging to Nazis. The Settlement resolved and released all such claims and more, covering

> any and all actions, causes of action, claims, *Unknown Claims*,[1] obligations, damages, costs, expenses, losses, rights, promises, and agreements of any nature and demands whatsoever, from the beginning of the world to now and any time in the future, arising from or in connection with actual or alleged facts occurring on or before the date of this Settlement Agreement . . . whether now accrued or asserted or hereafter arising or discovered, that may be, may have been, could have been, or could, be brought . . . against any Releasee . . . for, upon, by reason of, or in connection with *any act or omission in any way relating to the Holocaust, World War II and its prelude or aftermath, Victims or Targets of Nazi Persecution, transactions with or*

---

[1] The Settlement Agreement defined "Unknown Claims" as "Claims that a claimant does not know or suspect to exist in his/her favor as of the date of the Settlement Agreement."

> *actions of the Nazi Regime,* treatment of refugees fleeing Nazi persecution . . .
> , or any related cause or thing whatever, *including,* **without limitation**, *all
> claims in the Filed Actions and all other claims relating to Deposited Assets,
> Looted Assets, Cloaked Assets, and/or Slave Labor*.

Settlement Agreement § 1 (definition of "Claims or Settled Claims") (emphasis added).[2]

Rabbi Marvin Hier, Dean and Founder, signed the Wiesenthal Center's Organizational Endorsement that provided that the Center:

(1) endorsed the Settlement Agreement "as a fair, adequate, and reasonable settlement";

(2) affirmed that the Settlement Agreement "brings about complete closure and an end to confrontation with respect to the issues dealt with in the settlement";

(3) agreed "not to make any public statement or take any action that would violate or be inconsistent with this endorsement, including requesting or approving sanctions or opposing business transactions involving Swiss entities released by the Settlement Agreement based on conduct covered by the settlement";

(4) covenanted "not to sue, call for suits against, or support suits against any Swiss entity released by the Settlement Agreement based on conduct covered by the settlement";

(5) waived "any and all claims it may have against the Swiss entities released by the Settlement Agreement based on conduct covered by the settlement"; and

(6) agreed "to be bound by Sections 11 ["Settling Plaintiffs' Obligations] and 12 ["Releases and Covenants Not to Sue"] of the Settlement Agreement as if it had executed the Settlement Agreement as a Settling Plaintiff." Wiesenthal Center Endorsement. Section 11.2 of the Settlement Agreement includes an obligation to "not make any public statement or take any action that would violate or be inconsistent with this Settlement Agreement."

On August 9, 2000, this Court entered a Final Order and Judgment, granting final approval to the Settlement Agreement. There was "virtually unanimous worldwide support for the Settlement from Jewish and Holocaust survivors' organizations," including the Simon

---

[2] The Settlement defined Cloaked Assets as assets owned, controlled, obtained from, or held for the benefit of any company, entity, or individual associated with the Nazi Regime, "the identity, value, or ownership of which was in fact or allegedly disguised by, through, or as the result of any intentional or unintentional act or omission of or otherwise involving any Releasee." Settlement Agreement at 2. Looted Assets are assets "actually or allegedly belonging in whole or in part to Victims or Targets of Nazi Persecution that were actually or allegedly stolen, expropriated, Aryanized, confiscated, or that were otherwise wrongfully taken by, at the request of, or under the auspices of, the Nazi regime." Settlement Agreement at 3. The Settlement Agreement covered claims, including unknown claims, regarding both Cloaked and Looted Assets.

Hon. Edward R. Korman
March 16, 2023
Page 4

Wiesenthal Center, *In re Holocaust Victims Assets Litigation*, 105 F. Supp. 2d 139, 147 (E.D.N.Y. 2000).  The Center described the settlement as "historic and . . . a victory for truth and justice." Swiss Back in Good Graces, CNN Money (Aug. 13, 1998 5:44 PM), https://money.cnn.com/1998/08/13/companies/swiss/ (quoting Rabbi Marvin Hier).

For more than 20 years, the complete closure achieved through the Settlement and the Organizational Endorsements held.  However, in March 2020, the Wiesenthal Center, in violation of their agreement not to make public statements inconsistent with the settlement, issued a press release that generated damaging publicity, alleging that Credit Suisse held bank accounts belonging to persons domiciled in Argentina during World War II that the Center claimed held money looted from Jewish victims: *Wiesenthal Centre Reveals 12,000 Names of Nazis in Argentina, Many of Whom Apparently Had Accounts Transferred to Credit Suisse*, Simon Wiesenthal Center (Mar. 2, 2020), https://www.wiesenthal.com/about/news/wiesenthal-center-argentina-nazi.html ("We believe very probable that these dormant accounts hold monies looted from Jewish victims, under the Nuremberg Aryanization laws of the 1930s.").  The Wiesenthal Center relied on two publicly available lists, one comprising members of a Nazi-affiliated Argentine labor organization and the other a list of Argentine Nazis compiled by the U.S. State Department.  Neither of these lists includes any references or links to Credit Suisse.

In order to pursue historical truth and notwithstanding the Settlement, Credit Suisse retained AlixPartners, a leading international forensic firm, to conduct an independent investigation into the issues raised by the Wiesenthal Center.  In addition, to provide further assurance to the Wiesenthal Center, Credit Suisse subsequently engaged Neil Barofsky of Jenner & Block and Ira Forman, former U.S. Special Envoy for Monitoring and Combatting Anti-Semitism, as Ombudspersons to oversee AlixPartners' work.

For over two years, Credit Suisse committed significant efforts and resources to address and research matters raised by the Wiesenthal Center.  AlixPartners' team has spent tens of thousands of hours and reviewed over 10 million documents.  They have had unrestricted access to Credit Suisse's archives containing information on millions of historical Credit Suisse accounts, and have collected substantial information from external sources to perform their investigation.

The AlixPartners investigation has concluded that, of the nearly 10,000 Argentine individual whose names were referenced by the Wiesenthal Center, 8 likely held accounts at Credit Suisse's predecessor during the Nazi era (1933-1945) and that all but one of those accounts was closed by 1937.  There is no evidence that the accounts contained looted assets.  Credit Suisse also has undertaken research into additional issues raised by the Wiesenthal Center and the Ombudspersons.  The results of this research, much of which has been conducted by AlixPartners, has not identified material information about Credit Suisse's

**GIBSON DUNN**

World War II-era activities that was not yet known at the time of the Settlement or published by the Bergier Commission and others more than 20 years ago.

While AlixPartners' investigation proceeded without restrictions, Credit Suisse concluded its engagement with the Ombudspersons because of serious issues concerning their performance.[3] At a close-out meeting in December 2022, the Ombudspersons raised the likelihood that, in response to their termination, the Wiesenthal Center would generate adverse media coverage, congressional and regulatory investigations, and campaigns by NGOs and said that this would result in anti-Semitism attributable to the bank for terminating their engagement.

On January 6, 2023, Credit Suisse contacted the Wiesenthal Center again to invite them to a meeting to present the results of AlixPartners' investigation and, given the troubling statements of the Ombudspersons, to request an affirmation that the Center would honor its obligations under the Settlement. (A copy of the letter is attached as Exhibit A hereto). The Wiesenthal Center has not yet accepted the invitation.[4]

On February 15, 2023, Barofsky's counsel provided us with a copy of a January 27, 2023 "Statement" from the Wiesenthal Center signed by Rabbis Marvin Hier and Abraham Cooper. The Statement contains inaccurate and inflammatory accusations leveled at Credit Suisse. Among other things, the Statement incorrectly accuses Credit Suisse of intentionally taking actions to prevent the discovery and reporting of Nazi assets at the bank, and of refusing to accept its responsibility for its actions during and after the Holocaust. This Statement, which wrongly accuses Credit Suisse of both possessing Nazi assets and accounts, and of concealing those assets and accounts, was shared in violation of the Wiesenthal Center's obligations under the Settlement. Barofsky has informed Credit Suisse of his intention to use the Statement numerous times in a document he has threatened to make public.[5]

Barofsky has acknowledged that he had contacts with the Wiesenthal Center about the Statement and reviewed the Statement before it was executed. Moreover, the time sheets submitted by Barofsky evidence frequent interactions between him and his team and the Wiesenthal Center and its counsel. All of this strongly suggests that the Ombudspersons participated in the drafting of the Statement. Accordingly, it appears that the Ombudspersons are acting in concert with the Wiesenthal Center and have taken actions —

---

[3] Credit Suisse and the Ombudspersons are engaged in a dispute concerning the Ombudspersons' performance of their duties. Credit Suisse has retained a new Ombudsperson team (Clifford Chance and KPMG) to review the work performed by AlixPartners.

[4] The Wiesenthal Center, through its counsel, subsequently expressed its preference that discussions proceed between counsel. We have conveyed Credit Suisse's invitation to the Wiesenthal Center's counsel (twice in writing and once orally) and have not received a definitive response.

[5] We would be pleased to provide the Statement to the Court under seal for its *in camera* review.

the statements conveyed at the December close-out meeting, and crafting and disseminating the Statement — that, if taken by the Wiesenthal Center, would contravene the Center's obligations under the Settlement.

On March 15, 2023, Barofsky's law firm provided us with a March 14, 2023, subpoena from the U.S. Senate Committee on the Budget requiring Barofsky to produce "by no later than 6:00pm on Wednesday, March 15, 2023, any all reports or other similar documents — whether preliminary or final — regarding any investigation you performed or oversaw pertaining to Credit Suisse AG . . . ." (emphasis in original).[6]  A March 14, 2023, cover letter to Barofsky from the Committee Chair and Ranking Member accompanying the subpoena states, "[i]t has been alleged that your investigation included, among other aspects, Credit Suisse AG's provision of private banking services related to the assets and accounts of members of the Nazi Party . . . .  It has been further alleged that you prepared one or more written reports addressing a range of conduct by Credit Suisse AG including, but not limited to, the holding of Nazi assets that were concealed from the world community, investigatory bodies, and courts for many decades, and which remain unaddressed today.  Furthermore, it has been alleged that you presented one or more written reports to Credit Suisse AG that have not been publicly released."  The letter asserts jurisdiction "pursuant to its authority to draft budget plans and investigate issues that could affect spending, revenue, and the federal budget.  This includes, for example, budget requests that support governmental commissions, special envoys such as the Office of the Special Envoy for Holocaust Issues, special prosecutions, and related efforts regarding the recovery and receipt of Nazi assets."

The subpoena and accompanying letter are the realization of the threat made by Barofsky and Forman in December that the Wiesenthal Center would generate a congressional investigation (among other confrontational actions prohibited by the settlement).  And they closely track the charges contained in the Statement.  The conclusion appears inescapable that the Wiesenthal Center or its agents (its counsel, Barofsky, or Forman) were the source of these allegations.  Any report in Barofsky's possession is incomplete, unauthorized, materially false and misleading, defamatory, inflammatory and contains privileged material.

## II.  THE WIESENTHAL CENTER AND ITS AGENTS MUST REFRAIN FROM PUBLIC STATEMENTS AND ACTIONS INCONSISTENT WITH ITS OBLIGATIONS UNDER THE SETTLEMENT.

As this Court has recognized, "[t]here is a presumption in favor of enforcement of settlements."  *Geneva Laboratories Ltd. v. Nike West African Import and Export Inc.*, 2021 WL 7287611, *3 (E.D.N.Y. Aug. 16, 2021); *see also Red Ball Interior Demolition Corp. v.*

---

[6]  Around 6:00 p.m. on March 15, Barofsky's counsel conveyed that the Budget Committee had granted a 24-hour extension, making the documents due at 6:00 p.m. on March 16, 2023.

*Palmadessa*, 173 F.3d 481, 484 (2d Cir. 1999) ("Settlement agreements are contracts and must therefore be construed according to general principles of contract law.").

The Center, in turn, has (1) agreed "not to make any public statement or take any action that would violate or be inconsistent with [the Center's endorsement of the Settlement Agreement]," and (2) affirmed that the Settlement Agreement "brings about complete closure and an end to confrontation with respect to [issues concerning the conduct of Credit Suisse and its predecessors during the WWII era]" reflected in both Sections 2 and 3 of its Organizational Endorsement, as well as Section 11.1 and 11.2 of the Settlement Agreement, to which it is also bound. By sharing the Statement, while knowing that Barofsky will use and echo it in his own material and, as threatened by Barofsky and Forman, taking steps to generate the congressional investigation, however, the Center has (1) made public statements inconsistent with its endorsement of the Settlement and (2) taken a number of steps that repudiate complete closure, and escalate confrontation with respect to the issues resolved through the Settlement. In contrast, Credit Suisse has gone to exceptional lengths to examine the issues raised by the Wiesenthal Center (many of which had been thoroughly investigated 25 years ago), although it was under no obligation to do so, and has offered to present the results to the Wiesenthal Center.

As an initial matter and as discussed above, there can be no question that the matters raised by the Wiesenthal Center are covered by the Settlement that the Wiesenthal Center endorsed and to which it is obliged to comply. Assets looted from victims of Nazi persecution and other Nazi assets, including Cloaked Assets, are explicitly at the core of the Settlement and certainly fall within the scope of "Settled Claims" ("any act or omission in any way relating to the Holocaust, World War II and its prelude or aftermath, Victims or Targets of Nazi Persecution, transactions with or actions of the Nazi Regime").

The Statement makes assertions inconsistent with the Settlement and the Center's Endorsement. For example, it falsely asserts that (i) Credit Suisse concealed Nazi assets after World War II, (ii) the assets it claims to have identified have not been previously revealed because of Credit Suisse's document destruction and concealment and (iii) Credit Suisse refuses to take responsibility for its support of the Nazis. Additionally, the Statement repeatedly mischaracterizes the scope of the Settlement and contains inflammatory accusations that Credit Suisse is on the "wrong side of history" and is guilty of a "big lie." The letter accompanying the subpoena echoes these points in terms of allegations presented to the Senate Budget Committee.

Of course, the underlying purpose of the Statement (likely developed in coordination with the Ombudspersons) and the allegations presented to the Budget Committee is to stoke confrontation, provoke controversy and to reopen matters conclusively resolved by the Settlement, in contravention of the Wiesenthal Center's obligations thereunder.

By sharing its statement with the Ombudspersons and likely conveying allegations to the Senate Budget Committee, the Center has made these accusatory statements publicly, and at odds with its obligations under the Settlement.[7]  To prevent further harm, this Court should consider the Statement and the allegations conveyed to the Budget Committee as having been made publicly.  To the extent that Barofsky and Forman may, in coordination with the Center and ostensibly on its behalf, further publish the Statement and cause false and defamatory material prepared by Barofsky to be conveyed to the Senate Budget Committee, the harm will be compounded and, indeed, will be irreparable.  Further, by accusing Credit Suisse of participating in a cover-up after Credit Suisse performed a voluntary investigation into its claims regarding accounts covered by the settlement, the Center has contradicted its affirmation that the Settlement would bring about "an end to confrontation with respect to the issues dealt with in the settlement." Endorsement § 2.

## III.    REQUEST FOR AN EMERGENCY STATUS CONFERENCE

For the foregoing reasons, Credit Suisse requests an emergency status conference to obtain guidance from the Court on the most appropriate means, including injunctive relief, to remedy the injury already caused by the Center actions in violation of its obligations under the Settlement and to prevent additional actions exacerbating those injuries in contravention of the Center's obligations.[8]  Because following their termination (and perhaps before), Barofsky and Forman have been acting in concert with the Wiesenthal Center, we suggest that they participate in the status conference.  Such a conference may obviate the need for motion practice or other proceedings, including injunctive proceedings, to resolve the issues described above.

Given the time-sensitive nature of the Senate Budget Committee's subpoena, we ask for the status conference to be scheduled as soon as possible on an emergency basis and that

---

[7]     As the common law of defamation recognizes, publication to even one other individual is enough for courts to determine that harm has occurred. Restatement (Second) of Torts § 577 cmt. b (Am. L. Inst. 1977) ("It is not necessary that the defamatory matter be communicated to a large or even a substantial group of persons. It is enough that it is communicated to a single individual other than the one defamed.")

[8]     In its August 9, 2000, Final Order and Judgment, this Court retained "continuing jurisdiction over . . . all parties to this action and the plaintiff class members for the purpose of *enforcing* and administering the settlement." Final Order and Judgment § 6 (emphasis added). In addition, Section 14 of the Settlement Agreement provides that "[a]s part of the Final Order and Judgment, the Court shall retain jurisdiction for the purpose of . . . enforcing this Settlement Agreement." Settlement Agreement, § 14. Accordingly, this Court has retained jurisdiction to enforce the Settlement Agreement and may entertain Credit Suisse's request for a conference. *See Hendrickson v. U.S.*, 791 F.3d 354, 358 (2d Cir. 2015); *Tendilla v. 1465 Espresso Bar LLC*, 2021 WL 2209873, at *2–3 (S.D.N.Y. June 1, 2021) (entering judgment against defendant in response to a motion to enforce a settlement agreement, where the court ordered that following dismissal it would "retain jurisdiction over all proceedings solely to enforce the terms of the settlement between the parties in this action").

the Court instruct the parties and their agents to observe a standstill until the conference is held.

Respectfully submitted,

GIBSON, DUNN & CRUTCHER LLP                    MAYER BROWN LLP

F. Joseph Warin, Esq.                          Marc R. Cohen, Esq.
David Burns, Esq.

Attachments:
    Exhibit A, January 6, 2023 correspondence

cc:     Stein Mitchell Beato & Missner LLP (counsel to the Wiesenthal Center)
            Jonathan Missner, Esq., *jmissner@steinmitchell.com*

        Kramer Levin (counsel to Neil Barofsky & Jenner & Block)
            Barry Berke, Esq., *bberke@kramerlevin.com*

        Jenner & Block, LLP
            Neil Barofsky, Esq., *nbarofsky@jenner.com*

        Ira Forman, *Iniles1@me.com*

# EXHIBIT 5



Faith Gay
Partner
212.390.9001
fgay@selendygay.com

March 20, 2023

**<u>Via E-mail</u>**

Hon. Edward R. Korman
United States District Court
Eastern District of New York
225 Cadman Plaza East, Room 918
Brooklyn, New York 11201

Re:     <u>*In Re: Holocaust Victims Asset Litigation*, No. CV-96-4849 (ERK)</u>

Dear Judge Korman,

   We were retained on Friday, March 17, 2023, to represent the Simon Wiesenthal Center ("SWC") together with SWC's existing counsel, Stein Mitchell Beato & Missner LLP, and we write to apprise the Court of key facts misstated or omitted in Credit Suisse's March 16, 2023 letter referencing the above-captioned closed matter.

   SWC is a preeminent Jewish human rights organization whose mission includes uncovering and sharing historic facts about the Holocaust. In 2020, SWC and its investigative team, including Father Patrick DesBois and Dr. Helen Junz, found significant evidence that Credit Suisse maintained as yet undisclosed assets for Nazis and Nazi-affiliated entities ("Nazi Assets") during and after World War II. The collective work was presented to Credit Suisse.

   In response, Credit Suisse "committed to finding the truth" about its role as a banker and financier related to the Nazi Assets. Specifically, Credit Suisse represented to SWC that it was fully prepared to "investigate the information [SWC] provided [] and lay open – to the extent [it was] legally permitted – the results." To this end, Credit Suisse proposed — and SWC ultimately accepted — an independent investigation guided and overseen by a highly-respected lawyer and experienced government-appointed monitor, Neil Barofsky, acting as an independent ombudsperson, and assisted by the former U.S. Special Envoy to Monitor and Combat Anti-Semitism, Ira Forman. Credit Suisse assured

transparency and pledged "to share a copy of [Mr. Barofsky's] final report with [SWC]."

In reliance on Credit Suisse's unequivocal commitments to complete an independent investigation and publish the Barofsky report, SWC agreed to share its investigative work with Credit Suisse, intermediated by Messrs. Barofsky and Forman, so that this new information could be used to support the independent inquiry into the Nazi Assets held by Credit Suisse. Credit Suisse asked SWC to forebear from any public disclosure or litigation relating to the Nazi Assets pending the completion of Mr. Barofsky's independent report, and it promised in writing to provide SWC with the report. SWC agreed to these terms and complied.

Following a change in leadership at Credit Suisse in 2022, the bank fired its chosen independent ombudsperson and breached its commitments to share the Barofsky report with SWC and publish it.

SWC has not yet seen Mr. Barofsky's report and thus cannot represent to this Court whether the report calls into question any representations Credit Suisse made to this Court in obtaining the 1999 settlement related to Holocaust victims' assets. Nevertheless, Credit Suisse has chosen to write you a letter that is rife with false statements about SWC, its investigative team, and Mr. Barofsky.

In its letter, Credit Suisse alleges that SWC violated the "Organizational Endorsement" of the 1999 settlement of the Holocaust Victims Assets Litigation. That is incorrect. The notion that the 1999 "Organizational Endorsement" signed by many non-party Jewish organizations deprived them of the right to examine and report historical truths uncovered years after the settlement concerning Nazi Assets held by Credit Suisse is wrong on many levels, but it is also neither ripe nor urgent.

Credit Suisse also requests that this Court hold an "emergency" status conference. The bank's submission should be seen for what it is: a cynical maneuver by Credit Suisse to reverse course on its three-year-old commitment to SWC to "lay open" the truth regarding newly-discovered Nazi Assets housed at the bank during, and for many years after, World War II.

SWC respectfully requests that the Court deny the relief requested by Credit Suisse. However, if the Court finds it necessary to hear Credit Suisse's unsupported assertions and request for an "emergency" status conference, SWC respectfully asks the Court's permission to respond fully to the Credit Suisse allegations, on or before March 30, 2023.

We are available at any time to answer the Court's questions.

Respectfully submitted,

Faith Gay
Partner

Cc:    Stein Mitchell Beato & Missner LLP (Counsel to SWC)
         Jonathan Missner, jmissner@steinmitchell.com
         Andrew M. Beato, abeato@steinmitchell.com
         Melissa Fox, mfox@steinmitchell.com

         Gibson, Dunn & Crutcher LLP (Counsel to Credit Suisse)
         F. Joseph Warin, fwarin@gibsondunn.com
         David Burns, dburns@gibsondunn.com

         Mayer Brown LLP (Counsel to Credit Suisse)
         Marc R. Cohen, mcohen@mayerbrown.com

         Kramer Levin (Counsel to Neil Barofsky & Jenner & Block)
         Barry H. Berke, bberke@kramerlevin.com

         Ira Forman, iniles1@me.com

# EXHIBIT 6

Gibson, Dunn & Crutcher LLP

1050 Connecticut Avenue, N.W.
Washington, D.C.  20036-5306
Tel 202.955.8500
www.gibsondunn.com

F. Joseph Warin
Direct: +1 202.887.3609
Fax: +1 202.530.9608
FWarin@gibsondunn.com

May 8, 2023

Hon. Edward R. Korman
United States District Judge
United States Courthouse
Room 918
225 Cadman Plaza East
Brooklyn, New York 11201

Re:    *In Re: Holocaust Victims Asset Litigation*, Case No. CV-96-4849

Dear Judge Korman:

On March 16, 2023, we, as counsel for Credit Suisse Group AG ("Credit Suisse"), wrote you requesting a status conference to discuss recent events implicating the settlement agreement (the "Settlement Agreement" or "Settlement") that this Court approved on August 2, 2000 (attached as Exhibit 1, the "Letter").  We now write to update you on events that have transpired since March 16 and to renew our request for a status conference.  We are hopeful that you will be able to assist the relevant stakeholders and provide guidance to ensure the Settlement continues to succeed in realizing its objectives, including bringing about the "complete closure" and "an end to confrontation" with respect to the concerns and allegations addressed in the Settlement.[1]  Settlement Agreement at 1.

As we explained in the Letter, on March 15, 2023, Neil Barofsky's law firm, Jenner & Block, provided us with a March 14, 2023, subpoena (the "Subpoena") from the U.S. Senate Committee on the Budget (the "Budget Committee") requiring Barofsky to produce "'any and all reports or other similar documents – whether preliminary or final – regarding any investigation you performed or oversaw pertaining to Credit Suisse AG.'" Ex. 1, Letter at 6 (quoting the Subpoena).  On March 16, in response to the Subpoena, Jenner & Block produced to the Budget Committee a draft document (the "Ombudspersons' Draft") that Neil Barofsky and Ira Forman prepared following the termination of their engagement by Credit Suisse.[2]

---

[1] The Settlement's broad ambit covers any matter based on "any act or omission [whether known or unknown and arising at any time] in any way relating to the Holocaust, World War II and its prelude or aftermath, Victims or Targets of Nazi Persecution, transactions with or actions of the Nazi Regime, . . . or any related cause or thing whatever, including, without limitation, all claims in the Filed Actions and all other claims relating to Deposited Assets, Looted Assets, Cloaked Assets, and/or Slave Labor, or any prior or future effort to recover on such claims directly or indirectly from any Releasee."  Settlement Agreement at 2 (definition of "Claims or Settled Claims").

[2] The Ombudspersons' Draft cites numerous times to a January 27, 2023, "Statement" of the Simon Wiesenthal Center (attached as Exhibit 2).

On April 6, 2023, representatives of Credit Suisse and AlixPartners briefed the senior staff of the Budget Committee and produced to the staff a copy of AlixPartners' report detailing its investigative efforts and findings, as well as an accompanying report prepared by Credit Suisse. Copies of these documents are attached as Exhibits 3 and 4. After investigating for more than two years, AlixPartners found no evidence to substantiate the allegations that many individuals on an Argentine list of 12,000 names had accounts at a Credit Suisse predecessor bank during the Nazi period. The investigation also found no evidence that eight long-closed accounts identified in this period contained assets from any Holocaust victims.[3]

During the April 6 meeting with the senior staff of the Budget Committee, Credit Suisse sought to dispel the Budget Committee's mistaken belief that Barofsky and Forman ("the Ombudspersons"), themselves, were conducting a separate investigation, had made substantial contributions to the investigation being conducted by AlixPartners, and were terminated because they had found or were about to find significant information. Credit Suisse also identified materially inaccurate and misleading statements in the Ombudspersons' Draft. Further, Credit Suisse provided the Budget Committee staff with historical context and background on the Settlement. Credit Suisse then explained how publication of an outdated, misleading, and inaccurate draft would not advance the pursuit of historical truth, but, instead, would undermine the closure achieved by the Settlement.

Following the briefing, in response to the staff's suggestion, Credit Suisse agreed to undertake additional work on the so-called "ratlines" (i.e., escape routes for Nazis fleeing Europe), as part of Credit Suisse's efforts voluntarily to shine light on its past and make it part of the historical record. These additional investigative efforts are already underway by AlixPartners and the bank, under the oversight of Clifford Chance as successor ombudsperson, assisted by KPMG Switzerland. Credit Suisse also made clear that it would welcome information that the Wiesenthal Center has developed on the bank's involvement in the ratlines.

In the morning of April 18, reporters with access to documents provided but embargoed by the Budget Committee, including the Ombudspersons' Draft, contacted Credit Suisse. Several hours later, the staff notified Credit Suisse's counsel of the Budget Committee's impending release of the embargoed materials. Around mid-day, the Budget Committee issued a press release (attached as Exhibit 5, the "Budget Committee Release") with links to the Ombudspersons' Draft, the Subpoena, the Cover Letter to the Subpoena, the AlixPartners report, and a March 6, 2023, letter from Ranking Member Grassley to Budget

---

[3] The AlixPartners' report reflects the findings of a team of up to 50 professionals who spent more than 50,000 hours investigating the matter, using the bank's archives and databases containing information on millions of historical Credit Suisse accounts. AlixPartners applied state-of-the-art technology and manually reviewed 480,000 documents and collected substantial evidence from external sources.

Committee Chairman Whitehouse describing the basis for the investigation (attached as Exhibit 6, the "Grassley Letter").

The Grassley Letter conveys numerous inaccurate statements provided to the Budget Committee about Credit Suisse, the voluntary investigation the bank undertook with the expertise of AlixPartners, and the role and termination of the Ombudspersons. Among other things, the Grassley Letter includes allegations of a cover up by the bank, references to *In re Holocaust Victim Assets Litigation*, 105 F. Supp. 2d 139 (E.D.N.Y. 2000), and allegations that the bank concealed facts from this Court. *See* Ex. 6, Grassley Letter at 1. The Budget Committee Release amplifies many of those inaccuracies and cites various inaccurate and misleading statements from the Ombudspersons' Draft. *See* Ex. 5, Budget Committee Release.

Leading media outlets soon published numerous reports that contained inaccurate statements gleaned from the released materials. The New York Times, for example, reported, "The troubled banking giant Credit Suisse is facing new accusations that it has not been fully forthcoming about the scope of its historical assistance to Nazis, a quarter-century after it agreed to take part in a $1.25 billion settlement of lawsuits by Holocaust survivors." Charlie Savage, *Beleaguered Swiss Bank Accused of Impeding Hunt for Accounts Linked to Nazis*, N.Y. Times (Apr. 18, 2023), https://www.nytimes.com/2023/04/18/us/credit-suisse-nazis.html (Exhibit 7). The Wall Street Journal began its report with a similar lead: "Credit Suisse Group AG failed to fully investigate recent allegations that it supplied bank accounts to Nazi party members before and after World War II, and pushed aside an outside lawyer it had charged with overseeing an internal probe into the matter . . . ." Margot Patrick & Natalie Andrews, *Credit Suisse Failed to Probe Nazi Past, Senate Committee Says*, Wall Street Journal (Apr. 18, 2023), https://www.wsj.com/articles/credit-suisse-failed-to-probe-nazi-past-senate-committee-says-129394ee (Exhibit 8).[4]

---

[4] Other media and non-governmental organizations also reported on or made statements following the Budget Committee's Release and related reporting. *See, e.g.*, Press Release, Simon Wiesenthal Center, SWC Investigation of Credit Suisse AG and Nazi Assets (Apr. 18, 2023)("The actions taken today by the U.S. Senate Committee on the Budget shine light on a dark and troubling past that has remained outside the historical record. . . . We wish to especially thank Chairman Whitehouse (D-RI) and Ranking Member Grassley (R-IA) whose bipartisan leadership offers hope for full and final accountability from all who supported the Nazi regime during and after the Second World War."), https://www.wiesenthal.com/about/news/credit-suisse-ag-and-nazi.html (Exhibit 9); Press Release, World Jewish Congress, WJC Troubled by Credit Suisse's Firing of Neil Barofsky, Ira Forman, Who Were Investigating Scope of Bank's Ties to Nazis (Apr. 24, 2023)("'Given the Swiss bank's repeated assurances over the past several decades that it was committed to full transparency in regard to its activities during and after World War II and the Holocaust, we are deeply disappointed that Credit Suisse abruptly fired [Neil Barofsky and Ira Forman], who had worked to create a comprehensive report detailing the bank's shortcomings.'" (quoting Maram Stern, WJC Executive Vice President)), https://www.worldjewishcongress.org/en/news/wjc-troubled-by-credit-suisses-firing-of-neil-barofsky-ira-forman-who-were-investigating-scope-of-banks-ties-to-nazis (Exhibit 10).

# GIBSON DUNN

In light of these developments, we ask for the Court's assistance in bringing relevant stakeholders together in the status conference that we have requested.[5]  If the current situation is allowed to persist, it will undermine the objectives of the Settlement, its values, and what it was able to achieve.  We believe that a status conference is the best way to achieve this objective in a consensual manner.

Credit Suisse's commitment to pursue historical truth within the context of the Settlement is unwavering.  We and our client are available to attend such a conference at the Court's earliest convenience.

Respectfully submitted,

GIBSON, DUNN & CRUTCHER LLP                    MAYER BROWN LLP

F. Joseph Warin, Esq.                    Marc R. Cohen, Esq.
David Burns, Esq.

Attachments:  Exhibits

cc:    Selendy Gay Elsberg PLLC (counsel to the Simon Wiesenthal Center)
         Faith Gay, Esq., *fgay@selendygay.com*

       Stein Mitchell Beato & Missner LLP (counsel to the Simon Wiesenthal Center)
         Jonathan Missner, Esq., *jmissner@steinmitchell.com*

       Kramer Levin (counsel to Neil Barofsky & Jenner & Block)
         Barry Berke, Esq., *bberke@kramerlevin.com*

       Ira Forman, *iniles1@me.com*

---

[5] Credit Suisse has been unsuccessful over several months in its attempts to meet with the Wiesenthal Center.

# EXHIBIT 7

# GIBSON DUNN

Gibson, Dunn & Crutcher LLP

1050 Connecticut Avenue, N.W.
Washington, D.C. 20036-5306
Tel 202.955.8500
www.gibsondunn.com

F. Joseph Warin
Direct: +1 202.887.3609
Fax: +1 202.530.9608
FWarin@gibsondunn.com
Cm 18300.00248

May 22, 2023

VIA ECF
Hon. Edward R. Korman
United States District Judge
United States Courthouse
Room 918
225 Cadman Plaza East
Brooklyn, New York 11201

Re:     *In Re: Holocaust Victims Asset Litigation*, Case No. CV-96-4849

Dear Judge Korman:

As the Court may be aware, an issue has arisen concerning a matter governed by the 1999 Settlement in the captioned litigation, over which this Court retained jurisdiction.[1]  Given the Court's unparalleled familiarity and experience with this litigation, we would welcome the Court's views on how best to approach this matter.

We believe that the appointment of a neutral mediator would be a productive way to address the current situation in a cooperative manner envisioned by the 1999 Settlement.  Former Under Secretary of State and Ambassador Stuart Eizenstat, who has been in contact with the parties, is willing to serve in such a role.  Accordingly, consistent with the Court's continuing jurisdiction over the Settlement and in the interests of justice, we ask the Court to appoint Ambassador Eizenstat to assist the parties in resolving this matter.  Credit Suisse is willing to pay for any part or all of the costs associated with Ambassador Eizenstat's performance of this role, as agreed to by the parties or directed by the Court.  If, for whatever

---

[1] In its August 9, 2000 Final Order and Judgment, this Court retained "*continuing jurisdiction* over . . . all parties to this action and the plaintiff class members for the purpose of enforcing and administering the settlement."  Final Order and Judgment § 6 (emphasis added).  In addition, Section 14 of the Settlement Agreement provides that "[a]s part of the Final Order and Judgment, the Court shall retain jurisdiction for the purpose of . . . enforcing this Settlement Agreement."  Settlement Agreement § 14. *See Hendrickson v. U.S.*, 791 F.3d 354, 358 (2d Cir. 2015); *Tendilla v. 1465 Espresso Bar LLC*, 2021 WL 2209873, at *2–3 (S.D.N.Y. June 1, 2021) (entering judgment against defendant in response to motion to enforce the settlement, where following dismissal the court "retain[ed] jurisdiction over all proceedings solely to enforce the terms of the settlement").  The Court's exercise of jurisdiction without the need for further adversarial proceedings is the best way to achieve the "complete closure and end to confrontation" promised by the 1999 Settlement.

reason, any party objects to Ambassador Eizenstat's appointment, we would support the appointment of a mediator agreeable to all parties.

We are available to discuss these matters, if the Court believes such a meeting would be worthwhile.


GIBSON, DUNN & CRUTCHER LLP                    MAYER BROWN LLP


F. Joseph Warin, Esq.                          Marc R. Cohen, Esq.
David Burns, Esq.


cc:     Selendy Gay Elsberg PLLC (counsel to the Simon Wiesenthal Center)
            Faith Gay, Esq., *fgay@selendygay.com*

        Stein Mitchell Beato & Missner LLP (counsel to the Simon Wiesenthal Center)
            Jonathan Missner, Esq., *jmissner@steinmitchell.com*

        Kramer Levin (counsel to Neil Barofsky & Jenner & Block)
            Barry Berke, Esq., *bberke@kramerlevin.com*

        Patterson Belknap Webb & Tyler LLP (counsel to Ira Forman)
            Michael F. Buchanan, Esq., *mfbuchanan@pbwt.com*
            Jonathan Schenker, Esq., *jschenker@pbwt.com*

# EXHIBIT 8

Selendy Gay Elsberg PLLC
1290 Avenue of the Americas
New York NY 10104
212.390.9000

Faith Gay
Partner
212.390.9001
fgay@selendygay.com

**selendy
gay
elsberg**

May 24, 2023

**Via E-mail**

Hon. Edward R. Korman
United States District Judge
Eastern District of New York
Room 918
225 Cadman Plaza East
Brooklyn, New York 11201

Re: *In re Holocaust Victims Asset Litigation, Civ. No. 96-4849 (ERK)
(CLOSED)*

Dear Judge Korman:

On behalf of the Simon Wiesenthal Center ("SWC"), this letter responds to the May 22, 2023, letter of Credit Suisse Group AG ("Credit Suisse") requesting the Court to appoint Ambassador Stuart Eizenstat as a mediator in the above-referenced closed case. Because SWC was not a party in the closed case, and therefore not ECF registered, this response is directed to Chambers consistent with SWC's response to Credit Suisse's prior correspondence.

As this Court already has determined, there is no present case before the Court. For the same reason, there is no basis for the Court to consider Credit Suisse's request for the appointment of a mediator. Moreover, to the extent Credit Suisse's letter of May 22, 2023, implies otherwise, SWC writes to clarify that it has not consented to the appointment of any mediator, including Ambassador Eizenstat.

SELENDY GAY ELSBERG PLLC

STEIN MITCHELL BEATO &
MISSNER LLP

Faith Gay, Esq.
Jennifer Selendy, Esq.

Jonathan E. Missner, Esq.
Andrew M. Beato, Esq.
Melissa S. Fox, Esq.
Joshua Elliott, Esq.

cc:  Gibson, Dunn & Crutcher LLP (Counsel to Credit Suisse)
F. Joseph Warin (fwarin@gibsondunn.com)
David Burns (dburns@gibsondunn.com)

Mayer Brown LLP (Counsel to Credit Suisse)
Marc R. Cohen (mcohen@mayerbrown.com)

Kramer Levin (Counsel to Jenner & Block and Neil Barofsky)
Barry H. Berke (bberke@kramerlevin.com)

Patterson Belknap Webb & Tyler LLP (Counsel to Ira Forman)
Michael F. Buchanan, Esq. (mfbuchanan@pbwt.com)
Jonathan Schenker, Esq. (jschenker@pbwt.com)

Ambassador Stuart E. Eizenstat (seizenstat@cov.com)

# EXHIBIT 9

| | |
|---|---|
| **Subject:** | RE: In re Holocaust Victims Asset Litigation, Civ. No. 96-4849 (ERK) |
| **Date:** | Monday, February 2, 2026 at 12:26:21 PM Eastern Standard Time |
| **From:** | Burns, David P. |
| **To:** | Jonathan Missner |
| **CC:** | Melissa Fox, fgay@selendygay.com, Jennifer Selendy, Andrew M Beato, King, Marshall R., Warin, F. Joseph |
| **Attachments:** | image001.jpg |

Jonathan, we can confirm that we are comfortable with this schedule. We would like to request March 6 or March 9 for the actual hearing date. One more point of clarification to your email below: we have sought an order to clarify the scope of the settlement agreement; we have not submitted a motion to enforce the settlement. Thank you.

**David P. Burns**
Partner

T: +1 202.887.3786
DBurns@gibsondunn.com

**GIBSON DUNN**
Gibson, Dunn & Crutcher LLP
1700 M Street, N.W., Washington, D.C. 20036-4504

**From:** Jonathan Missner <JMissner@steinmitchell.com>
**Sent:** Monday, February 2, 2026 9:03 AM
**To:** Burns, David P. <DBurns@gibsondunn.com>
**Cc:** Melissa Fox <MFox@steinmitchell.com>; fgay@selendygay.com; Jennifer Selendy <jselendy@selendygay.com>; Andrew M Beato <ABeato@steinmitchell.com>; King, Marshall R. <MKing@gibsondunn.com>; Warin, F. Joseph <FWarin@gibsondunn.com>
**Subject:** Re: In re Holocaust Victims Asset Litigation, Civ. No. 96-4849 (ERK)

Given the timing, we intend to write Judge Korman this afternoon, apprising the court of the schedule conflict and proposing the schedule I suggested in my email below. I would appreciate knowing UBS' position beforehand. Jon

**From:** "Burns, David P." <DBurns@gibsondunn.com>
**Date:** Friday, January 30, 2026 at 7:32 PM
**To:** Jonathan Missner <JMissner@steinmitchell.com>
**Cc:** Melissa Fox <MFox@steinmitchell.com>, Faith Gay <fgay@selendygay.com>, Jennifer Selendy <jselendy@selendygay.com>, Andrew Beato <ABeato@steinmitchell.com>, "King, Marshall R." <MKing@gibsondunn.com>, "Warin, F. Joseph" <FWarin@gibsondunn.com>
**Subject:** Re: In re Holocaust Victims Asset Litigation, Civ. No. 96-4849 (ERK)

Received. We will discuss on our end and revert.

**David P. Burns**
Partner

T: +1 202.887.3786
DBurns@gibsondunn.com

**GIBSON DUNN**
Gibson, Dunn & Crutcher LLP
1700 M Street, N.W., Washington, D.C. 20036-4504

---

**From:** Jonathan Missner <JMissner@steinmitchell.com>
**Sent:** Friday, January 30, 2026 3:55:32 PM
**To:** Burns, David P. <DBurns@gibsondunn.com>
**Cc:** Melissa Fox <MFox@steinmitchell.com>; fgay@selendygay.com <fgay@selendygay.com>; Jennifer
Selendy <jselendy@selendygay.com>; Andrew M Beato <ABeato@steinmitchell.com>; King, Marshall R.
<MKing@gibsondunn.com>; Warin, F. Joseph <FWarin@gibsondunn.com>
**Subject:** In re Holocaust Victims Asset Litigation, Civ. No. 96-4849 (ERK)

David:

We saw that Judge Korman rescheduled the hearing to next Friday, February 6, but also indicated that the parties could agree on a proposed alternate date. Next Friday does not work for our side, as I am out of the country on pre-planned business travel that cannot be rescheduled. Beyond that scheduling conflict, however, it seemed to us that the parties and the court would benefit from more time for a thorough and orderly briefing schedule in advance of a rescheduled hearing.

To that end, we propose the following:

1.     SWC submits its brief in response to UBS's motion to enforce the 1999 settlement by Friday, February 13 (two weeks from today);
2.     UBS submits a reply, if any, to SWC's response, by Friday, February 27 (two weeks from our response); and
3.     The court holds a hearing on the matter within two weeks of UBS's reply.

Please let us know if this is agreed; if so, we can submit this to the court. We're available to discuss this at your convenience.

Best regards, Jon

**<span style="color:red">Jonathan E. Missner</span>** I  Managing Partner
**Stein Mitchell Beato & Missner LLP**
2000 K Street, NW Suite 600
Washington DC 20006
**D** 202.661.0956
jmissner@steinmitchell.com
www.steinmitchell.com



\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*
The information contained in this communication is confidential, may be attorney-client privileged, may constitute inside information, and is intended only for the use of the addressee.  It is the property of Stein Mitchell Beato & Missner LLP.  If the reader of this message is not the intended recipient or the employee or agent responsible for delivering this message to the intended recipient, you are hereby notified that any dissemination, distribution or copying of this communication is strictly prohibited and may be unlawful. If you have received this communication in error, please notify us immediately by reply or by telephone at (202) 737-7777, and immediately destroy this communication and all copies thereof, including all attachments.
 \*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

This message may contain confidential and privileged information for the sole use of the intended recipient. Any review, disclosure, distribution by others or forwarding without express permission is strictly prohibited. If it has been sent to you in error, please reply to advise the sender of the error and then immediately delete this message.

Please see our website at https://www.gibsondunn.com/ for information regarding the firm and/or our privacy policy.

This message may contain confidential and privileged information for the sole use of the intended recipient. Any review, disclosure, distribution by others or forwarding without express permission is strictly prohibited. If it has been sent to you in error, please reply to advise the sender of the error and then immediately delete this message.

Please see our website at https://www.gibsondunn.com/ for information regarding the firm and/or our privacy policy.

# EXHIBIT 10

# Testimony of Robert Karofsky, President of UBS Americas

Before the Senate Judiciary Committee
*"The Truth Revealed: Hidden Facts Regarding Nazis and Swiss Banks"*
February 3, 2026

Chairman Grassley, Ranking Member Durbin, Acting Ranking Member Whitehouse, and Members of the Committee, thank you for the opportunity to testify.

My name is Rob Karofsky, and I am the President of UBS Americas and the Co-President of our Global Wealth Management Division. Previously, I was the President of UBS's Global Investment Bank division. I am a member of UBS's Group Executive Board and report directly to our Group CEO.

I am here today with Barbara Levi, UBS's Group General Counsel.

As many of you know, UBS took on responsibility for the matter before us in 2023 when, in response to the request of Swiss authorities and with the cooperation of regulators around the globe, including U.S. regulators, it acquired Credit Suisse to help prevent a systemic financial crisis.

We approach today's topic with solemn respect: the Holocaust perpetrated by the Nazis is the darkest chapter in human history and continues to be felt to this day. Although more than 80 years have passed since the fall of Nazi Germany, we can never let ourselves forget the systematic murder of six million Jews and the horror experienced by survivors.

I appear before you as the most senior Americas executive of the world's largest wealth manager, and as a proud Jewish American. Today's topic is something that has the profoundest of meaning to Barbara and me personally. My parents raised me with a deep awareness of the gravity and impact of the Holocaust, and the most heart-felt sympathy for its victims. Although my grandparents were fortunate to have left Europe before the Second World War, fleeing to Massachusetts and making a life in this great country, I am acutely aware of the millions who were not so fortunate and perished at the hands of the Nazis. And Barbara's family was tragically affected by the Holocaust.

We are also gravely concerned about the rise of Holocaust denial and anti-Semitism here and elsewhere.

UBS accepts and deeply regrets that the World War II era was a dark period in the history of Swiss banking. UBS and Credit Suisse, and their predecessors were part of this chapter and history rightly has judged them. Both banks have apologized and taken responsibility for their actions. A global Settlement was reached in 1999, the proceeds of which were distributed to Holocaust victims and their heirs. Both UBS and Credit Suisse were instrumental parties to the Settlement.

We would not be able to represent UBS here today, or indeed day-to-day, if we did not unequivocally believe that the Bank is dedicated to Holocaust remembrance, education, and the search for historical truth to ensure that nothing like the Holocaust can ever happen again.

## Historical Investigations of Swiss Banks in the 1990's

Today, you will hear about Credit Suisse's current voluntary investigation into its World War II-era conduct. This multi-year effort entails production of more than 16.5 million documents consisting of 44 million pages and four terabytes of data; responds to more than 1,700 requests for archives visits, documents, and meetings; currently involves approximately 85 people working full time; and has produced several public reports. To support these efforts and to demonstrate our unflinching commitment to finding the truth, we have spent hundreds of millions on this investigation.

In his testimony before you today and previously, Neil Barofsky has praised UBS's extraordinary cooperation. In fact, we have undertaken an extraordinary private-sector effort to diligently review any relevant source existing in the Credit Suisse archives. The investigation also has involved research in 18 public archives in seven countries. Our objective has been to undertake all measures to identify truly new information. We believe this is what Chairman Grassley refers to as "leav[ing] no stone unturned."

To put the current review of Credit Suisse into perspective, it is important to understand the broader historical landscape, including the scale of the effort put forth over the last 30 years.

In the 1990s, thanks in part to the efforts of people in this chamber, the U.S. administration, Jewish NGOs including the Simon Wiesenthal Center, Switzerland, and its banks, led by UBS and legacy Credit Suisse, embarked on an unprecedented series of measures to examine their history and to achieve justice for victims of Nazi persecution and their heirs.

The findings of this intense scrutiny of Switzerland's and Swiss banks' World War II-era history in the 1990s painted a deeply troubling picture that included many previously unreported and shameful aspects that were exposed, documented, acknowledged, and addressed.

In 1996, following a hearing before the Senate Banking Committee, the Swiss banks and leading Jewish organizations established what was known as the Independent Committee of Eminent Persons chaired by former U.S. Federal Reserve Board Chair Paul Volcker. The members of the Committee included prominent representatives of the Jewish community. The Volcker Committee ordered a first of its kind audit of Swiss banks, including Credit Suisse and UBS, by four of the then "Big Five" accounting firms. The banks were required to provide full, unfettered access to their records. The Volcker Committee's main goal was to identify dormant accounts of Nazi victims, while also reviewing looted assets and Nazi-linked accounts. While the Volcker auditors identified the four individual accounts at Credit Suisse that involved forced transfers mentioned in the Ombudsperson's testimony and three were published as part of the court-administered settlement distribution process, the Ombudsperson's work has been able to identify specific transactions that occurred in accounts held at Credit Suisse that facilitated these forced transfers.

That same year, Switzerland enacted legislation establishing the Bergier Commission, composed of a panel of independent international historians and staff, to examine Switzerland's World War II-era history, including activities of Swiss banks. All Swiss companies, including Credit Suisse and UBS, were required by law to provide full access to their records. Following its investigation, the Bergier Commission published 25 volumes on topics such as looted assets, dormant accounts,

Nazi ties, and gold transactions. The Bergier Commission reported on many of the topics covered by the Ombudsperson's investigation including, the Argentine ratlines (where the Ombudsperson has found links to Credit Suisse) and the DWB / Kurzmeyer account. Some of the other Nazi-affiliated entities and issues that the Ombudsperson discusses also were extensively examined in the 1990's.

In addition, under the auspices of then-Under Secretary of State Stuart Eizenstat, the U.S. State Department published two reports that highlighted the relationships with Nazi Germany of six different countries, including Switzerland. The reports also included a detailed study of gold transactions and a critical assessment of our own country's post-World War II handling of heirless Holocaust victim assets.

Congress held numerous hearings on this topic and conducted its own investigations including into documents that the National Archives recently had declassified.

### Litigation and the 1999 Global Settlement

In addition to these investigations and reviews, beginning in October 1996, several class action lawsuits were filed in New York federal court against Swiss banks by classes of Holocaust victims who had deposited assets in the banks, or had assets looted by the Nazis or proceeds of their slave labor performed for the Nazis, trafficked by the Nazis through accounts held by Nazis and their supporters at Swiss banks. The cases were consolidated and eventually resulted in the 1999 landmark, court-approved settlement that was agreed to and endorsed by Jewish NGOs.

Under the Settlement, Credit Suisse and UBS agreed to pay $1.25 billion, an extraordinary amount at the time that was subsequently distributed by the court and court-appointed special masters to Holocaust survivors and heirs of Holocaust victims.

Agreement on the settlement figure was based on the sum of two roughly equal components:

- The first component of the settlement amount was the projected amount needed to compensate claimants to bank accounts that had been held at Swiss banks and identified through the Volcker process. These claims were based on information on specific accounts and had a clear legal basis.

- Importantly, the second component of the settlement amount covered all other possible types of claims related to Nazi Germany, the Holocaust, and World War II, its prelude and aftermath and included looted assets, slave labor, and transactions and relationships with the Nazi Regime and any individuals or entities affiliated with it. Such claims, which included potential claims based on facts discovered in the future, lacked a clear legal basis and were not possible to accurately quantify. This also represented a moral component that addressed all bad acts committed by the banks, regardless of whether they could give rise to legal claims.

The Settlement was intended by all parties and the presiding U.S. District Judge, Edward R. Korman, to achieve global resolution through a conclusive end to the controversy that went beyond legal and financial closure. It was not limited to the facts known at the time. Accordingly, the

scope of the Settlement is extremely broad and involves release of all claims whether known or unknown in any way associated with Nazi Germany and all individuals and entities associated or affiliated with it, the Holocaust, World War II, and its prelude and aftermath. As part of its comprehensive scope, the Settlement explicitly included "Nazi assets" — those belonging to Nazi companies and individuals.

This was much more than the typical class action settlement. It had an essential moral dimension that brought global peace, complete closure, and an end to confrontation. As evidence of this, major NGOs, including the Simon Wiesenthal Center, embraced the Settlement and agreed in writing to be bound by its terms. In its written endorsement (attached to my testimony), the Simon Wiesenthal Center, among other things:

- agreed that the Settlement was "fair, adequate, and reasonable,"

- "affirm[ed] [that the Settlement] brings about complete closure and an end to confrontation with respect to the issues dealt with in the settlement,"

- "agree[d] not to make any public statement or take any action that would violate or be inconsistent with [its] endorsement," and

- agreed not to sue, threaten to sue or support suits against the banks, based on "conduct covered by the settlement."

Because the parties to the Settlement recognized that, notwithstanding the many facts that had come to light, not all the facts could be known at the time (and some would never be known), the Settlement did not include any factual representations or further recitation of facts. In other words, it was the parties' judgment that, notwithstanding necessarily incomplete knowledge, a final and binding settlement that brought complete closure and an end to controversy was in everyone's interest. To further reinforce this, the Settlement expressly includes in the "Settled Claims" ". . . any claims . . . hereafter arising or discovered . . . ." Importantly, given that the Parties and the Court were aware that not all the facts could be known at the time, the Settlement was structured in a way that permitted continuing voluntary research to bring new information to light, without undermining or calling into question its binding finality and end to confrontation.

The Settlement distribution process, in which the banks had no say, was overseen and implemented by the court and court-appointed special masters. When it concluded in 2018, nearly $1.3 billion had been distributed to Holocaust victims and their heirs, including claimants to bank accounts, slave laborers, and needy survivors. Although the banks had no say in the Settlement distribution process, we are thankful that the settlement amount was dedicated so meaningfully to so many individual Holocaust survivors and heirs of Holocaust victims.

### Current Credit Suisse Investigation

As I have explained, even though the Settlement provided finality from claims and closure of controversy, nothing in it stops any party from voluntarily deciding to take steps to examine its own history.

Following the 2020 Simon Wiesenthal Center press release, alleging Credit Suisse maintained accounts for Argentine Nazis that likely held assets looted from victims of the Holocaust, Credit Suisse agreed to voluntarily investigate these allegations and retained a leading forensic firm, AlixPartners, to conduct the review. Credit Suisse subsequently decided to engage Neil Barofsky as an independent ombudsperson to oversee the voluntary review into its past. Credit Suisse's agreement was neither required nor prohibited by the Settlement and did not affect the Settlement in any way.

I will not go into a step-by-step description of the investigation that has occurred over the past several years, except to say that the scope of the investigation has increased significantly, pursuing any new lead that the investigative team has found and covering more topics than contemplated by the original scope of the SWC's inquiry. Since the acquisition of Credit Suisse we have hired and put at the Ombudsperson's unlimited disposal an external investigative team of forensic accountants, historians, and an anti-Semitism expert; we have expanded our team of archivists to ensure a prompt review of the historical records; we have procured any necessary equipment to facilitate the scanning and indexing of any record and when this was not possible, we have hired vendors to scan and index on our behalf. Overall, as I mentioned earlier, we have, thus far, dedicated immense resources to this review.

The Ombudsperson and his team have had unfettered access, without any screening for relevance, to whatever information they have requested from Credit Suisse's electronic and physical archives, including privileged information from before the 1990's. I also note that, as further demonstration of our transparency, we provided a tour of Credit Suisse's archives to one of the Chairman's staff when she was in Zurich.

Since we rehired him, the Ombudsperson continuously and appropriately has praised our level of cooperation with his work. We would have it no other way. To be absolutely clear: with the exception of one narrow class of privileged documents, the Ombudsperson will continue to have access to any information he seeks through the completion of his investigation on the current timetable.

It is unfortunate that the resources and efforts that Credit Suisse has dedicated to this review to take all reasonable and timely measures to identify truly new information have been obscured by the Ombudsperson's request that Credit Suisse provide communications between Credit Suisse and its counsel in the 1990's. It is important to understand the context and the proportion of this compared to the totality and comprehensiveness of the review. It is also important to understand the steps we are taking to provide the Ombudsperson access to this information.

The dispute is over a limited set of attorney communications between Credit Suisse and its attorneys and attorney files in the 1990's. These communications have not been provided because the Simon Wiesenthal Center and others have threatened litigation over this matter, which makes it of paramount importance to protect those specific attorney communications. The confidentiality of communications between clients and their lawyers is time-honored and long recognized in our jurisprudence, and this Committee, in particular, can appreciate its foundational importance to our legal system.

It also is important to put the size of the attorney communications into context. While our review remains ongoing, these documents amount to fewer than 150 documents, versus more than 16.5 million documents provided to the Ombudsperson, at this time. For context, Credit Suisse also has voluntarily provided all materials for which it could have claimed the attorney-client privilege for pre-1990's documents and gave the Ombudsperson full access to those documents.

Materials from the 1990's are not within the scope of the Ombudsperson's oversight, which is meant to be focused on Credit Suisse's history and World War II-era conduct. This investigation was never meant to be focused on whether and how to reopen the 1999 Settlement Agreement. And yet, that is the subject on which the documents the Ombudsperson is seeking is most relevant.

Notwithstanding our position and after a lengthy mediation, we have requested that Judge Korman issue an order to clarify and reaffirm the scope of the Settlement, which could have the added benefit of permitting UBS to provide Mr. Barofsky with access to the privileged materials he seeks. Let me be clear: any suggestion that we have sued or are attempting to silence today the Simon Wiesenthal Center is false.

You also have heard that the Ombudsperson and UBS are constrained by Swiss law from disclosing certain individual and corporate names implicated by the investigation. I hope the Committee can understand that UBS wants to be able to disclose the relevant information in a meaningful way and is doing everything possible to be in a position to do so, while still complying with Swiss law, which we of course are obliged to do.

We recognize the Ombudsperson's efforts over the last several years and commend the instances of new historical discoveries that he has described, for example, the additional information on the ratlines that showed that Credit Suisse rented office space to the Argentine Immigration Office adjacent to its Bern branch and that certain individuals who worked with that office had accounts at Credit Suisse. When we took over Credit Suisse almost three years ago, UBS fully committed to getting the Ombudsperson's work back on track so that it could be completed, according to the agreed-upon scope and in a reasonable amount of time. At the time, we at UBS did not have a clear understanding of this matter and how it was playing out. Now, with three years of experience, our priority is to complete this review so that the world can benefit from the findings in the coming final report at the end of this year. UBS will continue to follow the facts. Thank you again for permitting me to testify today. Ms. Levi and I would be pleased to address the Committee's questions.