GIBSON DUNN                                          MAYER | BROWN

February 27, 2026

Hon. Edward R. Korman
United States District Judge
United States Courthouse
Room 918
225 Cadman Plaza East
Brooklyn, New York 11201

Re:  In Re: Holocaust Victims Asset Litigation, Case No. CV-96-4849

Dear Judge Korman:

We write as counsel for Defendant Credit Suisse, and now Defendant UBS AG ("UBS"), in further support of UBS's request for a ruling clarifying the scope of the Settlement Agreement and release of claims approved by this Court on August 9, 2000 (as amended, "Settlement Agreement") (attached as Ex. 1), and for such other and further relief as this Court may deem just and proper.

Six years ago, the Simon Wiesenthal Center ("SWC") raised serious allegations about the actions of Credit Suisse's predecessor banks before, during, and after World War II. Credit Suisse, and since its acquisition in 2023 of Credit Suisse, UBS, have engaged in extensive voluntary efforts to investigate these allegations (which have expanded significantly since 2020). More recently, UBS engaged in mediation over the SWC's allegations and a fundamental disagreement over the scope of the Settlement Agreement. The mediation has run aground, and this Court's intervention to clarify the Settlement Agreement is urgently required. In doing so, the Court should reaffirm the obligations of the parties to the Settlement Agreement, confirm the breadth of its releases, and ensure the parties avoid "additional unnecessary litigation." August 11, 2023, Order.

The SWC raises two (and only two) objections to an order clarifying the Settlement Agreement. Each objection is without merit.

First, the SWC asserts that an order from this Court would be an improper "advisory opinion" because it would concern only a "hypothetical dispute." Response at 1. As this Court's August 11, 2023, Mediation Order recognized, however, there is a live and concrete "dispute" between Credit Suisse and the SWC "regarding obligations under" the Settlement Agreement and its accompanying Organizational Endorsement. At the core of this dispute is the SWC's position that it is entitled to monetary compensation based on an interpretation of the Settlement Agreement that Nazi assets were not covered—a position that UBS strongly contests. Indeed, the Court appointed Ambassador Stuart Eizenstat and Mark Donig as mediators for the very purpose of attempting to resolve "the dispute between the SWC and Credit Suisse to avoid additional unnecessary litigation of this matter." *Id.* UBS has worked in good faith to advance the mediation cooperatively and attempt to resolve this dispute amicably. Despite these efforts, and the tireless dedication of Ambassador Eizenstat, Mr. Donig, and the Court, an agreed-upon resolution could not be reached. Far from being a "hypothetical dispute," the dispute between UBS and the SWC is a controversy that for nearly six years has been on the brink of litigation.

The order UBS seeks would dispose of core issues in that dispute, not constitute an advisory opinion. It would also have the likely benefit of avoiding further legal proceedings.

Second, the SWC asserts that UBS's Proposed Order (ECF No. 5086-1) would not provide "clarification," but instead would "modify and enlarge" the Settlement Agreement. Response at 2. Not so. The Settlement Agreement provided a broad release of claims to provide complete and global closure to litigation and the broader public controversy relating to Swiss banks' World War II-era conduct. Although that release does not preclude an investigation into historical truth—the very investigation UBS steadfastly supports and in which it has invested significant resources—it does foreclose additional litigation (and threats of litigation and generation of public controversy) relating to those claims and others the SWC has since raised. In its Response, the SWC suggests the Proposed Order would violate its First Amendment rights. *Id.* at 12. But it does no such thing; the SWC is free to pursue its organizational mission and investigations. What the SWC agreed it would not do is threaten the finality of the Settlement, threaten or instigate litigation to pursue additional claims, or generate public controversy related thereto. The Proposed Order simply clarifies the scope of the Settlement, and the parameters of the SWC's long-standing endorsement and agreement to key terms of the Settlement Agreement.

UBS seeks a simple form of relief that is well within this Court's jurisdiction and sound discretion: clarification of the Settlement Agreement's terms and scope. Such a ruling will ensure that the Settlement Agreement can continue to be implemented consistently with its original purpose and the parties' mutual intent as it had for more than 20 years. UBS's commitment to pursue historical truth within the context of the Settlement is unwavering. The clarification order UBS seeks will ensure that the search continues unencumbered by disputes over the scope of the Settlement.

I. **Relevant background**

 A. **The Settlement Agreement brings complete closure of litigation**

In the mid-1990s, several broad putative classes of Holocaust survivors sued several Swiss banks, including Credit Suisse and UBS. *See, e.g.*, Compl. ¶¶ 32-39, *Weisshaus v. Union Bank of Switz.*, No. 1:96-cv-04849 (E.D.N.Y. Oct. 3, 1996). The classes alleged, among other things, that the banks or their predecessors held assets looted from victims of Nazi persecution in accounts belonging to Nazis or those acting on their behalf, benefited from transactions with Nazis and Nazi-affiliated entities, withheld Jewish assets deposited for safekeeping prior to and during World War II, provided banking services to Nazis during World War II, and following World War II failed to account for or return the deposited or transferred property. These suits were consolidated into a case captioned *In re Holocaust Victim Assets Litigation*, Nos. 96 Civ. 4849, 99 Civ. 5161, and 97 Civ. 461 (E.D.N.Y.).

The class action litigation was part of a larger controversy that culminated in a broad effort to understand, unmask, and redress the Swiss bank defendants' World War II-era history on the fiftieth anniversary of the end of the Holocaust. That effort involved, among others: Jewish organizations; federal, state, and local officials in the United States; foreign officials, including in Israel and Switzerland; the Independent Commission of Experts, a government-mandated independent group of internationally recognized historians chaired by Professor Jean Francois Bergier; and an unprecedented independent forensic audit of Swiss banks, headed by former Federal Reserve Board Chairman, Paul Volcker, culminating in the 1999 Volcker Report. This controversy received extensive media coverage and spawned threats of governmental sanctions and boycotts.

In recognition of the concerns about their historic World War II-era conduct, and to ensure "complete closure" with respect to such concerns, Credit Suisse and UBS entered into an unprecedented and comprehensive global settlement agreement in 1999 with five broadly defined classes of victims or targets of Nazi persecution (the "Settling Plaintiffs") and the World Jewish Restitution Organization. *See* Settlement Agreement. It was clear to all concerned parties that achieving such closure required a global resolution of the broader controversy, and not just a settlement of the litigation. Accordingly, as a condition precedent to the effectiveness of the Settlement Agreement, a "Related Agreement" required the Settling Plaintiffs to obtain the written endorsements of 17 Jewish organizations (the "Organizational Endorsers"), including the SWC. *See* Endorsement (attached as Ex. 2). On March 30, 1999, the last organizational endorsement was executed, and the Settlement Agreement became final. The Organizational Endorsers affirmed that "the Settlement Agreement brings about complete closure and an end to confrontation with respect to the subject matter it covers." Settlement Agreement § 11.1; *see In re Holocaust Victim Assets Litig.,* 105 F. Supp. 2d 139, 147 (E.D.N.Y. 2000).

## B. The Settlement Agreement broadly releases known and unknown claims

The Settlement Agreement's release of claims is sweeping. It provides that the Settling Plaintiffs released "all Claims against the Releasees." It defines "Claims or Settled Claims" as

> any and all actions, causes of action, claims, **Unknown Claims**,[1] obligations, damages, costs, expenses, losses, rights, promises, and agreements of any nature and demands whatsoever, from the beginning of the world to now and any time in the future, arising from or in connection with actual or alleged facts occurring on or before the date of this Settlement Agreement . . . ***whether now accrued or asserted or hereafter arising or discovered . . . in connection with any act or omission in any way relating to the Holocaust, World War II and its prelude and aftermath, Victims or Targets of Nazi Persecution, transactions with or actions of the Nazi Regime,***[2] ***treatment of refugees fleeing Nazi persecution by the Swiss Confederation or other Releasees, or any related cause or thing whatever***, including without limitation, all claims in the Filed Actions and all other ***claims relating to Deposited Assets, Looted Assets, Cloaked Assets,***[3] ***and/or Slave Labor***, or any prior ***or future effort*** to recover on such claims directly or indirectly from any Releasee [. . .]

Settlement Agreement § 1 (emphasis added).

In short, the release covers all claims—past, present, and future, including any "arising or discovered" after the Settlement Agreement—"in connection with" World War II or the Holocaust,

---

[1] "Unknown Claims" means "Claims that a claimant does not know or suspect to exist in his/her favor as of the date of the Settlement Agreement." Settlement Agreement § 1.

[2] "Nazi Regime" means (in relevant part) the Nazi government and "its instrumentalities, agents, and allies, . . . and all other individuals or entities in any way affiliated or associated with, or acting for or on behalf or under the control or influence of, the Nazi Regime." *Id.*

[3] "Cloaked Assets" means assets "wholly or partly owned, controlled by, obtained from, or held for the benefit of" any company, entity, or individual associated with the Nazi Regime, "the identity, value, or ownership of which was in fact or allegedly disguised by, through, or as the result of any intentional or unintentional act or omission of or otherwise involving any Releasee." *Id.*

3

including claims related to the banks' actions with respect to victims' accounts as well as accounts, assets, or transactions related to the Nazi Regime.

In addition to agreeing to a release that was extraordinarily broad, which the Settling Plaintiffs and the Organizational Endorsers explicitly acknowledged, the Settling Plaintiffs and the Organizational Endorsers undertook other obligations in the Settlement Agreement and Endorsement. *First*, both the Settling Plaintiffs and Organizational Endorsers agreed they would not "make any public statement or take any action that would violate or be inconsistent" with the Settlement Agreement, "including seeking or approving economic or other sanctions" against UBS or Credit Suisse for "conduct covered by the Settlement Agreement." Settlement Agreement §11.2; Endorsement Cl. 3. *Second*, the Settling Plaintiffs and the Organizational Endorsers covenanted "not to sue Releasees or initiate any form of proceeding seeking redress of any kind for any Claim covered by this Settlement Agreement in any judicial, administrative, or other proceeding anywhere in the world at any time . . . ." Settlement Agreement § 12.1; Endorsement Cl. 6. *Third*, and similarly, the Organizational Endorsers covenanted "not to sue, call for suits against, or support suits against any Swiss entity released by the Settlement Agreement based on conduct covered by the settlement." Endorsement Cl. 4.

### C. The Court approves the Settlement Agreement and retains jurisdiction

This Court approved the Settlement Agreement in 2000, *In re Holocaust Victims Litig.*, 105 F. Supp. 2d 139 (E.D.N.Y. 2000), and thereafter entered final judgment. The Settlement was affirmed on appeal. *In re Holocaust Victim Assets Litig.*, 14 F. App'x 132 (2d Cir. 2001). In approving the Settlement Agreement, this Court recognized that the Settlement was meant to afford all parties with finality and complete legal peace, closing the chapter on litigation related to World War II-era conduct of the Swiss bank defendants. 105 F. Supp. 2d at 142-43 (describing release); *id.* at 147-48 (noting Senator D'Amato's conclusion that the "the settlement is eminently fair and brings closure to the questions raised about the role of Switzerland during World War II").

This Court acknowledged that the Settlement was based on incomplete and evolving information. The Court explained that "[b]ecause of the passage of time, the destruction of records, and the death of most of the percipient witnesses, the potential amount of damages plaintiffs might have recovered, even if they had been able to prevail in litigation, would have been extremely difficult to calculate with precision." 105 F. Supp. 2d at 148. Plaintiffs' counsel, in deciding to enter the Settlement, weighed "the difficulty in gaining access to the Swiss banking records." *Id.* at 149. Against this backdrop, this Court concluded that neither the lack of information nor the prospect of new facts later coming to light was reason to disrupt the Settlement. *See id.* at 152 (revelations in the Volcker Report did not "justify upsetting the settlement").

Aware of the potential for disputes relating to the Settlement Agreement and Organizational Endorsement, the parties agreed that the Court "shall retain jurisdiction for the purpose of . . . enforcing this Settlement Agreement." Settlement Agreement § 14. This Court thus expressly preserved "continuing jurisdiction" to "enforc[e] and administer[ ] the settlement." Final Order and Judgment § 6 (Aug. 9, 2000).

### D. The March 2020 press release by the SWC and Credit Suisse's response

For more than 20 years, the complete closure achieved through the Settlement Agreement and the Organizational Endorsements held. In March 2020, however, the SWC issued a press release entitled "Wiesenthal Center Reveals 12,000 Names of Nazis in Argentina, Many of Whom

4

Apparently Had Accounts Transferred to Credit Suisse" (the "2020 Press Release," attached as Ex. 3). The 2020 Press Release alleged that "many of" these 12,000 individuals "had contributed to one or more bank accounts at the Schweizerische Kreditanstalt, which became the Credit Suisse bank." On the same day, the SWC sent a letter to Credit Suisse. *See* March 2, 2020, Letter to Credit Suisse. In the letter, the SWC speculated that any dormant Nazi accounts may hold money looted from Jewish victims of the Holocaust. The SWC urged Credit Suisse to provide access to Credit Suisse's archives so that the SWC could resolve the matter on behalf of Holocaust survivors.

In December 2020, after discussions with the SWC, Credit Suisse engaged AlixPartners, a world-renowned forensic accounting firm, to conduct a forensic review to determine whether any of the people referred to in the 2020 Press Release had Credit Suisse accounts. Although Credit Suisse knew that any claims relating to the SWC's allegations had already been resolved in the Settlement Agreement and that no further action was required as a legal matter, Credit Suisse took the SWC's allegations seriously. In the interest of pursuing historical truth and moral clarity, Credit Suisse resolved to investigate on an entirely voluntary basis.

In addition, Credit Suisse decided to seek, also on an entirely voluntary basis, independent oversight of the investigation. Credit Suisse did so in recognition of the significance and sensitivity of the issues that the investigation implicated. To that end, in June 2021, Credit Suisse retained Neil Barofsky of Jenner & Block in an "ombudsperson" role. Concurrently, Credit Suisse hired Ira Forman, a scholar on antisemitism, under a separate engagement letter to serve as an independent advisor who would work in coordination with Barofsky.

**E. The Court's involvement in this matter since March 2023**

On March 16, 2023, Credit Suisse submitted a letter to this Court, in which it raised concerns that the SWC had taken and appeared to be contemplating actions that were inconsistent with its obligations under the Settlement Agreement.

For example, attorneys representing the SWC "confidentially approached" then-Ranking Member Charles Grassley of the U.S. Senate Committee on the Budget (the "Budget Committee") "with information and allegations" that Credit Suisse "secretly hous[ed] Nazi bank assets during and after World War II." *See* March 6, 2023, Letter from Ranking Member Charles Grassley to Chairman Sheldon Whitehouse (attached as Ex. 4) The SWC's attorneys claimed that Credit Suisse "concealed Nazi assets" after World War II and "before and after litigation *In re Holocaust Victim Assets Lit.*," and expressly raised the scope of the Settlement Agreement, saying that "these Nazi assets were not addressed during previous litigation." *Id.* On the heels of the SWC's meeting with Senator Grassley's Office, the Budget Committee (on March 14, 2023) subpoenaed the Ombudsperson for a draft report he had prepared during his engagement by Credit Suisse. The cover letter accompanying the subpoena recited allegations that, among other things, the draft report addressed Credit Suisse's supposed "holding of Nazi assets that were concealed from the world community, investigatory bodies, and courts for many decades, and which remain unaddressed today." This instigation of a congressional subpoena had followed an earlier statement by the SWC, in which it similarly asserted that its new allegations concerning "Nazi Assets were not" "addressed in prior investigations and resolutions," including the Settlement Agreement. Statement of the Simon Wiesenthal Center at 3 (Jan. 27, 2023) (attached as Ex. 5).

On May 22, 2023, to address the dispute that had arisen between the parties in a cooperative manner, Credit Suisse sought the Court's views on how best to approach the matter and suggested the appointment of a neutral mediator, proposing former Under Secretary of State

5

and Ambassador Stuart Eizenstat to serve in that role. On June 16, 2023, the Court issued an order explaining that it was "willing to accept Credit Suisse's suggestion" to appoint Ambassador Eizenstat "as a mediator 'as a productive way to address the current situation in a cooperative manner.'" June 16, 2023, Order. The Court called for party submissions on any objections to that appointment. *Id.*

In its submission in response to the Court's June 16 order, the SWC claimed that its "*dispute*" with Credit Suisse was not governed by the Settlement Agreement, but was related instead to an oral, "new" agreement between Credit Suisse and the SWC in connection with a "transparent and thorough investigation by an independent and respected third party leading to a published report." July 7, 2023, SWC Letter to Judge Korman at 3 (emphasis added). This Court rejected the SWC's argument:

> This claim calls to mind the saying that "no good deed goes unpunished." Passing over the fact that there were transparent and thorough investigations by the Volcker Commission and the Bergier Commission, Credit Suisse's apparent good faith effort to respond to the SWC's desire for a "forensic investigation into the full scope of Nazi assets at Credit Suisse" did not create a new agreement.

August 11, 2023, Order.

In the same August 11, 2023, Order, the Court appointed Ambassador Eizenstat "to serve as mediator in the *dispute* between the SWC and Credit Suisse to avoid additional unnecessary litigation of this matter." *Id*. (emphasis added). The Court stated clearly that Ambassador Eizenstat's remit was "to assist in the resolution of a *dispute* regarding obligations under a long-existing agreement." *Id.* (emphasis added)*.*

**F. UBS's commitment to historical truth and good faith efforts to reach a resolution.**

Since acquiring Credit Suisse, UBS has fully met the commitment to the SWC to investigate the SWC's claims and is continuing to deliver on this commitment. To date, UBS and Credit Suisse have invested hundreds of millions of dollars in the voluntary investigation in response to the SWC's March 2020 press release and new investigative subject areas demanded by the SWC and overseen by the Ombudsperson, and projects that it will spend at least an additional $100 million. The multi-year effort to date has included the production of approximately 16.5 million documents consisting of 44 million pages and four terabytes of data; responses to more than 1,700 requests for archives visits, documents, and meetings; currently involves approximately 85 people; and has produced several public reports.

Since the Court's appointment of Ambassador Eizenstat, UBS has engaged in extensive, significant efforts to negotiate with the SWC to reach a mutually acceptable conclusion. Despite UBS's good-faith efforts, its mediation with the SWC did not reach a resolution.

**II. This Court has jurisdiction to issue an order clarifying the Settlement Agreement, and entering the order UBS seeks would be a proper exercise of that jurisdiction to resolve a live dispute between UBS and the SWC.**

As this Court recognized, this dispute is governed by the Settlement Agreement. *See* August 11, 2023, Order. In reaching that global settlement, both the parties and the Court agreed it should "retain jurisdiction." Settlement Agreement § 14; Final Order and Judgment § 6 (Aug. 9, 2000). With that explicit reservation of jurisdiction, this Court "retained" the attendant "authority

to clarify subsequently the settlement and to impose clarifying terms." *Manning v. New York University,* 299 F.3d 156, 163 (2d Cir. 2002); *see also Paulino v. S & P Mini Mkt. Corp.*, 790 F. Supp. 3d 319, 328 (S.D.N.Y. 2025) (finding that district courts may clarify a settlement agreement previously reached without expanding its terms).

The SWC argues that this Court lacks authority under the Settlement Agreement because UBS's January 28, 2026, letter seeks an "order clarifying the scope" of that Agreement, rather than enforcement. Response at 6, 8–9. UBS is indeed not seeking to enforce the Settlement Agreement against the SWC.[4] Instead, UBS is seeking the more targeted relief of an order clarifying the Settlement Agreement. It may do so without a motion to enforce. *See Medinol Ltd. v. Guidant Corp.,* 500 F. Supp. 2d 345, 349–50 (S.D.N.Y. 2007). When the Court retains jurisdiction, its authority to clarify its own orders is inherent. *Cnty. of Suffolk v. Stone & Webster Eng'g Corp.*, 106 F.3d 1112, 1117 (2d Cir. 1997) ("It is 'peculiarly within the province of the district court ... to determine the meaning of its own order.'"). Thus, it is "without question" that when "a settlement agreement is incorporated into a court's final judgment or order, the district court retains jurisdiction to interpret that agreement and order its enforcement." *United Steelworkers of Am. v. Libby, McNeill & Libby, Inc.*, 895 F.2d 421, 423 (7th Cir. 1990); *see also United States v. Volvo Powertrain Corp.*, 758 F.3d 330, 344 (D.C. Cir. 2014) ("As a general rule, 'a party may ask the district court to issue an order clarifying ... a [consent] decree.'" (quoting *Nehmer v. U.S. Dep't of Veterans Affs.*, 494 F.3d 846, 860 (9th Cir. 2007))); *Manning,* 299 F.3d at 163*; Marwood v. Elizabeth Forward Sch. Dist.*, 93 F. App'x 333, 335 (3d Cir. 2004).

Here, UBS seeks the exercise of this Court's jurisdiction to clarify the Settlement Agreement amid a live dispute between UBS and the SWC. This dispute arose out of the SWC's actions threatening the finality of the Settlement Agreement and its representations articulating, at a minimum, a legal position regarding the scope of the Settlement Agreement "adverse" to Credit Suisse. *See MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118, 127 (2007). The SWC has asserted that its new allegations concerning Credit Suisse's World War II-era conduct "were not" "addressed in prior investigations and resolutions," including the Settlement Agreement. January 27, 2023, SWC Statement at 2. It has made that position clear in communications to Credit Suisse since 2020. *See, e.g.,* March 19, 2020, Letter to Credit Suisse ("The claims derived from the evidence has not been resolved by prior litigation nor for that matter any commission, including the Independent Commission of Eminent Persons."). The SWC reiterated that position when attorneys for the SWC "confidentially approached" then-Ranking Member Charles Grassley of the U.S. Senate Committee on the Budget and claimed that the alleged assets "were not addressed during previous litigation." March 6, 2023, Letter from Ranking Member Charles Grassley to Chairman Sheldon Whitehouse. And in its latest response to this Court this month, the SWC objects to UBS's Proposed Order based on its apparent position that the scope of the Settlement Agreement is not broad enough to cover the Ombudsperson's oversight of an investigation into Credit Suisse's World War II-related activities. Response at 11.

Notwithstanding this clear evidence that a dispute exists, the SWC argues that there is not a "live dispute" and thus any clarification order would be an improper "advisory opinion." Response at 8. But consistent with Article III, this Court may address "real and substantial" disputes when they are "definite and concrete, touching the legal relations of parties having adverse legal interests" and "admi[t] of specific relief through a decree of a conclusive character," *MedImmune,* 549 U.S. at 127 (quoting *Aetna Life Ins. Co. v. Haworth,* 300 U.S. 227, 240–41 (1937))—in other words, a case like this one. As this Court's August 11, 2023, Mediation Order

---

[4] The SWC's position that UBS has "effectively withdrawn" its March 16, 2023, letter seeking the Court's intervention is mistaken. See Response at 9 n.31. UBS has done no such thing.

7

recognized, there is a live and concrete "dispute" between Credit Suisse and the SWC "regarding obligations under" the Settlement Agreement and accompanying Organizational Endorsement. That the mediation could not reach a resolution over precisely those respective obligations confirms both the existence and enduring nature of the dispute.

Contrary to the SWC's claims, moreover, this dispute over the scope of the Settlement Agreement is hardly "hypothetical." Response at 8. The SWC has threatened legal action against UBS based on the SWC's allegations of World War II-era conduct and the findings of the Ombudsperson. *See Classic Liquor Imps., Ltd. v. Spirits Int'l B.V.*, 151 F. Supp. 3d 451, 457 (S.D.N.Y. 2015) (justiciable controversy where letter was "clearly a threat of future litigation"). During Credit Suisse's and the SWC's 2020 negotiations regarding Credit Suisse's voluntary investigation into the SWC's allegations, the SWC's "willingness to continue further discussions" hinged on various commitments from Credit Suisse. Letter from the Simon Wiesenthal Center to Credit Suisse at 2 (Nov. 25, 2020) (attached as Ex. 6). "Absent these commitments," the SWC said it "ha[d] no intention to engage further with Credit Suisse, but instead it will seek *alternate accountability*." *Id.* (emphasis added). The SWC's latest response to this Court confirms that the SWC intended to investigate its allegations and to "subsequently address any remediation *and monetary compensation claims* based on the outcome" of that investigation. Response at 4 (emphasis added).[5] Seeking to address "monetary compensation claims" against UBS not only unmasks another clear and ongoing threat of litigation or other form of adversarial activity precluded by the Settlement Agreement and Organizational Endorsement, but it also crystalizes the active dispute. It also demonstrates the need for this Court's clarifying order to prevent litigation and achieve the Settlement Agreement's purpose of bringing a complete end to conflict.

The SWC's threat of litigation has been constant. In March 2025, the SWC sought reconsideration of this Court's February 6, 2025, order regarding access to judicial records. In addition to seeking access to these records to "defend" itself, the SWC specifically claimed it needed these for the SWC's "assertion of affirmative claims." March 7, 2025, Mot. for Recons. at 4. The SWC attempts to walk back this clear, on-the-docket threat of litigation by arguing it only meant to refer to "claims and defenses" with respect to UBS's March 16, 2023, letter regarding enforcement of the Settlement Agreement. Response at 9 n.31. But in doing so, the SWC notably omits its own reference to its assertion of "*affirmative* claims," which can only be understood as the litigation it has persistently threatened since March 2020.

In its Response, the SWC attempts to moot its past threats by stating it "has not sued UBS and is not threatening to sue UBS." Response at 9. But a party "is not entitled to argue, after taking action that compelled" another to seek "to clarify its rights vis-à-vis" that party, "that it did not really mean what it said." *Classic Liquor Imps.*, 151 F. Supp. 3d at 457. Even were the Court to credit the SWC's late-breaking and convenient denial, "simply holding litigation in abeyance . . . does not eliminate the case or controversy." *Nike, Inc. v. Already, LLC*, 663 F.3d 89, 96 (2d Cir. 2011). That is for the simple reason that a party "must prove 'no reasonable expectation' remains that it will 'return'" to the conduct that prompted the need for judicial intervention in the first place. *FBI v. Fikre*, 601 U.S. 234, 241 (2024). The SWC has not attempted to meet that "formidable

---

[5] The SWC claims this was a "mutual" intention and that Credit Suisse and the SWC intended to reach a separate agreement. Response at 4. But Credit Suisse and UBS have consistently maintained that the Settlement Agreement forecloses claims relating to the SWC's investigation. And this Court, as discussed above, has already rejected the SWC's argument that there exists some "agreement," other than the Settlement Agreement, that would govern. *See* August 11, 2023, Order.

burden." *Id.* Nor could it do so, as the impasse in the mediation demonstrates UBS and the SWC continue to actively dispute the scope and applicability of the Settlement Agreement.

Elsewhere, the SWC seeks to distinguish the Second Circuit's decision in *Manning*—which confirmed a district court's authority to clarify—on the basis that the case involved a motion under Rule 60(b). Response at 10. But *Manning* did not hold that a motion to clarify could only issue in the Rule 60 context. That makes sense. A motion to clarify does not turn on a specific federal rule of civil procedure (nor does it seek relief that Rule 60 provides). *Nat'l Treasury Emps. Union v. Vought*, 2025 WL 3771192, at *3 (D.D.C. Dec. 30, 2025); *see also United States v. Philip Morris USA Inc.*, 793 F. Supp. 2d 164, 168 (D.D.C. 2011) (explaining a motion to clarify seeks different relief than Rule 60(b)). Instead, courts "encourage[] parties to file motions for clarification when they are uncertain about the scope of a ruling." *Nat'l Treasury Emps. Union*, 2025 WL 3771192, at *3. And a motion to clarify is appropriate so long as the party seeking clarification has identified a dispute concerning the court's order and "a concrete context or particular factual situation." *Volvo Powertrain*, 758 F.3d at 344. That is exactly what UBS has done here.

Because of this concrete dispute over the scope and application of the Settlement Agreement, the cases the SWC relies upon are simply inapposite. Take, for instance, *Honeybee Robotics LLC v. Ensign-Bickford Aerospace & Defense Company*, where the court denied the motion for clarification because the movant's request was "unrelated" to any alleged "ambiguity in a prior court order." 2026 WL 82452, at *3 (S.D.N.Y. Jan. 12, 2026). Here, by contrast, UBS's request for clarification is directly related to clearing up the meaning of a prior order of this Court. In *Mears v. Montgomery*, the court denied a plaintiff's request to clarify its injunction because the plaintiff had "set[] forth no explanation of the factual context in which the terms would be used." 2013 WL 69221, at *2 (S.D.N.Y. Jan. 4, 2013). The same was true in *City of Almaty, Kazakhstan v. Ablyazov*, where the court found no "dispute over a particular set of factual circumstances." 2018 WL 3104453, at *2 (S.D.N.Y. May 29, 2018). But, of course, as detailed above, the particular factual context for UBS's request for clarification is quite clear.[6]

### III. UBS does not seek to alter or amend the Settlement Agreement.

UBS's motion is a classic motion to clarify. "Clarifications of orders previously issued, which may be obtained on motion or made *sua sponte* by the court, add certainty to an implicated party's efforts to comply with the order and provide fair warning" as to its "future conduct." *N.A. Sales Co., Inc. v. Chapman Indus. Corp.*, 736 F.2d 854, 858 (2d Cir. 1984). Thus, the general purpose of a motion to clarify is to explain or clarify the terms of that prior order rather than alter or amend it. Even when the language is "plain" or unambiguous (as UBS contends here), a court may still offer further clarification to the parties in the face of a dispute. *Briscoe v. City of New Haven*, 2010 WL 2794231 at *4 (D. Conn. Jul. 12, 2010).

---

[6] In a footnote, the SWC lists additional cases but none has any bearing on this Court's jurisdiction. *See* Response at 10 n.32. Two involve "hypothetical" disputes, which plainly do not apply to the issues controverted here. *See Corning Glass Works v. Sumitomo Elec. U.S.A., Inc.*, 683 F. Supp. 81, 82 (S.D.N.Y. 1988); *Rhee v. SHVMS, LLC*, 2024 WL 449289, at *2 (S.D.N.Y. Feb. 5, 2024). The other two cited cases are even further afield. The plaintiff in *Rochester–Genesee Reg'l Transp. Auth. v. Hynes–Cherin* sought clarification "to assist" in its *other* "litigation," which the court denied as it did not involve a controversy "presently" before the court. 2008 WL 4906249, at *1 (W.D.N.Y. Nov. 13, 2008). The plaintiffs in *In re Google Digital Advert. Antitrust Litig.* sought clarification of certain "guidelines," but the court denied it because no such "guidelines" were "imposed" by the court—there was thus no "order" to clarify. 2023 WL 196146, at *1 (S.D.N.Y. Jan. 17, 2023).

To that end, UBS has proposed an order that merely reiterates and confirms the unambiguous terms of the Settlement Agreement, as endorsed by the SWC. The fact that the SWC views reaffirmation of the Settlement Agreement's basic terms as an "enlarge[ment]" of the Settlement that supposedly raises "serious concerns" illustrates why this Court's exercise of jurisdiction is proper and why its guidance is essential. Response at 11.

As an initial matter, the SWC's Response does not contest the vast majority of what UBS's Proposed Order seeks. The SWC does not dispute that—as the Proposed Order states—"the Settlement's scope explicitly covers . . . (a) any matter relating to the assets of (i) Nazi-era German companies and other legal entities, (ii) individual Nazis and other natural persons, and . . . (iii) the Nazi government and its agencies and instrumentalities . . . ." Proposed Order ¶ 1. Nor does the SWC dispute that the Settlement covers "all claims [including unknown claims and "hereafter arising or discovered" claims] . . . in any way relating to the Holocaust, World War II, and its prelude and aftermath, Victims or Targets of Nazi Persecution, transactions with or actions of the Nazi Regime . . . or any related cause or thing whatever . . . ." *Id*. And the SWC similarly accepts that, as the Proposed Order says, the Settlement in several places specifically mentions German companies and individual Nazis. *Id*. Consequently, the SWC contests very little of the Proposed Order.

Instead, the SWC raises only three issues with the content of the Proposed Order. None are availing.

***1. Scope of Settlement Agreement relative to the Ombudsperson's Investigation.*** The SWC objects that the Settlement Agreement supposedly does not encompass all of the "'historical facts' that the Independent Ombudsperson currently is investigating." Response at 11. But tellingly, the SWC does not identify a single "fact" from this investigation that falls outside the scope of the Settlement. That is not surprising given the breadth of the Settlement Agreement's overarching release—covering, as it does, any claims "***in any way relating to the Holocaust, World War II and its prelude and aftermath***." Settlement Agreement § 1 (emphasis added); *see also* Preliminary Settlement Conference Transcript (Aug. 12, 1998) at 2 (parties and organizational endorsers affirming their intent to agree on "total releases, the broad as possible releases, for all claims of any kind arising out of a nazi era World War II or its aftermath [sic].").

UBS's voluntary investigation focuses solely on topics covered by the Settlement. In fact, much of the investigation addresses conduct that (as described above) even the SWC does not dispute is within the ambit of the Settlement Agreement. And although UBS's voluntary investigation has expanded (*e.g.*, to cover Credit Suisse's alleged provision of accounts (1) holding Nazi individuals' and entities' own assets or (2) used to support "ratlines"), the investigation has not strayed beyond the scope of the Settlement. As noted above, the SWC does not contest the language in the Proposed Order confirming that the Settlement's scope covers "individual Nazis" and "Nazi-era German companies and other legal entities," *i.e.*, the persons and entities subject to UBS's voluntary investigation. Proposed Order ¶ 1. Nor could the SWC contend otherwise. The Settlement Agreement releases all claims "in connection with . . . ***transactions with or actions of the Nazi Regime***." Settlement Agreement § 1 (Definition of Settled Claims (emphasis added)). "Nazi Regime," in turn, is broadly defined to include the "National Socialist government of Germany from 1933 through 1945 and its instrumentalities, agents, and allies (including, without limitation, all other Axis countries), all occupied countries, ***and all other individuals or entities in any way affiliated or associated with, or acting for or on behalf or under the control or influence of, the Nazi Regime***." *Id*. (Definition of Nazi Regime) (emphasis added). As such, the actions and transactions that are the subject of UBS's voluntary investigation, which delves into lists of Nazi individuals and entities, their assets, those

who helped them evade justice by fleeing to Argentina or elsewhere, and similar topics, are covered by the Settlement's broad release of not only dealings with Nazis, but dealings with those who associated with or assisted Nazis.[7]

The Ombudsperson recently testified before the Senate Judiciary Committee as to the scope of his oversight of UBS's voluntary investigation. The testimony confirms that, although the investigation has exceeded the parameters of the initial engagement, none of the Ombudsperson's additional topics can plausibly be said to fall beyond the reach of the Settlement.[8] They are covered by the Settlement's release of claims concerning "the Holocaust, World War II and its prelude and aftermath," and of "transactions with or actions of the Nazi Regime." Settlement Agreement § 1. Indeed, the Looted Assets definition captures "'aryanizing' Jewish businesses," the Slave Labor definition covers "accounts Credit Suisse held for other German businesses that used forced labor," and the Cloaked Assets definition encompasses "'intermediaries,' such as blacklisted Swiss lawyers who assisted Nazis in hiding their financial activities." *See* Settlement Agreement § 1.

**2. *Unconditional Nature of Release in Settlement Agreement.*** The SWC next takes issue with the statement in the Proposed Order that "the Settlement was not dependent on the representations of any party." Response at 2, 11. But that language is a mere recital of fact. On its face, nothing in the Settlement indicates that any party made any representation whatsoever, nor does the Settlement recite any such representations, let alone suggest that the Settlement is premised or founded upon any representations. To the contrary, the Settlement Agreement repeats Plaintiffs' allegation that the "Settling Defendants . . . concealed the true nature and scope of their conduct during and following the Holocaust," Settlement Agreement at 1, a position inconsistent with the view that the Settlement Agreement might rest on representations by the Settling Defendants. And it was against that background that the Settling Plaintiffs acknowledged that they had, through their counsel, "conducted as thorough an investigation as possible relating to the claims and the underlying events and transactions alleged" in their Complaints, *id.*, and "based on [that] investigation, [informal] discovery, review of public information, and research" the "Settling Plaintiffs have concluded that the terms and conditions of this Settlement Agreement are fair, reasonable, and adequate," *id.* at 2. The foregoing list of factors Settling Plaintiffs relied upon in determining that the Settlement was "fair, reasonable, and adequate," conspicuously omits any

---

[7] The release's inclusion of transactions involving Nazis or their assets reflects the context in which the Settlement arose—when there was extensive public controversy concerning the banks' provision of services to Nazis, separate from the looted or cloaked assets of victims of Nazi persecution. *See, e.g.*, Swiss Banks and the Status of Assets of Holocaust Survivors or Heirs, Hearing Before the S. Comm. on Banking, Hous. & and Urb. Affs., 104th Cong. (1996) Statement of Sen. D'Amato (describing Swiss accounts shown in "documents" were "generated in Operation Safe Haven, a U.S. Government operation conducted after the war to search for Nazi assets").

[8] The topics cited in this testimony are: Credit Suisse account relationships with the Nazi regime, including high-ranking Nazis; forced transfers of Jewish assets, including Credit Suisse's account relationships with individuals and entities involved in the looting of Jewish assets; Credit Suisse's relationship to Nazi Ratlines; Credit Suisse account relationships with German industrialists and companies that supported the Nazi's consolidation of power in the 1930s; Credit Suisse's financial relationships with German companies that benefitted from the "aryanization" of Jewish-owned businesses; Credit Suisse's historical ties to IG Farben; Credit Suisse account relationships with entities that used forced labor during the war; Credit Suisse account relationships with war profiteers tied to the Nazi regime; transactions involving Nazi-looted diamonds; Credit Suisse accounts held for various intermediaries with known connections to the Nazis; and disclosures related to DWB and Bank Hofmann. *See generally Testimony of Neil M. Barofsky*, Hearing Before the S. Comm. on the Judiciary, 119th Cong. (Feb. 3, 2026).

11

suggestion that the Settling Plaintiffs or their counsel were relying upon representations by the Settling Defendants.

Consistent with the absence of any representations in the Settlement Agreement, the Settlement Agreement broadly releases "Unknown Claims" and claims based any "actual or alleged facts." Settlement Agreement § 1. Unlike other settlements, *see, e.g. United States v. IMC E. Corp.*, 627 F. Supp. 3d 166, 179 (E.D.N.Y. 2022), the Settlement Agreement did not condition those broad releases on the existence or accuracy of any statements by any party. For example, as this Court observed, the Settlement was entered with full knowledge that "the Volcker Committee's investigation was ongoing and not likely to be completed for some time," and accordingly, this Court held that any new facts arising from the Volcker investigation provided no basis to upend the Settlement Agreement. 105 F. Supp. 2d at 151. Similarly, it was well known and accepted by all parties entering or endorsing the Settlement Agreement that the Independent Commission of Experts ("Bergier Commission") had yet to issue its report, which was expected to shed additional light on claims already settled. *Id*. at 162, 164 (noting that the Bergier report would address slave labor).

In addition, the Settlement Agreement expressly "supersede[s] any previous agreements and understandings between the parties with respect to the subject matter of th[e] Settlement Agreement" meaning that any representations not found in the Settlement Agreement itself do not survive its execution. *See* Settlement Agreement § 16.2; *One-O-One Enters., Inc. v. Caruso*, 848 F.2d 1283, 1287 (D.C. Cir. 1988) ("Were we to permit plaintiffs' use of the defendants' prior representations . . . to defeat the clear words and purpose of the Final Agreement's integration clause, 'contracts would not be worth the paper on which they are written.'" (quotations and citations omitted)); *see also S&S NY Holdings, Inc. v. Able Energy, Inc.*, 2012 WL 3084112, at *4 (S.D.N.Y. July 27, 2012) (citing to *One-O-One Enterprises* approvingly when determining that an integration clause in an Settlement Agreement superseded the prior agreements); *Dujardin v. Liberty Media Corp.*, 359 F. Supp. 2d 337, 356 (S.D.N.Y. 2005) ("It is generally understood that the purpose of an integration clause 'is to require full application of the parol evidence rule in order to bar the introduction of extrinsic evidence to vary or contradict the terms of the writing" (internal quotation and citation omitted)).

**3. Bar on Public Statements Inconsistent with Settlement Agreement.** Finally, the SWC asserts that the Settlement does not bar it or any other party to or Organizational Endorser of the Settlement Agreement from rekindling controversy and waging a public relations campaign against UBS on subjects as to which the Settlement "does and should bring about complete closure." *See* Response at 12 (arguing that, notwithstanding its signed Endorsement, the SWC is not barred, and may not be prevented, from "promoting . . . public controversy (in the media or otherwise)" concerning the World War II-era conduct of Credit Suisse). The SWC's position is wholly inconsistent with the plain text of the Settlement and the endorsement it and other leading Jewish organizations executed, to say nothing of the unique historical context that led to the Settlement.

Nothing in the Proposed Order would preclude the SWC or any other organization from pursuing objectives like those the SWC champions, e.g., "to search for justice related to hidden Nazi assets," "to investigate and document historical truths concerning heretofore undisclosed Nazi assets that appear to remain in the Bank's possession," "to conduct and publish new research about the Holocaust," or "to continue cooperating with" the Ombudsperson's "investigations into Nazi assets concealed by UBS." Response at 2, 3. As the SWC concedes, after the 1999 Settlement Agreement, neither Credit Suisse nor UBS ever raised a concern when the SWC "engaged in numerous investigations of myriad issues related to the Holocaust and

12

published its findings." *Id*. at 3.  For good reason: the Settlement does not preclude any of that conduct.  And, as UBS has affirmed on numerous occasions, its commitment to investigating historical truth is unwavering—and indeed has manifested itself in UBS's voluntary investigation of the SWC's allegations.  Accordingly, the Proposed Order curtails none of that activity.  Indeed, the Proposed Order will facilitate the parties' goal of ensuring a full and transparent investigation unimpeded by the current threat of litigation.

Rather, the Proposed Order's limitations mirror the tailored constraints in the binding Endorsement the SWC signed, which sought to "bring[] about complete closure and an end to confrontation with respect to the issues dealt with in the settlement."  Endorsement Cl. 2.  Specifically, in the Endorsement, the SWC agreed that it would not "make any public statement or take any action that would violate *or be inconsistent*" with the Settlement Agreement.  *See* Endorsement Cl. 3 (emphasis added); *see also* Settlement Agreement § 11.2 (same).  The SWC also agreed to be bound by the provision of the Settlement that forbids Plaintiffs from "initiat[ing] any form of proceeding seeking redress of any kind for any Claim covered by this Settlement Agreement in any judicial, administrative, or other proceeding anywhere in the world at any time . . . ."  *See* Settlement Agreement §12.1; Endorsement Cl. 6 (agreed to be bound by, inter alia, Settlement Agreement § 12).

The SWC's agreement (and that of others) to the foregoing restrictions was essential to achieving the groundbreaking $1.25 billion Settlement Agreement, because at the time, Credit Suisse and UBS—in the wake of advocacy by Plaintiffs' counsel and others including certain Jewish groups—faced calls for boycotts, negative media attention, congressional investigations, and the prospect of adverse regulatory treatment.  Had the SWC then insisted (as the SWC now insists) that its Endorsement left it or any other Organizational Endorser free to spur a revisiting of the Settling Defendants' World War II-era conduct at some future date through lawsuits, through other means, or by creating public controversy, the Settlement would not have reached fruition.

The SWC seeks to distract from the unambiguous consequences of its Endorsement by suggesting that requiring it to honor its contractual obligations raises First Amendment concerns.  Not so.  UBS is not asking this Court to enjoin SWC's speech, only to clarify the Settlement Agreement.  And even were the Court to decide *sua sponte* to impose injunctive relief, such relief would be permissible because the SWC expressly agreed to refrain from the speech at issue.  *See Romeo & Juliette Laser Hair Removal, Inc. v. Assara I LLC*, 679 F. App'x 33, 36 (2d Cir. 2017) (holding that a challenge to an injunction as violative of the First Amendment fails where "the injunction's prohibition on speech that is false, misleading, defamatory, or disparaging effectively enforces defendants' own covenant not to engage in such speech"); *see also SEC v. Romeril*, 15 F.4th 166, 172 (2d Cir. 2021) (discussing that parties in resolving legal proceedings can waive certain rights, noting that the "First Amendment is no exception, and parties can waive their First Amendment rights in consent decrees and other settlements of judicial proceedings.").  Moreover, the SWC did not "voluntarily relinquish[] any First Amendment rights other than those specifically related to the parties' particular dispute."  *Henley v. Cuyahoga Cnty. Bd. of Mental Retardation & Developmental Disabilities*, 141 F. App'x 437, 446 (6th Cir. 2005).  With "the underlying claims" and the "specific right" waived being "closely related," there is no First Amendment violation.  *Id.*  It is simply "part of the parties' bargain to resolve the case" and enforceable as any other provision.  *Id.*  Notably, none of the cases the SWC cites declined to enforce a non-disparagement clause on First Amendment (or any other) grounds.  *See* Response at 12 (citing *Legal Aid Soc'y v. City of New York*, 114 F. Supp. 2d 204 (S.D.N.Y. 2000), which involved a contract that did not contain a non-disparagement clause, nor even purport to address plaintiff's speech).

13

Finally, the SWC's argument that other Organizational Endorsers have been denied notice and an opportunity to be heard suffers from two fatal defects. First, this Court has already afforded the Organizational Endorsers that are parties to this action (e.g., the World Jewish Restitution Organization, a signatory of the Settlement Agreement and an umbrella organization for many of the Organizational Endorsers) notice and an opportunity to be heard on the Proposed Order. *See* ECF No. 5089 ("[T]he parties may submit to the Court any additional materials regarding their respective positions"). Second, none of the Organizational Endorsers is a necessary party under Rule 19 because this Court can afford complete relief without their presence and none of them has asserted an interest in the dispute. *See Peregrine Myanmar Ltd. v. Segal*, 89 F.3d 41, 48–49 (2d Cir. 1996) (explaining that absent party's joinder was not necessary because "'[c]omplete relief' can be accorded even without the [absent party], because nothing in the district court's statements or final judgment requires the [absent party] to do anything or change any of its positions" and further the absent party had not "claim[ed] an interest relating to the subject of the action.").[9] UBS merely seeks to reaffirm clear Settlement Agreement terms that were embraced by all decades ago.

\*     \*     \*

For the foregoing reasons, the Proposed Order is an appropriate clarification of the Settlement Agreement that is fully consistent with the terms of the Settlement and the SWC's Endorsement. That the SWC believes otherwise illustrates that there is a live dispute and that the Parties are in need of the Court's guidance.

UBS's request for a ruling clarifying the Settlement Agreement should be granted.

Respectfully submitted,

| GIBSON, DUNN & CRUTCHER LLP | MAYER BROWN LLP |
|---|---|
| *[signature]* | *[signature]* |
| David P. Burns, Esq.<br>Marshall R. King, Esq.<br>F. Joseph Warin, Esq. | Marc R. Cohen, Esq.<br>Alex C. Lakatos, Esq. |

---

[9] Even assuming the Settlement Agreement did not release potential claims based on the SWC's allegations of Credit Suisse's World War II-era conduct (which it does), the SWC would not have standing to pursue that litigation. The SWC appears to have no members, according to its public filings. *See* Form 990 for Tax Year Beginning July 1, 2023, The Simon Wiesenthal Center, Inc., https://tinyurl.com/yc6tja2c. Thus, it would only "have standing in its own right" if it could "meet the same standing test that applies to individuals." *N.Y. C.L. Union v. New York City Transit Auth.*, 684 F.3d 286, 294 (2d Cir. 2012) (internal quotation and alteration omitted). "That is, the organization must show 'actual or threatened injury in fact [to itself qua organization] that is fairly traceable to the alleged illegal action and likely to be redressed by a favorable court decision.'" *Port Auth. Police Lieutenants Benevolent Ass'n Inc. v. City of New York*, 718 F. Supp. 3d 300, 306 (S.D.N.Y. 2024). But the SWC could not demonstrate any "injury-in-fact" to the organization, let alone one traceable to Credit Suisse's World War II-era conduct.