
Stein Mitchell
Beato & Missner LLP

2000 K Street, NW Suite 600        P 202.737.7777        www.steinmitchell.com
Washington, DC 20006               F 202.296.8312

March 7, 2026

**VIA EMAIL**

Hon. Edward R. Korman
United States District Judge
Eastern District of New York
Room 918
225 Cadman Plaza East
Brooklyn, New York 11201

  **Re:**  *In re Holocaust Victims Asset Litigation*, Civ. No. 96-4849 (ERK)

Dear Judge Korman:

  We represent nonparty Simon Wiesenthal Center ("SWC"). We respectfully submit this letter brief as a surreply to UBS's[1] February 27, 2026, reply letter brief (ECF 5093) ("UBS Reply"), in support of the Bank's motion requesting that the Court issue an order of "clarification" regarding the 1999 Settlement (ECF 5086) ("Request for Clarification"). SWC submits this surreply because UBS's Reply inappropriately raised significant new arguments and authorities for the first time. *See Fisher v. Kanas*, 487 F. Supp. 2d 270, 278 (E.D.N.Y. 2007), *aff'd*, 288 F. App'x 721 (2d Cir. 2008) (arguments raised for the first time in a reply brief are improper).

## Introduction

  The new points in UBS's Reply, including unsupported and false speculation regarding possible future litigation with SWC, together with UBS's explicit disclaimer of any basis for moving to enforce the 1999 Settlement, conclusively establish that there is no live case or controversy before this Court. Put simply, SWC has not sued UBS. UBS has not moved to enforce the 1999 Settlement or otherwise set forth grounds to sue SWC for breach of the 1999 Settlement. Moreover, UBS has disclaimed any attempt to interfere with SWC's ongoing investigation and reporting regarding hidden Nazi Assets, or to stop SWC from cooperating with the Independent Ombudsperson's investigation. Notwithstanding the false and manufactured "record" UBS attempts to put before the Court in the Reply, UBS fails to identify any active controversy warranting the sweeping revision disguised as a "clarification" of the 1999 Settlement that it demands, and which is precisely the sort of judicial advisory opinion that Article III forbids. Specifically, UBS presses for an order that would materially expand and rewrite the 1999 Settlement, demanding that the Court reinterpret those terms well beyond the plain language of the settlement's terms, and as to which the 1999 Settlement parties have neither been notified nor heard by this Court. UBS seeks to have this Court impose new and vague restrictions—particularly

---

[1] As used herein, "UBS" or the "Bank" refers to UBS AG, including Credit Suisse, unless otherwise indicated.

as to protected speech—that the parties neither negotiated nor have authorized by way of an amendment to the 1999 Settlement Agreement.

As explained below, UBS's request seeks a nonjusticiable advisory opinion that revises and expands the 1999 Settlement itself in multiple material respects and denies parties to the Settlement any semblance of due process. The request should be swiftly denied.

<u>**Argument**</u>

I.    **UBS's Reply demonstrates that it seeks an improper advisory opinion because there is no justiciable case or controversy between SWC and UBS.**

UBS's Reply makes clear that if there was any "dispute" between the parties, it centered on UBS's threats to **enforce** the 1999 Settlement against SWC. More specifically, UBS's March 16, 2023 letter, which initiated the parties' latest series of interactions with the Court, claimed that the 1999 Settlement barred SWC's investigation and reporting regarding the Bank's retention of Nazi Assets. On June 16, 2023, the Court ordered the parties to mediate based on its interpretation of UBS's March 16, 2023 letter as a "motion to enforce." And then on January 27, 2026, the Court issued a docket entry stating that "[t]here is pending before me a motion to enforce the settlement agreement on behalf of Credit Suisse against the Simon Wiesenthal Center (ECF No. [5082])" and inviting submissions from UBS or SWC concerning this supposedly live dispute.

UBS now, however, expressly disclaims seeking to enforce the 1999 Settlement against SWC.[2] To be absolutely clear, UBS states in its Reply (as it did in its opening brief) that UBS "is indeed not seeking to enforce the Settlement Agreement against SWC."[3] UBS's Reply confirms its complete about-face, professing to have no interest in impairing SWC from achieving its nonprofit mission of investigating and reporting regarding Credit Suisse's retention of Nazi Assets: "SWC is free to pursue its organizational mission and investigations."[4] UBS made the same admission in its testimony before the Senate Judiciary Committee.[5] And in a self-congratulatory press release it issued just a few days before the hearing on this matter before the Court, the Bank once again stated that "UBS has not sued the SWC" and that "SWC and any other Jewish

---

[2] UBS Reply at 6. Emphasis is added throughout unless otherwise indicated.

[3] *Id.* at 2.

[4] *Id.*

[5] Feb. 13, 2026 SWC Letter Brief (ECF 5092) ("Opposition"), Ex. 10, Feb. 3, 2026 Written Testimony of Robert Karofsky, President of UBS Americas, before the Senate Judiciary Committee, at 6 ("Let me be clear: any suggestion that we have sued or are attempting to silence today the Simon Wiesenthal Center is false."); *see also* Feb. 3, 2026, Video Recording of "The Truth Revealed: Hidden Facts Regarding Nazis and Swiss Banks" Hearing before U.S. Senate Judiciary Committee, at 49:43-47, 1:54:02-06, 1:55:20-33, *available at* https://www.judiciary.senate.gov/committee-activity/hearings/the-truth-revealed-hidden-facts-regarding-nazis-and-swiss-banks (Barbara Levi, testified under oath repeatedly that "we have not sued the Simon Wiesenthal Center[,]" "we have no intention to sue the Simon Wiesenthal Center[,]" and whatever UBS is trying to do, it is "not to silence organizations" like SWC or others.).

organizations, consistent with their obligations under the 1999 Settlement, are free to continue to seek the truth related to the darkest chapter in human history."[6]

That leaves the Court without a sufficiently crystallized case or controversy to adjudicate.[7] The problem is exacerbated by the fact that UBS's motion is premised on extensive and unproven factual assertions of the sort that should not be put before the Court in a short letter motion, especially when UBS presents the overwhelming majority of its points for the first time in its 14-page "Reply" brief. UBS makes its true intentions clear when it notes that the "benefit" of its approach is "avoiding further legal proceedings."[8] UBS is seeking to circumvent the law by avoiding applicable procedure, notice requirements to settlement parties, evidentiary standards, and contract-based analysis that an actual enforcement motion would provide.

UBS cites case law about courts' inherent power to clarify their orders. But those cases do not obviate the constitutional case-or-controversy requirement, nor do they create an avenue for relief merely because UBS desires "clarification" of the 1999 Settlement. SWC has cited numerous cases holding that absent such a controversy, motions for clarification seek unconstitutional advisory opinions and must be rejected.[9] UBS cites *Medinol Ltd. v. Guidant Corp.* for the proposition that UBS did not need to file a motion to enforce,[10] but that is not what the case says. Indeed, both parties in *Medinol Ltd.* had filed a "motion to enforce the settlement" that set out the specifics of the parties' dispute. 500 F. Supp. 2d 345, 349 (S.D.N.Y. 2007). In fact, every case UBS cites concerning the presence of a justiciable dispute includes one critically relevant feature missing here: ongoing litigation between two parties where one has filed a motion to enforce a settlement seeking a contempt order, a preliminary injunction, or relief from a judgment or order. There is no litigation between SWC and UBS, nor has SWC or UBS filed any such motion here.

Because UBS cannot point to any live dispute, it attempts on Reply to create a hypothetical controversy and presents it to the Court for the first time: "At the core of this dispute is the SWC's position that it is entitled to monetary compensation based on an interpretation of the Settlement Agreement that Nazi Assets were not covered—a position that UBS strongly contests."[11] But UBS's characterization of this as a "core" dispute is false and verges on frivolous, exposing the procedural inappropriateness of UBS's motion.

None of UBS's cited materials support its invented claim that SWC has waged a campaign of threatened litigation to recover monetary compensation the organization claims it is owed with respect to UBS's undisclosed Nazi Assets. It was UBS, not SWC, that involved this Court and invoked the 1999 Settlement based on what the Independent Ombudsperson, Neil Barofsky, has

---

[6] Ex. 1, Mar. 5, 2026 "UBS Statement on Voluntary Review of Credit Suisse's World War II Activities" *available at* https://www.ubs.com/global/en/media/voluntary-review.html.

[7] Again, it bears emphasis that the 1999 Settlement's grant of continuing jurisdiction is "for purposes of **enforcing** th[e] Settlement Agreement." Settlement Agmt. § 14. UBS's Reply does not point to any other express provision of the 1999 Settlement granting this Court ongoing jurisdiction.

[8] UBS Reply at 2.

[9] SWC Opposition at 9-10.

[10] UBS Reply at 7.

[11] *Id.* at 1.

described as "false" and "outlandish" misrepresentations.[12] In an unavailing effort to manufacture a live dispute, UBS's Reply misleadingly cites two statements of SWC. The Bank first partially quotes a statement from the background section of SWC's Opposition, which in full reads: "Contemporaneous documents reflect the mutual intention of Credit Suisse and SWC to enter into an agreement to fully and transparently investigate the Nazi Assets and subsequently address any remediation and monetary compensation claims based on the outcome."[13] That reference to "monetary compensation" was **not** regarding SWC claiming that the organization was owed monetary compensation with respect to Nazi Assets. Indeed, UBS itself asserts that there would be no standing for any such claim—"[e]ven assuming the Settlement Agreement did not release potential claims based on the SWC's allegations of Credit Suisse's World War II-era conduct (which it does), the SWC would not have standing to pursue that litigation"—undercutting its argument that there is a live case or controversy before the Court.[14]

As SWC anticipated,[15] UBS also cites a statement in SWC's March 7, 2025 motion for reconsideration of this Court's order regarding SWC's access to certain docketed material, which SWC sought "in anticipation of litigation pertaining to [SWC's] claims and defenses in the pending Motion to Enforce the Settlement Agreement filed by Credit Suisse ("Motion"). Dkt. 5083." To be sure, SWC referenced "affirmative claims" that it might bring **were UBS to seek to enforce the 1999 Settlement**: SWC absolutely would raise appropriate counterclaims and defenses against UBS if it were to initiate litigation to enforce the Settlement, including fraud, fraudulent inducement, waiver, breach of contract, and promissory estoppel. But that scenario is purely hypothetical because UBS has now clarified that it is not moving to enforce the Settlement against SWC. "[A] controversy does not exist where 'the defendant ha[s] not taken any action, even of a preliminary nature, against the plaintiff, and the defendant ha[s] not indicated that it intend[s] to take any future legal action against the plaintiff.'" *United Fin. Cas. Co. v. Paddon,* 248 F. Supp.

---

[12] In a recent submission to the Senate Judiciary Committee, Mr. Barofsky stated that the "proceeding currently before Judge Korman was initiated as a letter from Credit Suisse to Judge Korman that made a number of false claims related to my oversight and specifically regarding SWC's interactions with me, including: . . mischaracterizing [ ] concerns about Credit Suisse's efforts to curtail the investigation and my oversight as threats made on behalf of SWC." Mr. Barofsky further noted that the Bank's March 16, 2023 letter to the Court which launched the current matter "made the outlandish and false claims that [Mr. Barofsky and Ira Forman] were 'agents' of SWC, that Mr. Forman was a co-Ombudsperson instead of being an 'Independent Advisor,' and that SWC's communications with me 'contravene the Center's obligations under the Settlement.'. . . In short, the factual basis for the proposed order contains false statements that characterized SWC's cooperation with me as violative of the 1999 Settlement Agreement, when, in reality, it was expressly invited by Credit Suisse itself." Ex. 2, Responses of Independent Ombudsperson Neil to Questions for the Record, Senate Judiciary Committee, at 14 (*available at* https://www.judiciary.senate.gov/imo/media/doc/95317009-9c96-3e8f-f63d-04b7f29ef02f/2026-02-03_QFR-Responses_Barofsky.pdf).
[13] SWC Opposition at 4.
[14] UBS Reply at 14 fn. 9. Although not conceding UBS is correct in its lack of standing assertion, SWC submits that UBS's own argument underscores the lack of any actual, imminent, threat of litigation for which "clarifying" the scope of the 1999 Settlement would address.
[15] SWC Opposition at 9 fn. 31.

3d 368, 373 (N.D.N.Y. 2017) (quoting *Jones v. Sears Roebuck and Co.*, 301 F. App'x 276, 282 (2d Cir. 2008)).

Rather than a campaign of threatened litigation, SWC has been investigating and bringing to light UBS's retention of Nazi Assets "before and after litigation in *In re Holocaust Victim Assets Lit.*"[16] Obviously, UBS's conduct that post-dates the 1999 Settlement could not have been resolved by the 1999 Settlement. SWC also petitioned concerned elected officials when UBS peremptorily fired Independent Ombudsperson Neil Barofsky and sought to shut down and conceal the results of his investigation of the Bank's Nazi Assets. SWC believes that UBS's actions violated an agreement SWC and UBS reached regarding the investigation and appointment of Mr. Barofsky as the Independent Ombudsperson.[17]

Regardless, UBS's Reply makes clear that any hypothetical dispute between the parties is moot. SWC has been pursuing its organizational mission and investigations, actions UBS disclaims any intent to challenge. UBS now avers that it no longer is blocking the Independent Ombudsperson's investigation, and that it no longer seeks to block SWC from investigating Nazi Assets held by UBS or SWC's continuing cooperation with the Independent Ombudsperson. UBS's Reply makes this plain:

> Nothing in the Proposed Order would preclude the SWC or any other organization from pursuing objectives like those the SWC champions, e.g., "to search for justice related to hidden Nazi assets," "to investigate and document historical truths concerning heretofore undisclosed Nazi assets that appear to remain in the Bank's possession," "to conduct and publish new research about the Holocaust," or "to continue cooperating with" the Ombudsperson's "investigations into Nazi assets concealed by UBS."[18]

To sum up: UBS and SWC have not sued each other. UBS has not moved to enforce the 1999 Settlement. SWC has not threatened to sue UBS, although it has prepared to defend itself. And UBS has now disclaimed any attempt to silence SWC, prevent SWC from fulfilling its mission to investigate and reveal hidden Nazi Assets, or stop SWC from cooperating with the Independent Ombudsperson's investigation into such assets concealed and still retained by UBS.

The Court had it right the first time: "[there is not] a live case pending before [the Court][.]"[19] It should decline UBS's continued insistence that this Court issue an unconstitutional advisory opinion.

---

[16] UBS Reply at 5 (quoting Reply Ex. 4).

[17] SWC recognizes and respects that in its August 11, 2023 Order, this Court declined to find such an agreement had been reached. SWC respectfully submits that conclusion was mistaken and reached on a far from complete record.

[18] UBS Reply at 12 (quoting Response at 2, 3).

[19] SWC Opposition Ex. 1, May, 17, 2023 Email from Chambers of Hon. Edward R. Korman.

## II. UBS's Reply fails to rebut that through its Proposed Order, it seeks to materially modify and enlarge the terms of the 1999 Settlement.

UBS offered no argument in its opening brief to explain or justify how its Request for Clarification is faithful to or justified by the 1999 Settlement's terms. In its Opposition, SWC showed that UBS's purported clarification request was in reality a surreptitious effort to change and expand the settlement terms, pointing to at least three examples in UBS's Proposed Order (submitted with its Request for Clarification): (1) the 1999 Settlement supposedly encompasses every "historical fact" that the Independent Ombudsperson currently is investigating;[20] (2) "the Settlement was not dependent on representations of any party";[21] and (3) the 1999 Settlement prohibits a party or organizational endorser from "promot[ing] any public controversy (in the media or otherwise)" concerning the subject matter of the settlement.[22] For the first time on reply, UBS now tries to show that its Proposed Order is consistent with the 1999 Settlement, but its arguments fail to close the significant daylight between the actual settlement terms and the "clarification" UBS seeks.

### A. UBS's Reply fails to demonstrate that the 1999 Settlement embraces every "historical fact" relating to the Independent Ombudsperson's investigation.

With respect to the "[s]cope of the Settlement Agreement relative to the Ombudsperson's investigation" UBS claims that "SWC does not identify a single 'fact' from this investigation that falls outside the scope of the Settlement."[23] As a nonparty and nonmovant, it is not SWC's burden—nor within its knowledge—to catalog every historical fact that is or will be at issue in the Independent Ombudsman's investigation. Nevertheless, the obvious example of an historical fact not encompassed by the 1999 Settlement is UBS's retention and concealment of Credit Suisse's Nazi Assets in the 27 years since the 1999 Settlement was concluded. What is more, the Independent Ombudsperson found instances of direct obstruction by the Bank to hide historical facts from this Court, federal investigations, Settling Plaintiffs, and Organizational Endorsers:

> Documents and witness testimony indicate that Credit Suisse did not always share information that it knew with outside investigations such as the Volcker Commission and the Bergier Commission. For example, Credit Suisse's internal comments on a draft report by accountants working for the Volcker Commission on Kurzmeyer expressed that Credit Suisse knew of additional information not included in that report, including that Kurzmeyer had a more significant role in moving capital and suspected dealings in Nazi gold than what was reported in the Volcker Commission draft. Credit Suisse's internal comment stated that the Volcker Commission accountants' report was 'rather sanitized' and said it was '[b]est to leave [it] as is!'[24]

---

[20] Proposed Order ¶ 1.
[21] *Id.*
[22] *Id.* ¶ 2.
[23] UBS Reply at 10.
[24] Ex. 3, Dec. 17, 2024 N. Barofsky Ltr. to Senate Budget Committee, at 9-10.

Concealed historical facts, or concealed facts that post-date the 1999 Settlement, cannot be encompassed by the 1999 Settlement, no matter how broadly the Bank would like to construe its language.

Moreover, UBS fails to explain the import, breadth and specificity of the finding it urges the Court to adopt. What does it mean for SWC, or any other person, that the 1999 Settlement encompasses every "historical fact" relating to Mr. Barofsky's investigations? What activities of SWC or any other person are limited, or not limited, by this assertion, even if true? The Proposed Order does not say. UBS offers an incomplete gloss in its Reply about what UBS itself thinks is unobjectionable,[25] but neither SWC nor any other person or entity should have to rely on, or be bound by, UBS's vague *ex ante* advisory opinion it advances.

Most importantly, the parties to the 1999 Settlement have had no opportunity to understand or object to the sweeping, vague language proposed by UBS that seeks materially changed terms. This critical reality underscores why the Court should decline to adopt UBS's proposed reworking of the 1999 Settlement.

### B.    UBS's Reply fails to demonstrate that the 1999 Settlement did not depend on any representations made by the parties to that agreement.

UBS fails to establish that the 1999 Settlement was not dependent on any representations of any party. There are far too many unanswered questions to make UBS's request viable as a mere "clarification." UBS points to the 1999 Settlement's supposed silence as to representations. But that mischaracterizes the document. For example, the 1999 Settlement's recitals state that counsel for the Settling Plaintiffs "analyzed available information adduced through informal discovery" and "conducted arms-length negotiations with Settling Defendants."[26] It goes on to state that "based on the investigation, discovery, review of public information, and research described above, Settling Plaintiffs have concluded that the terms and conditions of this Settlement Agreement are fair, reasonable, and adequate to Settling Plaintiffs and in their best interests…."[27] These statements suggest that the Settling Plaintiffs' attorneys received representations from the Bank and its representatives and relied on those representations in agreeing to the 1999 Settlement, and UBS does not submit evidence to the contrary. Regardless, UBS does not establish that an agreement's silence proves that no representations were made or relied upon in the negotiation and conclusion of the agreement. Injecting this kind of blanket disclaimer into the 1999 Settlement is a significant modification that simply cannot be made without notice to and consent by all Parties to the 1999 Settlement.[28]

Nor can UBS find refuge in the garden-variety merger and integration clause contained in the 1999 Settlement.[29] That clause is not a disclaimer of reliance on representations under New York law. "Ordinarily, 'an omnibus statement that the written instrument embodies the whole agreement, or that no representations have been made" is insufficient to bar a claim of fraudulent

---

[25] *Id*. at 12.
[26] Settlement Agmt., Recitals p. 1.
[27] *Id.* at 2.
[28] *Id.* § 16.2.
[29] UBS Reply at 12 (quoting Settlement Agmt. § 16.2).

inducement." *PetEdge, Inc. v. Garg,* 234 F. Supp. 3d 477, 488 (S.D.N.Y. 2017) (quoting *Mfrs. Hanover Tr. Co. v. Yanakas*, 7 F.3d 310, 315 (2d. Cir. 1993) (citing *Danann Realty Corp. v. Harris*, 5 N.Y.2d 317, 184 N.Y.S.2d 599, 157 N.E.2d 597, 598–99 (1959)); *see also Robinson v. Deutsche Bank Tr. Co. Ams.*, 572 F.Supp.2d 319, 323 (S.D.N.Y. 2008) ("Under New York law, ... a general merger clause does not, standing alone, preclude a claim of fraudulent inducement."). Indeed, it has long been New York law that "a contractual promise made with the undisclosed intention not to perform it constitutes fraud and, despite the so-called merger clause, the plaintiff is free to prove that he was induced by false and fraudulent misrepresentations to ... execute the agreements." *Sabo v. Delman,* 3 N.Y.2d 155, 161, 164 N.Y.S.2d 714, 143 N.E.2d 906, 908–09 (1957); *see also New Shows, S.A. de C.V. v. Don King Prods., Inc.*, 210 F.3d 355 (2d Cir. 2000) ("But under New York law, fraud claims may be predicated on oral fraudulent representations, even where a contract between the parties contains a standard integration clause.").

The 1999 Settlement lacks any specific disclaimer of reliance of the sort required for this Court to conclude as a matter of law that no representations were made or could serve as the basis for opposing enforcement of the settlement. Put differently, mere silence as to representations coupled with a standard integration clause is a far cry from an agreed affirmation in the 1999 Settlement that "the 1999 Settlement is not dependent upon any representations made by the Parties" as UBS asks the Court to hold. "In the absence of a dispute over a particular set of factual circumstances" concerning the existence or import of any such representations—since UBS has provided no evidence concerning the factual circumstances justifying its proffered no-representations gloss—"such a ruling by the court would, again, amount to an impermissible advisory opinion." *Mears v. Montgomery,* 2013 WL 69221, at *2–3 (S.D.N.Y. Jan. 4, 2013), *aff'd,* 566 F. App'x 17 (2d Cir. 2014) (denying clarification motion). And once again, the Settling Parties to the 1999 Settlement—who are the most crucial to a determination of what representations were made to induce the 1999 Settlement—have not been notified or given an opportunity to be heard by this Court, let alone consent to the modification of the agreement that UBS urges.

C.      **UBS's Reply fails to demonstrate that the 1999 Settlement prohibits promoting any "public controversy" concerning anything related to the matters covered by that agreement.**

UBS requests an order that nonparty Organizational Endorsers such as SWC "may not, with respect to any matters covered by the Settlement … promote, assist in promoting or cause to promote **any public controversy (in the media or otherwise)** …."[36] In its Opposition, SWC pointed out that this language is not what the 1999 Settlement says; it injects vagueness and uncertainty; and that such vagueness and uncertainty has a dangerous chilling effect on SWC's (and other Organizational Endorsers') First Amendment rights. It is impossible to discern what SWC apparently is permitted to do from the "public controversy" it supposedly is forbidden from engaging in, concerning anything subjectively "controvers[ial]" relating to the Swiss banks, the Holocaust, World War II, or its aftermath.

Unable to explain what the no-promoting-public-controversies language in its Proposed Order means, UBS falls back on re-quoting the terms of the 1999 Settlement itself.[30] But if that is all it means, there is no need for the Proposed Order. Why reformulate the language of the 1999

---

[30] *Id.* at 13.

Settlement to a version that on its face is less certain, with the attendant chilling effect that vagueness would have on SWC or another organization? And again, it is not permissible to do this without notice to and consent of the 1999 Settlement's Settling Parties and other Organizational Endorsers.

On Reply, UBS blithely suggests that the Court not worry about this problem based on its purported reassurance that "[n]othing in the Proposed Order would preclude the SWC or any other organization from pursuing objectives like those the SWC champions," including the types of actions it has been undertaking for the past several years.[31] SWC is unmoved by UBS's reassurances, having been pressed into a protracted mediation based on UBS's (now abandoned) position that what SWC has been doing (investigating and searching for justice about Nazi Assets remaining with the Bank) violated the 1999 Settlement. UBS's reassurances are also undermined by its own inability to maintain a clear or consistent understanding of what its new prohibition would cover. One page after saying that SWC is free to "to search for justice related to hidden Nazi assets," and "to investigate and document historical truths concerning heretofore undisclosed Nazi assets that appear to remain in the Bank's possession,"[32] UBS then says SWC (and other Organizational Endorsers) cannot "spur a revisiting of the Settling Defendants' World War II-era conduct at some future date through lawsuits, **through other means**, **or by creating public controversy**,"[33]—whatever that means. This alone warrants rejecting UBS's "clarification" request.

The words of the 1999 Settlement speak for themselves. They were carefully negotiated, and the Court should not permit UBS to unilaterally rewrite them especially given the heightened concerns around terms that implicate or waive First Amendment rights—a point that UBS does not dispute.

## III. The impact on absent Settling Parties and Organizational Endorsers is yet another reason for the Court to deny UBS's requested "clarification" order.

UBS dismisses the central concern that absent Settling Parties and Organizational Endorsers should be given notice and an opportunity to be heard.[34] It cites this Court's notice on the docket about the present submissions and hearing, but none of the Parties or many Organizational Endorsers were given actual notice of these filings and order, none of which are on the docket. And crucially, they cannot be expected to be on constructive notice of letters emailed to the Court in a long-closed Settlement, and in the case of the Organization Endorsers where they never were parties (and are not recipients of court notifications) in the first place. "An elementary and fundamental requirement of due process in any proceeding which is to be accorded finality is notice reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections." *Mullane v. Cent. Hanover Bank & Trust Co.,* 339 U.S. 306, 314 (1950). UBS also rather disingenuously asserts that none of the Settling Plaintiffs or other Organizational Endorsers "has asserted an

---

[31] UBS Reply at 12.
[32] *Id*.
[33] *Id.* at 13.
[34] *Id.* at 14.

interest in the dispute."[35] But each of these entities would be equally subject to the material changes of the 1999 Settlement's terms that UBS's Proposed Order effectuates. If one or more such entities runs afoul of the Proposed Order, if entered, UBS would be entitled to enforce the order against them. These other persons and entities therefore have an urgent and material interest in the matter. Before the Court does anything to impact them, they must be given notice and an opportunity to be heard if and when an actual case or controversy exists.

### Conclusion

UBS's requested "clarification" order is an improper advisory opinion because there is no justiciable controversy between UBS and SWC. And the changed and enlarged interpretation of the 1999 Settlement that UBS advances is not justified by the settlement itself and would infringe SWC's (not to mention the Settling Plaintiffs' and other Organizational Endorsers'), constitutional rights.

SWC respectfully urges the Court to stay its hand and deny UBS's "clarification" request.

SELENDY GAY PLLC

Faith Gay, Esq.
Jennifer Selendy, Esq.

STEIN MITCHELL BEATO & MISSNER LLP

Jonathan E. Missner, Esq.
Andrew M. Beato, Esq.
Robert B. Gilmore, Esq.
Melissa S. Fox, Esq.

cc:     Gibson, Dunn & Crutcher LLP (Counsel to Credit Suisse and UBS AG)
        Marshall R. King (mking@gibsondunn.com)
        David P. Burns (dburns@gibsondunn.com)
        F. Joseph Warin (fwarin@gibsondunn.com)
    Mayer Brown (Counsel to Credit Suisse and UBS AG)
        Marc R. Cohen (mcohen@mayerbrown.com)
        Alex C. Lakatos (alakatos@mayerbrown.com)

---

[35] *Id.*

# EXHIBIT 1

 Media

# UBS Statement on Voluntary Review of Credit Suisse's World War II Activities

Recently, the U.S. Senate Judiciary Committee held a hearing that focused on the ongoing voluntary review of Credit Suisse's activities before, during, and after World War II. The Holocaust perpetrated by the Nazis is the darkest chapter in human history and is an atrocity that continues to have profound meaning to this day. UBS and Credit Suisse have apologized for the role the banks played in this chapter, taken accountability for their actions, and undertaken significant efforts to examine and publicize their World War II era history.

**The Settlement Agreement of 1999**

Under the 1999 landmark court-approved Settlement of lawsuits filed against Swiss banks by classes of Holocaust victims, Credit Suisse and UBS paid $1.25 billion, which was subsequently distributed by the court and court-appointed special masters to Holocaust victims and their heirs.

The Settlement was intended to achieve a global resolution through a conclusive end to the controversy that went beyond legal and financial

## Media Contact

Switzerland:
+41-44-234 85 00
Americas:
+1-212-882 58 58

## Links

**www.ubs.com/media** >

Download PDF
**UBS Statement**

closure. The payment that the banks made as part of the Settlement Agreement had two components: compensation for legally recognized claims and a larger portion addressing moral and unknown claims, where the banks agreed to compensate for their improper conduct, regardless of whether those acts could give rise to legal claims. Accordingly, the scope of the Settlement is extremely broad and includes the release of all claims – whether known, unknown, or later discovered – that are in any way associated with the Nazi Regime (including associated individuals and public or corporate entities), the Holocaust, World War II, and its prelude and aftermath.

As further evidence of the breadth of the Settlement and its applicability beyond the resolution of the litigation, major Jewish organizations embraced the Settlement as fair, adequate and reasonable, and agreed in writing to be bound by its terms. While the Settlement provides finality from claims and closure of controversy, it does not prevent any party from voluntarily reviewing its own history.

## Credit Suisse's voluntary review into its World War II-era conduct

As part of that search for historical truth, beginning in 2020, Credit Suisse – and, following its acquisition, UBS – have conducted a monumental voluntary investigation into Credit Suisse's World War II-era conduct. Credit Suisse and UBS have taken these steps notwithstanding the finality of the 1999 Settlement and the extensive historic investigations already conducted by the Independent Committee of Eminent Persons (ICEP), [1] the Bergier Commission, [2] the U.S. Senate, and others in the 1990s and early 2000s. This multi-year effort has entailed making available more than 16.5 million documents, consisting of 44 million pages and four terabytes of data; approximately 85 people; and research in 18 public archives in seven countries. UBS has continued to support these efforts, as a testament to its unwavering commitment to finding the truth. To that end, UBS rehired the independent Ombudsperson who was previously engaged by Credit Suisse to oversee this unprecedented voluntary review, dedicating so far hundreds of millions of dollars to uncover the truth.

The purpose of this voluntary review is to responsibly strengthen the historical record of this dark period in human history, with the aim that, through knowledge and reflection, the atrocities of Nazism are never repeated. The bank welcomes any new findings.

## Q & A

### 1. What does UBS hope this voluntary review will lead to?

The purpose of this unprecedented voluntary review, which has expanded in scope well beyond what was originally envisioned, is to responsibly strengthen the historical record of this dark period in human history, with the aim that, through knowledge and reflection, the atrocities of Nazism are never repeated.

### 2. When will the voluntary review on Credit Suisse's World-War II-era conduct conclude?

This voluntary review will conclude at the end of this year when the Ombudsperson issues his final report.

### 3. Can this voluntary review lead to further legal claims?

Swiss banks and classes of Holocaust victims reached a landmark, court approved Settlement in 1999 that was agreed to and endorsed by Jewish organizations. This Settlement had the purpose of bringing final closure to litigation and all public disputes related to World War II, its prelude, and its aftermath. The historic 1999 Settlement is binding, covers facts known and unknown and later discovered, and includes Nazi assets as well as victims' assets. However, this Settlement agreement does not prevent continuing to understand history and openly share the findings, which is what Credit Suisse chose to undertake in 2020.

### 4. There appear to be new findings from the current voluntary review. What is UBS's view on these new findings?

As a result of the extensive work conducted previously, including by the Bergier Commission and the ICEP, much was already known about the role of Swiss banks during WWII and its aftermath. UBS, however, welcomes any new findings of Nazi accounts and improper activity, as the purpose of this unprecedented voluntary review is to responsibly strengthen the historical record of this dark period of human history, with the aim that, through knowledge and reflection, the atrocities of Nazism are never repeated.

### 5. Some have publicly argued that the Settlement agreement should not bar further legal actions, claiming it covered only accounts belonging to Holocaust victims – not Nazi accounts – and that not all facts were known at the time?

The historic 1999 Settlement is binding, covers facts known and unknown, and clearly and explicitly includes Nazi assets as well as

victims' assets, something recognized and understood at the time the Settlement was negotiated.

## 6. UBS recently attended a US Senate hearing relating to its voluntary review of Credit Suisse's WWII-era conduct. How concerned are you that this review could lead to potential new claims?

The hearing concerned Credit Suisse's ongoing voluntary investigation into its World War II–era conduct, which we expect to conclude when the Ombudsperson issues his final report by the end of this year.

Swiss banks reached a landmark, court approved Settlement in 1999 that was agreed to and endorsed by Jewish organizations. Under this Settlement, Credit Suisse and UBS agreed to pay USD 1.25 billion – an extraordinary amount at the time – which was subsequently distributed by the court and its appointees to hundreds of thousands of Holocaust survivors and heirs of Holocaust victims.

The Settlement Agreement is clear that it covers both known and unknown claims and those subsequently "arising or discovered". At the time, the parties anticipated that additional information could emerge in the future. Because the purpose of the Settlement was to bring "complete closure and an end to the confrontation," they explicitly included "unknown" claims to avoid reopening discussions in light of new discoveries.

## 7. UBS has been accused of restricting and retaining information from the voluntary review. Why and what are the documents retained?

This refers to a limited set of files and communications protected by attorney-client privilege, which relate to the 1990s Holocaust class action litigation and the 1999 Settlement Agreement. The bank's historic voluntary review focuses on the World War II-era activities, not the litigation that resulted in the 1999 Settlement Agreement.

In the interest of transparency, we are nevertheless exploring ways to provide the Ombudsperson with access to these documents. At the same time, we must ensure appropriate safeguards are in place, particularly given recent threats of litigation related to the 1999 Settlement Agreement.

To put this in context, Credit Suisse has provided the Ombudsperson with approximately 16.5 million documents and has withheld less than

0.1% of the total number of documents. Notably, Credit Suisse has not withheld any privileged documents from prior to the 1990s or in the 1990s that do not relate to the 1990s class action litigation.

## 8. Can UBS disclose the names of account holders or are they protected by confidentiality pursuant to Swiss law?

UBS must comply with applicable laws and can, therefore, share client data only in compliance with Swiss requirements. However, UBS has no interest in protecting Nazi criminals or their supporters. Accordingly, we are pursuing options to be able to provide as many names as legally possible in the final report.

## 9. Is it true that UBS has sued the Simon Wiesenthal Center?

No, this is not correct. UBS has not sued the SWC. UBS has asked Judge Korman, the judge who oversaw the class action Settlement in 1999, for clarification of the 1999 Settlement Agreement that we hope will avoid litigation threatened by the SWC and others.

The SWC and any other Jewish organizations, consistent with their obligations under the 1999 Settlement, are free to continue to seek the truth related to the darkest chapter in human history.

Any decision Judge Korman will take will be made public.

## 10. Has UBS set aside a provision for any potential financial claims?

UBS is confident in its position, and consistent with its policy, does not comment on provisions.

[1]The ICEP, chaired by Paul Volker, was established in 1996 to conduct a forensic audit and investigate Swiss bank accounts that may have belonged to Holocaust victims.

[2]The Independent Commission of Experts: Switzerland – Second World War, chaired by noted historian Jean-Francois Bergier and comprised of leading international historians of the World War II era, was established in 1996, mandated by Swiss Legislation to investigate Switzerland's role in relation to Nazi Germany and the Holocaust and was the official vehicle to discover the truth about Switzerland's World War II era history.

**Media**

Contact

Social media

Photos

Subscription

**Investor relations**

Press releases

Quarterly reporting

Annual reporting

Corporate calendar

Shareholder information

Ratings

**Our firm**

What we do

Our employees

Our culture

Corporate governance

The products, services, information and/or materials contained within these web pages may not be available for residents of certain jurisdictions. Please consult the sales restrictions relating to the products or services in question for further information.

Copying, editing, modifying, distributing, sharing, linking or any other use (whether for commercial purposes or otherwise) of this material, other than personal viewing, without UBS's prior written permission is strictly prohibited

© UBS 1998 - 2026. All rights reserved.

# EXHIBIT 2

**Questions for the Record**
**Charles E. Grassley of Iowa**
**United States Senate Committee on the Judiciary**
**The Truth Revealed: Hidden Facts Regarding Nazis and Swiss Banks**
**February 3, 2026**

**Questions for Independent Ombudsperson Neil Barofsky**

**1)**     **It is my understanding that you were limited in providing names of Credit Suisse account holders in your testimony before the Committee. For your final report, you pledged to include all relevant account holder names. What, if anything, has UBS told you that it has done to ensure that the public will be able to access the entirety of the final report, including all the account holder names found?**

The final report detailing the findings of my oversight of UBS's investigation of Credit Suisse's historical relationships with Nazis and their facilitators will contain all relevant account holder names, as well as any other available account-related information relevant to my findings. I will deliver that report to UBS in Switzerland and UBS will make that report publicly available, including by providing it to the Committee. My hope is that UBS will make public my report in its entirety.

To date, UBS has told me that it has completed the following tasks related to public access to information regarding account holders and other account-related information (collectively "client-identifying information"):

- UBS instructed its outside counsel to analyze how it could disclose client-identifying information with the Committee and/or to the public.

- As referenced in my written testimony, UBS's outside counsel reviewed information about individuals and entities that I proposed to include in my written testimony to the Committee to determine whether it could, in its view, be provided consistent with Swiss law. For some information, UBS's outside counsel determined that public disclosure was lawful, and I included that information in my written testimony. For other information, UBS's outside counsel informed me that they believed that client-identifying information could not be included in my written testimony, and I did not include that information. Based on this experience, I expect that there will be information that I will include in my final report that UBS and its counsel will believe cannot be disclosed under Swiss law without further action. In other words, some information will require further action by UBS and/or the Swiss government to avoid omissions and anonymization in the version of the final report provided to the Committee and/or the public.

- UBS consulted with its primary regulator in Switzerland, the Swiss Financial Market Supervisory Authority (FINMA) regarding its investigation and the disclosure of materials. UBS has not informed me of

any other contacts it may have had with the Swiss government beyond discussions with FINMA.

On February 11, 2026, UBS shared with me its current planning for the final report. UBS confirmed it will transmit my final report to the Committee from Switzerland in a manner it believes is consistent with Swiss law.

As noted above, with respect to my recent testimony, the process did not result in the inclusion of all relevant client-identifying information. The Committee, of course, has asked UBS to consider all available pathways to transmit my final report in its entirety in a manner consistent with Swiss law, including discussions with the Swiss government about either determining that disclosure of the final report would be consistent with exceptions to Swiss banking secrecy law, or to change the law to allow for full disclosure. UBS advised me that it believes that the Swiss government would expect the Bank to have exhausted all possible alternative means of disclosing client-identifying information, such as contacting first-generation heirs or legal successors and seeking waivers from them, before UBS approached the government for an alternative solution. UBS informed me that in situations where it remains unclear whether a former client has living heirs, UBS "would plan to conduct a case-by-case assessment."

**2)     If UBS refuses to publish the full final Ombudsperson report in an unredacted manner, what steps will you take to ensure that you maintain editorial control over the report while maximizing transparency to the Senate Judiciary Committee? Please provide a description of what process you will use to do so.**

The final report that I provide to UBS will include all relevant information, including client-identifying information. If UBS does not publish that report in its entirety due to concerns that including certain information would violate Swiss law, I will follow a process that maintains my editorial control over the contents of the report while maximizing transparency to the Committee.

Specifically, I will ask UBS to identify all information in the final report that it believes cannot be publicly disclosed in a manner consistent with Swiss law. I will then prepare a second version of my report that addresses those concerns by anonymizing the description of account holders or other relevant individuals or entities. I will work with UBS and its counsel to include relevant information to the greatest extent possible while adhering to UBS's interpretation of Swiss law. That process will necessarily involve discussions and negotiations with UBS and its outside counsel, but, as guaranteed by my engagement agreement, the analytical conclusions and findings of this version of my report will be my own.

**3)     In your written testimony, you described comments made by UBS proposing to delete content from your testimony on the basis that UBS had not agreed that certain subject matter is within the scope of your oversight. Has UBS maintained or withdrawn those objections to the scope of your oversight? Please provide an update on the status of all communications related to this subject matter.**

UBS has clarified its position on its scope objections, providing to my team in a February 25, 2026 email stating the following:

The scope of your oversight work is defined in the engagement letter and, as you have previously noted, this ultimately is the Bank's investigation. As a general matter, with the exception of looking into the 1990s and onward period (beyond the already-investigated Kurzmeyer/DWB and Bank Hofmann findings), we do not object to the oversight work that you currently are engaged in, as reflected by your written testimony. If you would like to expand your oversight work to go beyond the current UBS investigation, please note the proposed expansion to UBS for discussion.

I understand UBS's statement to be a withdrawal of its objections to the specific portions of the testimony that it previously sought to delete as being out of scope and a withdrawal of its objection to certain topics pertaining to its 1990s investigation, such as DWB and Bank Hofmann, as described in my written testimony.

The Bank has, however, maintained an objection to any work regarding the 1990s investigation that does not specifically relate to Kurzmeyer, DWB, and Bank Hofmann. This would presumably include areas of my written testimony that the Bank did not previously object to, regarding Rheinmetall, the German arms manufacturer, and the German Red Cross. It may also preclude any inquiry into any additional examples of the Bank concealing or failing to disclose information to the Bergier Commission or other investigative bodies that may arise during the course of the investigation.

The email I quoted above was provided after the following communications between my team and UBS regarding its scope objections:

- On January 22, 2026, in response to a draft of the testimony, UBS for the first time objected to, and asked for me to strike, certain aspects of my written testimony based on the claim that "these topics reflect scope expansions that have neither been formally requested nor approved." This included the high-level summaries concerning four categories of individuals and legal entities listed in Section II.D of my testimony ("Other Cases Under Review"): German individuals and entities that funded or otherwise contributed to the rise of the Nazis in the 1930s (first bullet); accounts related to the aryanization of Jewish businesses (second bullet); a war profiteer (sixth bullet); and looters of Jewish assets, including those involved in the trade of looted diamonds and a Nazi-controlled bank (seventh bullet) (February 3, 2026 Testimony of Neil Barofsky, pages 51–52).

- On February 1, 2026, my team received a draft of UBS's proposed written testimony. In that testimony, UBS made the broad assertion that all materials related to the 1990s were out of scope: "Materials from the 1990's are not within the scope of the Ombudsperson's oversight, which is meant to be focused on Credit Suisse's history and World War II-era conduct." It further explained that the investigation "was never meant to be focused on whether and how to reopen the 1999 Settlement Agreement."

- On February 11, 2026, I discussed with UBS the objections UBS raised to the scope of the investigation and my oversight and asked whether UBS was maintaining those objections. I explained to UBS that, contrary to its position, each topic area it had proposed to strike from my testimony was within the scope of the investigation and my oversight and was previously agreed to by UBS. I explained that each topic area refers to specific Nazis or facilitators that were searched for by AlixPartners with the agreement of the Bank. Some of these were within the investigation's scope since before I was re-engaged by UBS, and the rest were added between January 2024 and June 2024. Consistent with these names being approved and incorporated into the investigation, AlixPartners conducted forensic searches for those names in the Bank's archives and databases, analyzed the results, produced hundreds of preliminary case binders to my team, and delivered dozens of presentations on their progress that included topics now objected to.

I further explained that the inclusion of these topics within my oversight is required by my engagement agreement. The agreement requires me to "provide input and recommendations on the scope, methodology, and approach of the Investigation, and provide ongoing oversight, review, and testing of any such additional work," and provides that my oversight "shall extend to the entirety of the scope of the Investigation," including any expansions. Thus, once UBS and AlixPartners took investigative steps within these areas, which they have done for all of them, my oversight followed as a matter of course under my engagement agreement.

I also noted that UBS did not object previously to the inclusion of these subject matters in the investigation when it had an opportunity to do so. For example, over a year ago, UBS received and did not object to my December 17, 2024 letter to the Senate Committee on the Budget, which expressly referenced these topics. Moreover, I provided multiple drafts of my written testimony to the Bank, and, at first, the Bank raised no objection; to the contrary, UBS, AlixPartners, and UBS's outside counsel worked collaboratively with my team to confirm that the anonymized descriptions were consistent with the investigation's preliminary findings and were compliant with its view of Swiss law.

I also noted that UBS's position with respect to the 1990s was inconsistent with the plain language of our engagement letter and the Bank's conduct since the inception of my engagement, for the reasons described in more detail below in response to Question No. 4.

As part of the discussion on February 11, 2026, UBS agreed to confirm whether it maintained any of these scope objections. At that meeting, UBS agreed to articulate, in writing, any remaining scope objections and, to the extent UBS has determined an area is out of scope, to provide its assessment of the impact that decision will have on the investigation.

- On February 20, 2026, a member of my team wrote to the Bank for a status update on the above.

- On February 23, 2026, a member of my team repeated the request for a status update on the above.

- On February 25, 2026, UBS provided its above-quoted response. It provided no further information and did not provide any further assessment of the impact its position will have on the investigation going forward.

**4)** **If UBS is maintaining any objections to the scope of your oversight, please describe your understanding of each such objection and your response. Also, please explain the impact on your oversight should scope restrictions remain in place, including in your final report.**

As to the objections maintained by UBS (described above and incorporated here by reference), my engagement agreement is quite clear that oversight into fact questions concerning the investigative work conducted during the 1990s is within the scope of the investigation and is not limited to Kurzmeyer, DWB, and Bank Hofmann.

My engagement letter with UBS states that "[t]he Parties intend for the initial and primary focus of the Ombudsperson to be oversight of the work performed by CSAG and the CSAG Agents since June 2022 and assessment of the extent to which CSAG and the CSAG Agents have addressed the aspects of the Ombudsperson's oversight pursuant to his June 3, 2021 Engagement Letter left incomplete or unanswered as identified by the Ombudsperson as of the preparation of the February [2023] Report." In turn, my February 2023 report raises a number of *incomplete or unanswered* questions about the 1990s review conducted by Credit Suisse. For example, on page 108 of the report, there is an entire subsection entitled "**Questions Regarding Disclosures to the Bergier Commission**"; it also notes on page 126 that, at that time, the Ombudsperson was not "given the opportunity to verify whether there were additional documents in Credit Suisse's archives that could provide additional light on this account, what happened to the assets after they were transferred to another Credit Suisse account, *or whether there were other facts learned which were similarly inconsistent with other previous assertions to the Bergier Commission, the Volcker Commission, or other historical inquiries*." (emphasis added). Thus, the 1990s scope contemplated by my engagement letter expressly goes beyond merely reviewing representations concerning DWB, but also includes more generally a review of the veracity of Credit Suisse's "assertions to the Bergier Commission, the Volcker Commission, or other historical inquiries" during the 1990s. Additional questions pertaining to the 1990s are set forth at pages 8 ("Credit Suisse's decision to stop its review midstream has left many questions unanswered, *including questions about the thoroughness of its prior investigative efforts. . .*") and 21 (noting that curtailment of the Bank's investigation resulted in "leaving unanswered important questions regarding . . . *whether there were other similar failures of disclosure in the 1990s investigations*") (emphasis added).

UBS's conduct since I was re-engaged has been consistent with the engagement agreement encompassing Credit Suisse's 1990s investigation into its scope. This includes cooperating with our investigation into Credit Suisse's failure to disclose the DWB-affiliated account referenced above, and the information about Bank Hofmann discussed in my written testimony. Furthermore,

in reviewing a draft of the letter I provided to the Senate Budget Committee on December 17, 2024, UBS did not object to my inclusion of the following description of our work: "We are continuing to investigate the circumstances regarding why the Bank failed to disclose this documentation of its relationship with the SS officer to the Bergier Commission, *as well as those surrounding several other accounts that were identified by Credit Suisse in the 1990s and appear not to have been disclosed*." (emphasis added)

Given the clarity around the engagement letter's inclusion of the 1990s investigation as part of the scope of the current inquiry, we read UBS's current position as a statement of its intent to narrow the existing scope of the investigation, as it is entitled to do under our engagement letter, which provides:

> If CSAG determines to narrow the scope of the Investigation, the Ombudsperson's report shall cover the work performed by CSAG and the Ombudsperson prior to the determination to narrow the scope, CSAG's rationale in narrowing the scope, and the Ombudsperson's assessment of that rationale, its context, and the impact on the Investigation and its results (Engagement Agreement at 3).

To the extent that UBS's position affects the investigation, I will address that determination, and its consequences, in my final report.

That said, I am unable to delineate at this time how UBS's current position will affect my final report. On the one hand, it should have no impact on certain of the 1990s topics covered in my written testimony—Kurzmeyer, DWB, and Bank Hofmann. On the other, UBS's failure to include Rheinmetall and the German Red Cross might prevent us from reporting on the thoroughness of the Bank's prior investigation of those relationships. More significantly, UBS's position may have a significant impact on ongoing efforts to answer the questions raised in my February 2023 report regarding whether there were other facts learned in the 1990s which "were similarly inconsistent with other previous assertions to the Bergier Commission, the Volcker Commission, or other historical inquiries."

Were UBS to cut off access to documents and information related to its 1990s investigation, it would undermine the effectiveness of my oversight. As my testimony describes, some of the most significant discoveries of this investigation, including the registry card confirming the DWB-affiliated account and the manuscript on Bank Hofmann's ties to Nazi Germany, were located within the Bank's 1990s investigative files (February 3, 2026 Testimony of Neil Barofsky, pages 26–27 and 38–42). These files go to some of the core questions raised in my February 2023 report: what Credit Suisse knew about its Nazi-era relationships, what it disclosed to the Bergier Commission and other historical inquiries, and what it chose to withhold from the public record. If UBS were to cut off our access to these files based on its narrowing of the scope of the investigation, it would have a material impact on the efficacy of the investigation and my oversight.

5)  **In UBS's testimony, Ms. Barbara Levi stated that UBS has a difference of opinion regarding the interpretation of the bank's engagement agreement with the Independent Ombudsperson and stated there is language allowing UBS to withhold privileged information. Please describe your understanding of this dispute, including your position on the engagement letter's requirements that UBS provide you with**

**relevant privileged material. Also, describe discussions, if any, with UBS regarding
your access to documents before you were re-engaged to this investigation.**

My engagement agreement is unambiguous. The "Cooperation" section, which appears on page 5
of the agreement, discusses the Bank's obligation to produce documents and it makes clear that
the Bank's cooperation includes access to all documents, privileged or not. This section of the
engagement agreement initially states that the Bank must provide "the Ombudsperson with
reasonable access to all relevant personnel . . . as well as records, documents, reports, and other
information, including but not limited to, access to CSAG's corporate and physical and other hard
copy archives, assisted access to all relevant systems, both automated and manual, and all
applicable software and hardware, as needed by the Ombudsperson to perform his duties and
responsibilities set forth in this Engagement Letter, to the extent legally permissible." It goes on
to state that the Bank's ability to withhold documents under this provision is limited, by
affirmatively stating that UBS may "impos[e] no restrictions other than those required by law on
the Ombudsperson's ability to access documents . . . ." The agreement then provides that the
obligation is not just specific to the Bank, but extends also to its employees, requiring the Bank to
instruct its employees to "fully cooperate with the Ombudsperson" including by making "available
all records, documents, reports, and other information, and provide access to all relevant systems,
both automated and manual, as well as all applicable software and hardware, as reasonably
requested by the Ombudsperson" (Engagement Agreement at 6). In other words, the engagement
agreement has no provision that allows the Bank or its employees to withhold privileged
documents.

The only reference to withholding privileged materials in the engagement letter applies *not* to the
Bank itself, or to its employees, but to the Bank's third-party vendors. For third parties alone, the
agreement requires the Bank to "take all reasonable steps" to ensure their cooperation with the
Ombudsperson's requests "[e]xcept as protected by applicable privileges" (Engagement
Agreement at 6). Thus, as this third-party provision makes clear, when the engagement agreement
intended to allow for an exception for privileged documents, it expressly included one. It defies
basic tenets of contract law for the Bank to suggest that its obligation to provide "all documents"
includes an implied protection for privileged documents when the very same provision of the
engagement letter explicitly carves out privileged documents only for third parties, but not for the
Bank itself. There is thus no basis for the Bank to claim that having agreed to produce from its
own archives all documents other than those prohibited by law, it also intended to exempt
privileged documents without saying so.

To the extent that UBS may contend, as it has orally stated to my team, that the separate
"Confidentiality" section of the engagement agreement provides a basis for withholding privileged
material, it is incorrect. The section of the engagement letter on confidentiality expressly applies
only to documents and information that *have already been "provided"* to the Ombudsperson. It
first includes in its definition of "Confidential Information" "any materials, documents,
information provided [by the Bank] . . . including any information over which [the Bank or its
affiliates] assert privilege . . . ." (Engagement Agreement at 12). It then explains that, with respect
to such already-produced documents, "[t]o the extent the Ombudsperson is granted access to
information over which CSAG and/or UBS asserts privilege, the Ombudsperson shall not assert
that access to such privileged information in any way constitutes a waiver of any claim of

privilege" (Engagement Agreement at 13). This provision does not contemplate the restriction of my access to privileged documents in the first place, nor does it otherwise purport to modify the "Cooperation" provisions of the agreement discussed above; instead, it only applies to privileged documents already "provided" to me. By doing so, this provision provides protection to the Bank from any future claims in litigation that it has waived privilege. It does so by preventing me from asserting that any privilege was waived by the Bank's production of documents to me, and from disclosing them further without the Bank's consent.[1]

The Bank's contractual obligation to provide me with relevant privileged materials is supported by UBS's conduct since my re-engagement in late 2023. For nearly two years, UBS routinely and without objection provided my team with relevant privileged materials, including documents related to the 1990s Holocaust victim litigation. Indeed, the very first document production I received upon re-engagement included a memorandum from Credit Suisse's outside counsel providing legal advice on the Bank's 1990s review—a privileged document that I referenced in my December 17, 2024 letter to the Senate Committee on the Budget after first sharing it with UBS and confirming that it had no objection to my doing so. That conduct was consistent with a meeting I had with UBS when I was re-engaged. At that time, I discussed with UBS the need to rectify the circumstances of my prior wrongful termination by Credit Suisse, and I stated I would only agree to be re-engaged if UBS committed to provide me with all necessary documents, without exception. Although we did not specifically discuss privileged documents, I was clear that I was not willing to return to this engagement unless I had unfettered access to the archives and all the materials necessary for me to conduct oversight.

On February 11, 2026, I asked UBS to point to any specific language in the agreement that it believes authorizes it to withhold privileged documents. The Bank identified no such provision in the agreement at that time, and, to date, the Bank has not responded.

If documents continue to be withheld, the consequences for the completeness and integrity of my oversight are potentially significant. As I described in my written testimony, UBS has inserted external lawyers, who previously had no role in the investigation, between the archival documents and my team (February 3, 2026 Testimony of Neil Barofsky, pages A-12, A-15). These lawyers now review documents before my team can access them, and they withhold or redact a subset of them on privilege grounds. Since the hearing, AlixPartners has continued providing my team with case binders containing redacted documents. The case binder constitutes the full record of materials upon which AlixPartners relies when it makes a determination about whether a Nazi or Nazi-affiliated person or entity held an account at Credit Suisse. Providing me with redacted case binders means that the very materials AlixPartners relied upon to reach its conclusions will be obscured, fundamentally undermining my ability to test those conclusions, or potentially come to a different conclusion. As I noted in my written testimony, for many of the Nazi accounts identified in this investigation, the only surviving proof of an account relationship may be a single document, such as a registry card (February 3, 2026 Testimony of Neil Barofsky, page 13). Withholding even

---

[1] At the Bank's request, my team shared certain legal citations in which courts found no waiver of the work product protection asserted against an adversary when a party had disclosed materials to a non-adversary such as an auditor, under the protection of confidentiality. *See, e.g.*, *In re FirstEnergy Corporation*, 154 F.4th 431, 443 (6th Cir. 2025); *United States v. Deloitte LLP*, 610 F.3d 129, 139–40 (D.C. Cir. 2010).

a small number of relevant materials can therefore meaningfully impact the investigation's completeness.

In addition, when documents are withheld or redacted, my team may not be able to see the full extent of Credit Suisse's relationship with a particular Nazi, including how an account was used, the types and values of assets held, or whether there are indications that the account was used to traffic looted Jewish assets, finance the Holocaust, or otherwise support the Nazi war effort (*see* February 3, 2026 Testimony of Neil Barofsky, pages A-15, A-16).

As a result, for those portions of the investigation affected by the withholding of relevant information, I will be unable to fulfill completely two of my core responsibilities under the engagement agreement: to "[r]eview, assess, monitor, and test the work performed by [the Bank and AlixPartners] in performing the [i]nvestigation," and to "[a]ssess whether the [i]nvestigation included all reasonably available relevant digital and physical databases and repositories at [the Bank]." In practical terms, this means I will be unable to certify in my final report that the investigation has been thorough and complete with respect to the affected areas, and that it has truly left no stone unturned.

Completing this investigation with integrity—and being able to tell the Committee and the public that no stone has been left unturned—requires access to all relevant materials. Access to all relevant materials is what UBS agreed to provide, and I urge it to honor that commitment.

6)  **Has UBS restored your unfettered access as part of this investigation? Specifically, is UBS continuing to withhold or redact documents from your oversight? If so, please provide an update on the volume, number of pages, and types of documents that are being withheld or redacted.**

No. UBS has not restored my unfettered access to documents as part of this investigation.

Below I provide an update on my current understanding regarding the volume, number of pages, and types of documents being withheld or redacted. As I reported in my written testimony, prior to the hearing, UBS told me that it had redacted or withheld approximately 290 "documents" (February 3, 2026 Testimony of Neil Barofsky, page A-13). UBS reported in its written testimony that it had redacted or withheld approximately 150 "documents," and UBS told me that it would produce to me the 140 "document" difference between those two numbers (*see* February 3, 2026 Testimony of Robert Karofsky, page 6). To date I have not received those 140 "documents."

**Redacted Documents**. At a February 11, 2026 meeting with UBS, AlixPartners presented my team with an "initial assessment of redacted pages and corresponding review" of a document production the Bank made to my team on January 28, 2026, covering 15 of the 72 "documents" my team has identified as containing redactions.

During the presentation, the Bank acknowledged that these were not actually 15 discrete documents, but instead that each "document" could contain binders and collections of memoranda, reports, and notes. Moreover, AlixPartners explained that the 15 files were on average 1,054 pages long and ranged from 254 pages to 1,923 pages in length. In total, these 15 "documents" amounted to 13,841 total pages, of which 1,967 were redacted.

The presentation also indicated that the materials being withheld include information relevant to the investigation. For this small sample of files containing redactions, AlixPartners conducted searches of the underlying pages across those documents for the last names of individuals and names of entities subject to the investigation's search lists. They identified a total of 6,044 hits across the redacted pages of the 15 "documents."

This includes 3,585 hits on search names found in just one file which is a digitized project management binder from the Bank's investigators' archives from the 1990s. This "document" is entitled Projektleitung-101 ("Project Management 101") and totals 1,536 pages, every one of which has been redacted. According to an inventory accessible to my team, this binder contains the files of a former Credit Suisse leader overseeing the Bank's 1990s investigation, making it relevant to what Credit Suisse's leadership knew about its Nazi-era relationships and what it chose to disclose or withhold.

**Withheld Documents**. With respect to documents that have been entirely excluded from production, I am unable to determine the actual number of documents they contain or their volume. The only documents I can account for are those produced to my team in redacted form. To date, UBS has not provided a privilege log or any other accounting of what is being withheld, and my team therefore has no means of assessing the full scope of withheld documents.

I have requested that UBS brief me on its privilege review process and provide me with reliable information regarding the extent of redacted or withheld information. UBS agreed to provide that briefing in March.

I further encouraged UBS to provide to the Committee a complete and accurate account of the redacted and withheld documents, including a page count, and to correct any misimpression it may have made upon the Committee when it referenced the number of withheld and redacted documents as being only 150.

7)   **What is the earliest date you sought to search Credit Suisse's archive for documents relating to the 1990s class action litigation? Please provide a timeline of the bank's objection to that request.**

Documents relating to the 1990s class action litigation have been part of this investigation from the outset.

By way of background, concurrent with the class action litigation during the 1990s, Credit Suisse conducted an internal investigation that examined topics that are relevant to the investigation and my oversight, including Credit Suisse's relationships with certain Nazis and their facilitators and what Credit Suisse disclosed to the Bergier Commission and other historical inquiries. Because Credit Suisse's internal investigation was conducted under the direction of its lawyers, much of the investigative work that was done at that time is intermingled with the class action litigation files.

Since well before I was initially retained in 2021, SWC made clear that "obfuscation" of the 1990s investigation was part of its core allegations against the Bank. For example, SWC had specific concerns regarding Credit Suisse's prior efforts to investigate a list of the most notorious and high-level Nazis and their financial supporters that the Bank received in 1997. SWC also expressed concern about the scope and effectiveness of Credit Suisse's participation with the Bergier Commission. As noted above, resolving previously unanswered questions about Credit Suisse's

candor with the commissions of the 1990s was raised in my February 2023 report and was incorporated into the scope of my work in my engagement letter with the Bank.

As also noted above, the Bank has been producing documents to me from its 1990s investigative files from the outset of my work and after my reengagement. More recently, the search for relevant information pertaining to this topic identified additional areas of the Credit Suisse archives that include relevant documents, including areas related to the 1990s litigation. On May 28, 2025, AlixPartners shared with my team a list of search terms that were being used for structured analysis of Credit Suisse's archives as part of our overall collaborative effort to ensure that all relevant portions of the archives are reviewed. On June 30, 2025, my team submitted a supplemental list of additional search terms to the Bank and AlixPartners, which included terms such as "Aryanization," "Looted Assets," "Blacklist," "Arthur Andersen," and "Bergier," among other historically relevant terms. These search terms were not directed at litigation files as such; they were designed to identify archival materials relevant to Credit Suisse's Nazi-era relationships across all sections of the archives, including sections that had not previously been systematically reviewed.

Beginning on August 26, 2025, and continuing through October 2025, AlixPartners and my team visited the Credit Suisse archives in person and examined sample documents from the sections of the archives that hit on the search terms. On September 17, 2025, AlixPartners distributed "testing sheets" listing the archive sections to be screened for relevance during that week's testing, which included the archive sections containing the materials from the 1990s investigation and the Holocaust class action. During these sessions, AlixPartners and my team opened and reviewed documents from the class action files without any objection from AlixPartners or UBS as to privilege. On September 25, 2025, AlixPartners agreed that materials from these class action boxes of documents were relevant and warranted further review, and therefore should be scanned and indexed.

On October 16, 2025, in a departure from past practice, my team was informed by UBS that we would not have immediate access to the documents once they were scanned, but that instead they would be subject to a privilege review through which privileged documents would be withheld and/or redacted.

**8)**     **As of the hearing, UBS had not provided you with a privilege log detailing the stated grounds for withholding documents being redacted or withheld. Has UBS provided you the privilege log since the hearing? If so, please produce that log to the Committee, along with any related context necessary to contextualize the documents.**

UBS has not provided me with a privilege log or any other document detailing the stated grounds for withholding or redacting documents, though it has agreed to do so in the future. It did provide certain information about a subset of 15 redacted "documents" discussed above.

**9)**     **In response to a question from Senator Cruz regarding the impact of the proposed order sought by UBS from Judge Korman, you described that the order's breadth could "inhibit or prevent Simon Wiesenthal Center (SWC) from continuing to provide information and being a gateway for information relevant to this investigation."**

      **a.**     **Has UBS committed to you, or made any commitments you are otherwise aware of, that they will clarify or otherwise amend the scope of its proposed**

**order so that SWC, and any other organizations that may be impacted by such an order, may continue to cooperate fully with the investigation and your oversight?**

No, to my knowledge, UBS has not made any such commitments.

    **b.**    **Has UBS communicated that they will neither seek nor enforce any restriction on SWC's ability to communicate with you, share information with you, or otherwise continue to your ongoing work?**

UBS represented to me at a meeting on February 11, 2026, that its effort to seek a clarification of the settlement is not intended to prevent SWC from communicating with me about the investigation.

**10)**    **In your opinion, can UBS' proposed order be read to silence SWC, directly or indirectly, from discussing findings related to the Holocaust?**

UBS stated at the hearing that the proposed order was seeking a clarification of the 1999 settlement agreement and was not meant to silence SWC. However, I am concerned that the phrasing of the proposed order could be interpreted as having that effect, nonetheless.

The proposed order states that the Settlement's scope "explicitly covers" the ongoing investigation:

> Given the clear wording of the Settlement, and the NGOs' endorsement thereof, I affirm that the Settlement's scope explicitly covers all the subjects of the investigation into Credit Suisse's history that were and are being performed since 2020 [sic] by the independent Ombudspersons [sic] (appointed by Credit Suisse in 2021 and reappointed by UBS in 2023), and specifically (a) any matter relating to the assets of (i) Nazi-era German companies and other legal entities, (ii) individual Nazis and other natural persons, and the [sic] (iii) the Nazi Government and its agencies and instrumentalities, and (b) any historical fact whether known or unknown at the time the Settlement was entered into. The Settlement covered "all claims [including unknown claims and "hereafter arising or discovered" claims] . . . in any way relating to the Holocaust, World War II, and its prelude and aftermath, Victims or Targets of Nazi Persecution, transactions with or actions of the Nazi Regime . . . or any related cause or thing whatever . . . ."

The proposed order would then confirm that endorsers of the Settlement "may not, with respect to any matter covered by the Settlement . . . promote, assist in promoting or cause to promote any public controversy (in the media or otherwise) . . . ."

I am concerned that the wording of the proposed order could be read to prohibit SWC from making statements to me or otherwise regarding the subject matter of the investigation and my oversight, including regarding the Holocaust. As noted above, the proposed order explicitly covers the investigation I am overseeing and includes a prohibition on SWC "assisting in promoting any public controversy" about the investigation. That language could be read to prevent SWC from providing any information to me that, should it end up in my final report, might be considered as

potentially "promoting public controversy" by UBS. Thus, even if, as UBS stated at the hearing, the order is not intended to silence SWC, the language is sufficiently suggestive that, without clarification, SWC could justifiably fear how the order would be interpreted in the future and decline to collaborate with my work.

That fear is just what Rabbi Abraham Cooper raised in his prepared testimony for the Committee. He explained that UBS's legal action has already had an impact on SWC's work, and SWC fears the order could prevent it from future research and investigation:

> As suggested by the court docket in *In re Holocaust Victims Asset Litigation*, SWC has been under an existential threat by UBS' efforts to twist the organizational endorsement into a cudgel against SWC for bringing these previously undisclosed facts and history to light. The action has interfered with the fulfillment of our non-profit mission. It has caused SWC to divert considerable programmatic resources to defend itself from the issuance of any federal district court order in the Eastern District of New York that could require SWC to cease all future research, investigation, and publication of any information on Swiss institutions' roles with the Nazis. […] This proposed order would permanently ban SWC from speaking publicly about Nazi funds and any topic that could include Swiss banks, the Holocaust, World War II, and even Jewish victims of the Nazis. (February 3, 2026 Testimony of Rabbi Cooper, page 8).

For that reason, I have asked UBS to formally clarify the extent of the order it seeks to confirm that SWC and other Jewish organizations are not prohibited from cooperating freely and without restriction with the investigation or my oversight of the investigation.

**11)  In your opinion, can UBS' proposed order be read to block SWC from providing investigatory information to you and your team?**

Yes. UBS has explained to me that its proposed order is not intended to have that effect, but I am concerned that, without clarification, the proposed order could be read to block SWC from providing information to me and my team, as noted above.

SWC's efforts prompted Credit Suisse to begin this investigation and SWC has been an essential partner from its inception. This has not been an accident. When Credit Suisse originally hired me, the Bank requested that I serve as a channel through which SWC could provide information to the investigation—information SWC had independently developed about Credit Suisse's Nazi-era ties that Credit Suisse itself wanted access to but could not obtain directly from SWC. Credit Suisse did so with full knowledge that any information SWC provided to me would be included in my public report. Since that time, as discussed in my February 2023 report, SWC has shared numerous investigative leads with my team that have led to the discovery of newly identified accounts at the Bank. Further, SWC has facilitated access to Argentine government archives and other sources of historical documentation.

If the proposed order is issued, I am concerned that SWC would curtail its communications with me out of fear of legal risk any time it communicated findings to my team that touched on Holocaust-era transactions, Nazi accounts, or ratline activity. Given that those subjects align with

the scope of my investigation, the proposed order could effectively prevent SWC from serving the role it has played throughout this investigation. If they are constrained from engaging with my team on those matters out of concern about running afoul of Judge Korman's order, that could impair my ability to complete a comprehensive final report.

Unfortunately, the record before Judge Korman could reinforce SWC's concerns that it could not share information with me. As noted in my testimony, the proceeding currently before Judge Korman was initiated as a letter from Credit Suisse to Judge Korman that made a number of false claims related to my oversight and specifically regarding SWC's interactions with me, including:

- Credit Suisse's letter claimed that a statement made by SWC to my team and included in my February 2023 report regarding Credit Suisse's decision to curtail its investigation and my oversight was a violation of the 1999 settlement agreement.

- Ira Forman, former U.S. Special Envoy to Monitor and Combat Antisemitism, currently serves as my advisor, but, prior to our termination he had been hired directly by Credit Suisse as an "Independent Advisor" to provide advice about, among other things, the "scope, methodology and approach of the investigation," as well as "political considerations," "insights and perspectives of the Jewish community," and to "carry out . . . communications . . . with the Simon Wiesenthal Center." Credit Suisse's letter claimed that advice given to Credit Suisse by Mr. Forman in December 2022 violated the 1999 settlement agreement by mischaracterizing his concerns about Credit Suisse's efforts to curtail the investigation and my oversight as threats made on behalf of SWC.

- Because neither Mr. Forman nor I are signatories to the settlement agreement, and are not bound by it, Credit Suisse's letter made the outlandish and false claims that we were "agents" of SWC, that Mr. Forman was a co-Ombudsperson instead of being an "Independent Advisor," and that SWC's communications with me "contravene the Center's obligations under the Settlement." Rather than retracting these false statements, the proposed order appears to incorporate them by falsely referring to the work of the "Ombudspersons," even though Mr. Forman has never served in that role.

In short, the factual basis for the proposed order contains false statements that characterized SWC's cooperation with me as violative of the 1999 Settlement Agreement, when, in reality, it was expressly invited by Credit Suisse itself.

Given this context, I am concerned that without clarification any such order could be read as blocking SWC from sharing information with my team.

I have told UBS that the statements made by Credit Suisse and UBS's current lawyers in its prior submissions to Judge Korman, as well as its reference to Ombudspersons in the proposed order, are false and should be corrected.

Senate Judiciary Committee
Hearing on
The Truth Revealed: Hidden Facts Regarding Nazis and Swiss Banks
February 3, 2026
Questions for the Record
Senator Amy Klobuchar

**For Neil Barofsky, Independent Ombudsman and Partner at Jenner & Block**

In your testimony, you discussed your work providing oversight of the investigation being undertaken "to assess and report on Credit Suisse's previously unreported relationships with the Nazis and their enablers, before, during, and immediately after World War II."

- **What remains to be done in the investigation? What are your responsibilities versus the responsibilities of the banks, and what is your expected timeline?**

As described in my written testimony, the investigation has two distinct components with separate responsibilities and timelines: the Bank's forensic investigation, conducted by AlixPartners at UBS's direction, and my independent oversight, testing, and reporting (*see* February 3, 2026 Testimony of Neil Barofsky, pages 7–8, A-1 through A-7).

**The Bank's Investigation:** UBS is responsible for directing and funding the forensic investigation into Credit Suisse's Nazi-era account relationships. As detailed in my written testimony, this work is being conducted at UBS's direction by the global consulting firm AlixPartners, which searches Credit Suisse's electronic and physical archives for names on the various search lists, analyzes the collected documents, and reaches conclusions about whether the evidence demonstrates that a particular individual or entity held an account at Credit Suisse (*see* February 3, 2026 Testimony of Neil Barofsky, pages A-1 through A-4). For each search name, independent of whether an account relationship was identified or not, AlixPartners prepares a case binder containing all relevant documents and evidence. AlixPartners is scheduled to produce more than 1,000 final case binders to my team in the coming months. As stated in my written testimony, UBS has estimated that it would complete its investigative work by approximately July 31, 2026 (*see* February 3, 2026 Testimony of Neil Barofsky, page 2), although more recently it has suggested that its production of case binders may extend beyond that date.

The remaining investigative work, as summarized in my written testimony, includes without limitation finalizing account relationship determinations across all search lists and categories; completing the digitization and incorporation of archival materials that have been identified but not yet fully processed, including materials from the Legal Department, committee minutes, and targeted predecessor entity archives; and completing the review of newly discovered evidence, including regarding Credit Suisse's relationships with the SS, the Argentine ratline, and forced transfers of Jewish assets (*see* February 3, 2026 Testimony of Neil Barofsky, pages 5–7, 51–52, A-9, A-10). The investigation is also continuing to examine the areas listed in Section II.D of my written testimony, including accounts related to aryanization of Jewish businesses, the rise of the Nazis, companies using forced labor, high-ranking Nazi individuals, war profiteers, looters of Jewish assets, and intermediaries (*see* February 3, 2026 Testimony of Neil Barofsky, pages 51–52).

**My Oversight:** As described in my written testimony, my role as Independent Ombudsperson includes my obligation to review, assess, monitor, and test the work performed by UBS and AlixPartners, and to assess whether the investigation includes all reasonably available relevant databases and repositories (*see* February 3, 2026 Testimony of Neil Barofsky pages 5–7, 10–11, A-1, A-2). In most instances, I do not conduct the forensic investigation myself; rather, I provide input and recommendations on its scope, methodology, and approach, and I independently verify the thoroughness and accuracy of the Bank's work. As detailed in my written testimony, my team includes independent forensic financial analysts, a team of historians with decades of relevant experience, former U.S. Special Envoy to Monitor and Combat Antisemitism Ira Forman, and Swiss legal counsel (*see* February 3, 2026 Testimony of Neil Barofsky, pages 13–14).

After UBS completes its investigation and provides my team with all relevant documents and final case binders, I will need several additional months to complete my testing and to draft my final report. If UBS is able to complete its investigation by the end of July 2026, with a timely rolling production of materials between now and then, I expect to submit my final report by the end of 2026. If it cannot, that may impact the expected completion date of my final report. As stated in my written testimony, that report will include all relevant details, including the names of account holders, transaction information, and the sources upon which I rely, and I will provide it to UBS in Switzerland (*see* February 3, 2026 Testimony of Neil Barofsky, page 7).

UBS has shared with me its current planning for the final report. UBS confirmed it will transmit my final report to the Committee in a manner it believes is consistent with Swiss law.

**Risks to the Timeline.** It is important to emphasize that the timeline for completing the investigation is driven by the Bank and AlixPartners, not by me and my team. My role is to oversee, test, and report on the Bank's work, not to direct the pace at which that work is conducted. My primary objective is for the Bank and AlixPartners to be thorough and complete in their forensic review. I would not want the investigation to be rushed at the expense of accuracy or comprehensiveness, nor would it serve the interests of accountability and historical truth to do so. My team is working on drafts of the final report in parallel with the Bank's ongoing work, but the report must be informed by the final results of the investigation as delivered to me by AlixPartners. If UBS and AlixPartners do not complete their work and deliver all final case binders on a rolling basis with completion by July 31, 2026, my report will necessarily be delayed as well.

In addition, as detailed in my written testimony, UBS's decision to institute a privilege review and withhold relevant documents from my team risks delaying the completion of the investigation and my report, as it adds processing time and may require additional testing to assess the impact of any gaps (*see* February 3, 2026 Testimony of Neil Barofsky, pages A-12 through A-17). As I stated in my written testimony, I strongly urge UBS to continue dedicating the necessary resources to maintain the anticipated timeline, to restore my team's unfettered access to all relevant documents, and to withdraw its remaining scope objections so that the investigation and my oversight can be completed as planned.

# EXHIBIT 3



Neil Barofsky

December 17, 2024

**VIA ELECTRONIC MAIL**

The Honorable Senator Sheldon Whitehouse
Chairman
Committee on the Budget
U.S. Senate
Washington, DC 20510

The Honorable Senator Chuck Grassley
Ranking Member
Committee on the Budget
U.S. Senate
Washington, DC 20510

Re:     **Oversight of Credit Suisse Investigation of Nazi Ties**

Dear Chairman Whitehouse and Ranking Member Grassley:

I write in response to your December 9, 2024 letter requesting an update on the status of my oversight of an investigation (the "Investigation") by Credit Suisse AG ("Credit Suisse" or the "Bank")[1] into its historic servicing of previously undisclosed Nazi-linked accounts.

### 1.    Background

As you know, I was retained by Credit Suisse in June 2021 as an "Independent Ombudsperson." Along with my team, my role was to provide independent oversight of the Investigation, which Credit Suisse had initiated voluntarily after the Simon Wiesenthal Center ("SWC") raised allegations about the existence of previously undisclosed relationships between Credit Suisse and Nazi and Nazi-related account holders before, during, and after World War II. Although the Bank sought out and initially cooperated with our oversight, that cooperation ended in the summer of 2022, after Credit Suisse replaced its General Counsel. Following demands by the Bank that we exclude from our oversight many of the subject areas discussed below, which we refused to do, we were fired by Credit Suisse in December 2022.

In February 2023, we prepared a report of our findings and submitted it to Credit Suisse (the "February 2023 Report"), as required by the terms of our original engagement agreement. We

---

[1] Note that throughout this letter, we use "Credit Suisse" or "the Bank" to refer to Credit Suisse as well as predecessor banks and entities acquired by Credit Suisse over the years, some of which were acquired after World War II.

then produced the February 2023 Report to the United States Senate Committee on the Budget (the "Committee") on March 16, 2023, in response to a subpoena issued by the Committee.

In June 2023, after UBS AG ("UBS") completed its acquisition of Credit Suisse, it replaced Credit Suisse's General Counsel again, and in December 2023, the new Acting Credit Suisse General Counsel decided to reinstate me in my role as Independent Ombudsperson, restoring my full oversight of the Investigation. Since then, as my team carried out our oversight responsibilities, we have regularly met with Committee staff to keep them abreast of the status of our work.

The information in this letter responds to the Committee's questions and otherwise summarizes the progress we have made since being reinstated approximately one year ago. We must caveat that because the Investigation is ongoing, this summary is subject to change pending completion of the work. Additionally, as noted below, due to the Bank's view of the applicability of Swiss banking secrecy law to this matter, we do not identify any account holders in this letter; instead, we have provided the information that you have requested on an anonymized basis.

## 2. Bank Cooperation[2]

At the outset, we want to stress the extraordinary level of cooperation that Credit Suisse, under the leadership of UBS, has provided since we were reinstated. We would not have been able to obtain the information detailed below absent such cooperation. Under UBS's direction, Credit Suisse has dedicated significant resources to the Investigation. According to UBS, it has more than 50 people working on the Investigation, including its team of consultants and forensic accountants. It more than doubled the staff otherwise working in the Bank's archives to facilitate faster processing of requests for archival documents and hired vendors to expedite the work of scanning and indexing archival documents. Notably, the Bank dedicated resources to overcoming technical and practical hurdles related to these archival documents, such as obtaining specialized equipment to scan aging records from the 1930s and 40s.

Under UBS's direction, Credit Suisse also has provided resources for my team,[3] including the funding of our own forensic accountants to evaluate the Bank's work. In addition, Credit Suisse has funded our retention of subject-matter experts to provide critical support to the Investigation and our oversight. These individuals include historians with decades of experience studying the

---

[2] This section addresses the Committee's request for "[a]n update on the status of [our] communications and collaboration with UBS, Credit Suisse staff, and other parties whose cooperation is required […] to complete [our] work." *See* Dec. 9, 2024 Letter, at 2.

[3] My team also includes Ira N. Forman, the former U.S. Special Envoy for Monitoring and Combating Anti-Semitism. Among other tasks, Mr. Forman provides advice on insights and perspectives of the Jewish community and historical background on relevant topics.

financial relationships between Nazi Germany and the Swiss banks, and experts on the flight of Nazi perpetrators following World War II.

Credit Suisse also has provided my team with full access to the Bank's private archives, which typically are not available to outsiders. Based on the work being done in the archives, my team has made and overseen significant discoveries and has identified previously undiscovered banking relationships, as noted below. With the Bank's support, my team also has conducted additional archival research in Europe, South America, and the United States to contextualize the information regarding these newly discovered Bank client relationships. Similarly, the Bank has incorporated additional public and corporate archives in its own research to ensure the Investigation is thorough.

### 3. SWC[4]

My team works in close cooperation with SWC, which has continued to conduct its own investigation into Credit Suisse's role in providing banking services to Nazis. SWC has provided us with evidence and information to support additional areas of inquiry, including the names of Nazi-related individuals and entities that SWC said had ties to Credit Suisse. Moreover, SWC has allowed us to incorporate the fruits of its investigation into our work, and SWC contributes as a thought partner for key decisions related to our oversight of the Investigation.

SWC's cooperation has been invaluable to the progress of the Investigation and our oversight, and the results to date could not have been achieved without SWC's involvement and cooperation.

### 4. Scope of Review of the Bank's Files[5]

We have taken to heart the Committee's directive "to ensure […] a clear-eyed and historically complete review that leaves no stone unturned."[6]

#### A. Archival Work

My team has worked closely with Credit Suisse to ensure that all relevant parts of its archives that remain are incorporated into its review. This is an enormous undertaking. The Credit

---

[4] This section addresses the Committee's request for "[a]n update on the status of [our] communications with the Simon Wiesenthal Center (SWC) to ensure that their leads and concerns are addressed during the ongoing work." *See* Dec. 9, 2024 Letter, at 2.

[5] This section addresses the Committee's request for a summary of measures taken to ensure that the Investigation "leaves no stone unturned." *See* Dec. 9, 2024 Letter, at 1.

[6] *Id.*; *see also* Committee Press Release August 17, 2023, available at https://www.budget.senate.gov/chairman/newsroom/press/credit-suisse-failed-to-fully-investigate-nazi-linked-accounts-full-report-confirms; Committee Press Release December 5, 2023, available at https://www.budget.senate.gov/chairman/newsroom/press/credit-suisse-reinstates-independent-ombudsperson-to-review-nazi-linked-accounts-as-a-result-of-budget-committee-investigation-.

Suisse archives are an amalgamation of archives from various predecessor banks that Credit Suisse has acquired over the last century. The archives span approximately 300,000 linear meters of archival shelving, including records from different time periods and predecessor banks, kept in a variety of different storage and file systems.

As we described in our February 2023 Report, although prior investigations using Credit Suisse's archives made significant findings that contributed to the historical record, they were not tasked with and did not review every potentially relevant component of those archives. Moreover, they faced their own time pressures to complete their work. As a result, an important priority for my team has been identifying and working with the Bank to make sure that sections of the archives that may not have been systematically reviewed in the past are examined and tested for relevancy.

In some cases, our oversight work has identified the need to more comprehensively review documents from particular Credit Suisse predecessor banks and entities that are known to have serviced accounts for Nazi perpetrators and to have participated in activities that looted funds from Nazi victims—such as Bank Leu, Bank in Zurich, and Fides (a trust and fiduciary company majority-owned by a Credit Suisse predecessor at the time). In other cases, such as in the example discussed below, we have focused on the need to include documents more comprehensively from particular departments at Credit Suisse.

### B.     Incorporation of New Archival Material

One recent discovery of documents resulting from our testing of the completeness of prior archival reviews is especially noteworthy. The work overseen by my team led to the identification of approximately 3,600 boxes of physical documents (approximately 400 linear meters of archival cabinets) and approximately 40,000 microfilms. The files came from a research department at Credit Suisse known as the "Inf Department." This department collected internal bank information as well as newspaper articles and other public information akin to "Know Your Customer" information about some Bank clients, as well as other individuals and entities, including during World War II. Although some portions of this archive were included in prior reviews, the Inf Department files as a whole were not previously scanned, indexed, or otherwise systematically incorporated into those reviews.

A "pilot" review of Inf Department files has shown that they contain content that is potentially highly probative for the Investigation and our oversight. To test the relevance of these archive materials, Credit Suisse's consultants manually searched for matches of a sample of 99 Nazis and Nazi affiliates. That search identified 23 documents relating to 13 of the names searched, a significantly high relevance rate that we and the Bank have determined warrants a complete scanning and indexing of the files contained in these boxes. Moreover, our preliminary review of a sample of documents from the Inf Department files indicates their potential importance. For example, numerous client files in the sample are marked with a stamp stating "Amerikanische schwarze Liste"—meaning "American Black List"—a list maintained by the Allies of individuals and companies that were directly financed by, or were known to regularly

trade with, Axis powers. Notably, we have not seen this stamp in our review of other archival documents outside of the Inf Department.



This is potentially an important marker for relevant accounts. One file bearing this stamp relates to an entity that was involved in selling looted Jewish assets. Although the Investigation previously had indicated that this entity held an account in the 1950s, the Inf Department documents demonstrate that the account was actually open during World War II, when assets were actively being looted. Another relevant example found in the Inf Department archives is a document that identifies a Credit Suisse client acting as a "front" for certain Nazi financiers, at least one of whom, according to our research, escaped Europe after the war. It appears that neither of these documents were previously identified by Credit Suisse.

5.　　**Timing**[7]

Credit Suisse currently estimates that it will complete the Investigation in September 2025. At that point, we will finalize any remaining testing and prepare a report of our findings, which we anticipate requiring several months.

A.　　**Timeline for the Investigation**

As discussed in detail above, the timeline for the Investigation is driven by several factors, including: the size of the Bank's archives and our efforts to ensure that all material records are reviewed, including those not previously identified; the identification of previously unreviewed documents by our testing (*i.e.*, the identification of the approximately 3,600 boxes from the Inf Department noted above); the need to scan, index, and review those files; the difficulties of working with paper documents from the 1930s and 40s; and the reliance on a limited team of trained archivists to respond to requests to retrieve physical documents contained in the Bank's archives. In that regard, we are in the process of completing our work to analyze the Bank's archive plan to identify additional sources of potentially relevant material, and that process may result in the need for further review that could impact the timeline.

The Investigation's timeline is also driven by the complexity of analyzing relevant files. A significant amount of the analysis remaining to be completed by the Bank concerns Nazi

---

[7] This section addresses the Committee's questions regarding the timeline of Credit Suisse's investigation and our oversight work, as well as potential factors that could cause delays, and actions taken to mitigate the risks of further delay. *See* Dec. 9, 2024 Letter, at 1.

"intermediaries"—*i.e.*, individuals or entities that facilitated the movement, transfer, or concealment of funds, assets, or looted property for the benefit of Nazis or Nazi affiliates. As we have found to date, the work of identifying intermediaries and determining whether their activity was for the benefit of a Nazi or Nazi affiliate is inherently challenging—by design, intermediaries were used to cloak the true beneficiaries of such transactions. Indeed, in the 1990s, the Independent Committee of Eminent Persons (the "Volcker Commission")[8] opted not to conduct a systematic review of a list of approximately 4,000 potential intermediaries it collected because it determined that tracing the accounts to their beneficial owners would prove too complicated. Thus, completing this review will be an important means of contributing to the historical record, which is why it was a key recommendation of our February 2023 Report. This component of the investigation has already begun to bear fruit with the identification of previously undiscovered connections and relationships between Credit Suisse and prominent Nazis through intermediaries. I credit the Bank with pursuing a full investigation of this category of account holders, consistent with the Committee's direction, and recognize that this complex work takes time.

Under UBS's direction, Credit Suisse has taken various steps to help accelerate the Investigation and reduce the risk that the timeline will be further extended. It has committed to addressing each element of the archival document research process, which is the key driver of the Investigation's timing. As noted above, the Bank has already more than doubled its archival staff, who are working six days a week. The Bank is working on retaining two to five additional archival staff, the maximum number of workers that the archival space can facilitate efficiently. Additionally, as mentioned above, the Bank has retained two outside vendors to scan and index the newly discovered documents and microfilms. The vendors, in turn, have expanded their teams significantly at the Bank's request (one vendor tripled the size of its staff; a second vendor imported specialized equipment and its staff works six days a week for twelve hours a day). Moreover, the Bank is prioritizing archival reviews so that the most work-intensive cases are delivered to my team for testing as soon as possible.

## B.     Testing and Reporting

After the archival work is complete and Credit Suisse has concluded its own review, we will need to complete our testing of the Bank's work. It is possible that—as with the Inf Department—our testing may identify additional sources of material that will need to be incorporated into the Investigation.[9]

As we conduct our testing, we will draft a report detailing our findings. Once complete, the draft report will be delivered to Credit Suisse in Switzerland. We expect the Bank will ask us to prepare two versions of our report. One version will contain all relevant names (the "Final Report")

---

[8] The Volcker Commission was established in 1996 by a memorandum of understanding between the World Jewish Restitution Organization, the World Jewish Congress, and the Swiss Bankers Association to identify dormant accounts of victims of Nazi persecution in the four major Swiss banks and to assess the banks' treatment of those accounts.

[9] To speed up my team's testing, I have directed them to work with the Bank's vendors to test the Bank's investigative work while it is ongoing—a process that led to the discovery of the Inf Department files.

and will likely not be made publicly available. The other version, which Credit Suisse would deliver to the Committee, will anonymize the names that the Bank chooses not to disclose based on its view of the applicability of Swiss banking secrecy law to the Final Report (the "Anonymized Report"). We expect that preparing the Final Report will take approximately three to four months, depending on, among other things, the pace of our testing and whether additional research is required. Although we will endeavor to prepare the Anonymized Report as efficiently as possible, based on our prior experience, we believe that it will likely add months to our report drafting timeline.

### 6.     Progress on Investigative Topics[10]

Under UBS's direction, Credit Suisse's cooperation has allowed my team to expand on the key findings detailed in our February 2023 Report.

Based on the work to date, the Investigation has identified several hundred accounts with potential Nazi connections that we are in the process of further investigating, including to determine which accounts were not identified previously, or were discovered previously but not disclosed by prior investigations. In response to your request for a summary of preliminary observations and findings, below are some examples of the progress achieved over the last year, which are a direct result of the Committee's oversight and UBS's commitment to add to the historical record.

### A.     The 1990s Investigations

The Committee requested an update regarding my team's "findings related to the previously undisclosed account at Credit Suisse's predecessor Schweizerische Kreditanstalt (SKA), which was apparently controlled by a senior officer of the Nazi Schutzstaffel (SS) whom the bank later described as a representative of Deutsche Wirtschaftsbetriebe GmbH 'DWB.'"[11] We included certain preliminary information on this topic in our February 2023 Report, and below is an update on that work.

As background, in 1997, a German author and a German journalist reported on documents written by the Nazi SS that had been found in the German Federal Archives indicating that the SS had a banking relationship with Credit Suisse. Those documents describe how three senior SS officers arranged for the opening of an account at Credit Suisse on behalf of DWB.[12] The documents further describe how this account was used to receive the funds of a Hungarian Jewish businessman, August Wild, and that the account holders were a combination of the SS officers and a Swiss citizen named Alfred Kurzmeyer, an intermediary for Nazis during the war. Additionally,

---

[10] This section addresses the Committee's request for a summary of preliminary observations and findings. *See* Dec. 9, 2024 Letter, at 2.

[11] S*ee* Dec. 9, 2024 Letter, at 2.

[12] DWB served as a holding company for numerous SS companies that had been entrusted with the economic exploitation of the Jews murdered by the Nazis.

according to the German author, the funds in the account were obtained from Wild in exchange for sparing him from the gas chambers.

In 2001, when drafting a report that covered Kurzmeyer, the Bergier Commission asked Credit Suisse if it had any additional information about "these events" (appending an excerpt from the German author's book and the German journalist's article).[13] The Bergier Commission asked a series of additional questions, including to what extent the links between Kurzmeyer and the Bank were documented, whether internal research was done at Credit Suisse in response to the journalist's article, and whether there was further information about the account of August Wild or the relationship between the Bank and DWB's parent entity, the SS's Main Economic and Administrative Office. In its request to Credit Suisse, the Bergier Commission specifically mentioned a letter between one of the SS officers and Kurzmeyer discussing the account. In response, the Bank told the Bergier Commission that "[t]here are no indications from the [Bank] documents that SKA entered into a business relationship with DWB during this time period."[14] Given Credit Suisse's response, the Bergier Commission concluded that the account described in the documents from the German Federal Archives likely existed but that Credit Suisse documents that would have confirmed its existence must have been destroyed.[15]

As we reported in our February 2023 Report, the investigation we were then overseeing identified an account "registry card" from the wartime period that included Kurzmeyer's name as well as the name of one of the three senior SS officials affiliated with DWB, a document that was consistent with what was described by the German author.[16] Prior to being terminated in 2022, we confirmed that a copy of the card was contained in the files of the team of Bank employees who conducted historical research in the Bank's archives in the 1990s and 2000s and who were responsible for drafting the response to the inquiry from the Bergier Commission noted above. As stated in our February 2023 Report, as a result of our termination, we were not able to investigate further why this card was not provided nor otherwise identified to the Bergier Commission, or whether there were other key Nazi or Nazi-related accounts that Credit Suisse found but did not disclose at the time.

Since our work resumed in December 2023, we have reopened our oversight and investigation of the circumstances surrounding Credit Suisse's 1990s investigation of this SS-related account registry card. At UBS's direction, Credit Suisse has facilitated my team's review of thousands of documents from the working files of the Bank's prior investigation and has arranged interviews with several former employees who worked on the project. Although that

---

[13] Letter from Bergier Commission to Credit Suisse, dated July 4, 2001.

[14] *Id*. at 87.

[15] Bergier Commission, Vol. 9, *Tarnung, Transfer, Transit. Die Schweiz als Drehscheibe verdeckter deutscher Operationen (1938–1952)* (2002), at 169.

[16] Report of the Independent Ombudsperson and Independent Advisor to Credit Suisse, dated February 15, 2023, at 123-126.

investigation is ongoing, and the results are tentative pending completion of our work, we can provide the following update on the facts we have developed:

- Following the publication of the 1997 article referenced above reporting on the SS account, the Bank initiated a search for documents indicating a relationship with either DWB or the SS officers referenced in the article, including the SS officer whose name ultimately appeared on the registry card alongside Kurzmeyer's. Witnesses who worked on the investigation in the 1990s recalled that the allegations were viewed as significant at the time and were a focus for the investigative team. Indeed, at the time, a lawyer for the Bank stressed to the Bank's team the importance of searching for these documents given the ongoing investigation by the United States Senate as well as lawsuits brought by Holocaust victims and their heirs against Credit Suisse and other Swiss banks.

- Documents indicate that the Bank's investigative team searched for documents related to Kurzmeyer, the relevant SS officers, and DWB several more times and reached the following results:

  o In 1998, a Bank memorandum detailed a "list of persons and companies for whom information [was] available." The list included the names of two of the SS officers reportedly affiliated with the DWB account, including the account holder. The memorandum advises that information on the individuals was "available by telephone if required." According to a witness, the memorandum called for information to be shared orally because it was very sensitive or unconfirmed.

  o In 1999, a researcher for the Bank wrote an email to some of the senior members of the team in which that researcher recalled: "I can remember a general registry card with a reference to [DWB]."

  o Also in 1999, a different researcher identified the registry card and included it in a collection of findings related to Kurzmeyer. According to a witness, these findings would have then been escalated to more senior members of the investigative team.

- Documents and witness testimony further indicate that Credit Suisse did not always share information that it knew with outside investigations such as the Volcker Commission and the Bergier Commission. For example, Credit Suisse's internal comments on a draft report by accountants working for the Volcker Commission on Kurzmeyer expressed that Credit Suisse knew of additional information not included in that report, including that Kurzmeyer

9

had a more significant role in moving capital and suspected dealings in Nazi gold than what was reported in the Volcker Commission draft. Credit Suisse's internal comment stated that the Volcker Commission accountants' report was "rather sanitized" and said it was "[b]est to leave [it] as is!"

More broadly, we also have been told that Credit Suisse's general approach to the outside investigations was to share only information that was specifically requested and not to offer additional information known to the Bank. One example we were given is that if the outside researchers were in the Bank's archives looking for something and a researcher knew where it was located, the researcher would not tell the outside investigator where to look unless specifically asked to do so. We were told a variety of reasons for this approach, including a desire to protect the Bank, a concern that the outside researchers were biased against the Bank, and a belief that outside researchers did not want assistance from Bank employees because the outside researchers wished to be strictly independent.

We are continuing to investigate the circumstances regarding why the Bank failed to disclose this documentation of its relationship with the SS officer to the Bergier Commission, as well as those surrounding several other accounts that were identified by Credit Suisse in the 1990s and appear not to have been disclosed.

## B. Ratlines[17]

The Investigation has identified client documents and other evidence that demonstrate a significant connection between Credit Suisse and one of the key routes, known as "ratlines," through which Nazis and their collaborators fled justice after World War II.

Based on results to date, the Investigation has identified Credit Suisse accounts for more than three dozen individuals connected to the ratlines. A cluster of these individuals were connected to a ratline that operated from a base in Switzerland and assisted hundreds of Nazis to flee after the war, including war criminals involved in the atrocities of the Holocaust. In addition to showing the significance of this ratline, our research has focused on the funds required to operate the ratline, including to pay for bribes, false identification documents, and transportation. These findings have been supported by the research of our experts, including the renowned ratlines expert and author Uki Goñi.

---

[17] This section addresses the Committee's request for information and specific examples related to, among other topics, the ratlines. *See* Dec. 9, 2024 Letter, at 2.

## C.    Other Account Holders[18]

As indicated above, the Investigation has identified scores of individuals and legal entities connected to Nazi atrocities whose relationships with Credit Suisse had either been previously unidentified, or for which the relationship had been partially identified but the full nature of the Bank's involvement has not yet been reported publicly. The Investigation has also identified accounts for several hundred alleged Nazi intermediaries who helped Nazis to hide gold, camouflage illicit transactions to purchase war materials, loot Jewish assets, including through the aryanization of Jewish businesses, and generally support the Nazi war economy. With respect to intermediaries, the identification of an account does not mean that the account was necessarily used for illegal or Nazi-related activities, and as indicated above, that question will be subject to further investigation.

Below is an anonymized list of just a few of the banking relationships the expanded investigation has uncovered to date that appear to have previously not been identified and fully and publicly disclosed, pending further investigation:

- A blacklisted Swiss lawyer who acted as an intermediary, known for specializing in cloaking transactions, held several accounts at Credit Suisse and Fides. Documents further show that the lawyer managed assets for a subsidiary of a notorious Nazi-owned industrial conglomerate.

- Individuals and financial institutions that were involved in the exploitation of Jews during the Nazi occupation of another country. For example, a Nazi who oversaw a bank that was used by the Nazis to loot assets from the local Jewish population had several accounts with Credit Suisse. Several of these accounts were opened shortly after the Nazis required Jewish citizens of that country to deposit their assets at that bank. The bank itself also had accounts at Credit Suisse.

- Nazi-affiliated banks that were involved in the theft of Jewish assets, including one bank that appears to have used its account at Credit Suisse to do so.

- A German manufacturer that relied extensively on concentration camp slave laborers held an account at Credit Suisse that was opened during the war.

- A Nazi-controlled entity that was effectively run by the SS opened an account with Credit Suisse during the war.

---

[18] This section addresses the Committee's request for information and specific examples related to, among other topics, "documents uncovered to date concerning individuals, legal entities, and intermediaries that in any way supported Nazis or Nazi activities." *See* Dec. 9, 2024 Letter, at 2.

- An entity involved in selling looted Jewish assets had an account at Credit Suisse that was open during the war (noted above).

- An intermediary who acted as a front for Nazis, including one who escaped Europe, had an account with Credit Suisse during the war.

Further work in each of these areas is ongoing.

\* \* \*

In closing, I would like to reiterate my deep appreciation to the Committee for its continued oversight, to SWC for its commitment to uncover the truth about this darkest chapter of human history, and to UBS for its extensive cooperation and dedication to supporting this important work.

Sincerely,

Neil Barofsky